**EXHIBIT A**

Westlaw.

factiva.

9/30/04 WASHPOST A04

Page 1

9/30/04 Wash. Post A04
2004 WL 93180167

The Washington Post
Copyright 2004, The Washington Post Co. All Rights Reserved

**Thursday, September 30, 2004**

A Section

Ex-Lobbyist Is Assailed at Hearing; Senators Say Pair Influenced Indian Tribes to
Bilk Them

Susan Schmidt
Washington Post Staff Writer

Former lobbyist **Jack Abramoff** and public relations executive Michael Scanlon
formed a secret partnership that corruptly influenced Indian tribal elections in
order to bilk tribes that operate gambling casinos out of more than $66 million in
fees, lawmakers charged yesterday during an unusual Senate committee hearing.
Abramoff, appearing under subpoena before the Senate Indian Affairs Committee,
endured blistering attacks from senator after senator, turning aside all questions
by invoking his Fifth Amendment right against self-incrimination. Scanlon dodged
U.S. marshals who attempted to serve him with a subpoena compelling him to appear,
according to Sen. John McCain (R-Ariz.), who with the panel's chairman, Sen. Ben
Nighthorse Campbell (R-Colo.), has been leading the seven-month investigation into
Abramoff's and Scanlon's activities.

Nighthorse Campbell said the documentary trail developed by the committee,
including the e-mails released yesterday, tell a story of unbounded greed. He said
he believes Abramoff privately showed bigotry and contempt for tribal officials
who were awarding him and Scanlon multimillion-dollar contracts, referring to them
as "idiots" and "troglodytes."

"Do you refer to all your clients as 'morons'?" he demanded of Abramoff. The
witness, flanked by lawyer Abbe D. Lowell, looked abashed but did not answer,
citing his right against self-incrimination.

Two tribal leaders, one from the Agua Caliente tribe in Palm Springs, Calif., the
other from the Saginaw Chippewa tribe in Michigan, testified about their futile
efforts to block their tribes from spending millions of dollars to hire Abramoff
and Scanlon. Agua Caliente Chairman Richard Milanovich said he has since learned
that Abramoff and Scanlon entered into "a secret cabal with certain tribal
members" to whom they provided "assistance" that is still being investigated.

Bernie Sprague, sub-chief of the Saginaw Chippewas, said that, in the fall of
2001, Abramoff and Scanlon "smeared the reputations of other candidates running
for Tribal Council" and got their hand-picked slate elected.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9/30/04 WASHPOST A04

The Senate committee has assembled hundreds of thousands of pages of documents about Abramoff and Scanlon's work with six tribes in various parts of the country. Records show that Scanlon and Abramoff each collected $21 million of the $66 million in fees paid to Scanlon's companies. On top of that, the tribes paid $16 million in lobbying fees to Greenberg Traurig, Abramoff's former lobbying firm, which typically charged them $150,000 to $175,000 a month.

"The documents show that **Jack Abramoff** systematically sought out impressionable tribal leaders and representatives, seduced them with promises of power and prestige, and helped them attain positions of power within their tribes," McCain said. "Once in power, their allies on the tribal council steered multimillion-dollar contracts to Mr. Abramoff's lobbying firm and Mr. Scanlon's PR company."

While "every kind of charlatan and every type of crook" has exploited American Indians since the sale of Manhattan island, McCain said, "what sets this tale apart, what makes it truly extraordinary, is the extent and degree of the apparent exploitation and deceit."

The activities of Abramoff, once a powerful lobbyist with extensive ties to Republican leaders, and Scanlon, a former spokesman for House Majority Leader Tom DeLay (R-Tex.), are also being investigated by a federal grand jury in Washington.

In a telephone interview last night, Scanlon said he did not appear before the committee because his attorneys and committee lawyers had not worked out the terms of the subpoena for his testimony. He said the claims about his manipulation of tribal elections were overblown. "What was alleged is that tribal elections were rigged. What the committee produced were talking points [for tribal candidates]," he said.

Lawmakers yesterday cited the pair's e-mail traffic, which the panel subpoenaed from Greenberg Traurig, where Abramoff was head of government relations until March, when he quit under pressure.

When Scanlon complained on March 5, 2003, about an Agua Caliente tribal member, Abramoff counseled: "I think the key thing to remember with all these clients is that they are annoying, but that the annoying losers are the only ones which have this kind of money and part with it so quickly."

Sen. Byron L. Dorgan (D-N.D.) strained to find words to describe the e-mails and other evidence, calling the two men's activities "a cesspool of greed, a disgusting pattern, certainly, of moral corruption, possibly of criminal corruption. . . . a pathetic, disgusting example of greed run amok."

"I think all of us know this is the most extraordinary pattern of abuse to come before this committee in the 18 years I've served here," said Sen. Kent Conrad (D-N.D.), who described the pair's conduct as "scuzzy" and "outrageous."

Lawmakers said the e-mails and other documents show that the two men spent tens of thousands of dollars on mailings and other materials for candidates in tribal elections. Individual tribes make their own rules governing outside influence on tribal elections. The National Indian Gaming Act bars the use of tribal funds to benefit individual candidates.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The e-mails show that just before the 2002 Agua Caliente tribal elections, Scanlon asked Abramoff: "How much do you want me to spend on the AC race -- I gotta get a team out there ASAP -- Then rotate a new team in after that -- So travel is gonna run about 20K and materials like 5-10K. Should we go for it?"

Abramoff replied: "Yes, go for it big time."

The panel subpoenaed Chris Petras, former legislative director of the Saginaw Chippewas, who was a liaison to Abramoff and Scanlon. Petras said that he could not recall any discussions about the pair becoming involved in tribal elections and that he was not convinced they had done anything wrong.

An e-mail from Abramoff to Scanlon in the fall of 2001 suggested otherwise. "I had dinner tonight with Chris Petras of Sag Chip. He was salivating at the $4-5 million program I described to him . . . He is going to come in after the primary with the guy who will be chief if they win (a big fan of ours already) and we are going to help him win. If he wins, they take over in January, and we have millions."

After the Saginaw Chippewa election, Scanlon congratulated his staff and Abramoff for the victory of seven of eight candidates running as "The Slate of Eight." "We had less than three weeks to take 8 guys who never met before and get them elected. It was a great plan, and great execution by a great team. . . . We now control 9 out of the 12 seats on the council . . . hopefully we will be doing some more work for the tribe in the near future."

E-mails in the winter of 2002 appear to show Abramoff attempting to drum up more business for Scanlon by stoking unwarranted fears about "racinos" legislation that could revive competition from the horse racing industry.

On Oct. 10, 2002, Scanlon sent Abramoff a news clipping about horse racing bills in the Michigan legislature, with the message: "Here we go! This could kill Saginaw!"

Abramoff responded: "Chris thinks this is not going anywhere. Can you call him and scare him?"

On Dec. 10, 2002, Abramoff appeared to do just that in an e-mail to Petras. "Chris, I am getting worried about this. Last night we opened Stacks [a Pennsylvania Avenue restaurant owned by Abramoff] and there were some WH guys there. . . . They told me that there is a hearing coming up on this immediately, and they have heard that this is going to happen!!! . . . where is Scanlon on this? . . . We need to get him firing missiles. How do we move it faster? Please get the council focused on this as soon as you can."

Abramoff sent a copy to Scanlon, who messaged back: "I love you."

---- INDEX REFERENCES ----

NEWS SUBJECT:     (Domestic Politics (GPOL); Political/General News (GCAT); Politics/International Relations (GPIR))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

Westlaw.

factiva.

11/8/04 WASHPOST A23

Page 1

11/8/04 Wash. Post A23
2004 WL 93190083

The Washington Post
Copyright 2004, The Washington Post Co. All Rights Reserved

Monday, November 8, 2004

A Section

Abramoff Allies Keeping Distance; Lobbyist Under Scrutiny for Dealings With
Indian Tribes [CORRECTED 29 NOV 2004]

Thomas B. Edsall
Washington Post Staff Writer

PUBLISHED CORRECTIONS: In a Nov. 8 article, the Business Roundtable and Humana
were incorrectly described as clients of Jack Abramoff, former lobbyist for the
firm of Greenberg Traurig LLP, in 2003. The firms are clients of Greenberg
Traurig. The error resulted from inaccurate information on a Web site operated by
the U.S. Senate that contains required disclosure reports submitted by registered
lobbyists. (Published 11/17/04)

Shortly after Republicans took control of Congress in 1994, tribal leaders of the
Mississippi Band of Choctaw Indians approached lobbyist Jack Abramoff with a
problem. The tribe's Silver Star Hotel & Casino had barely opened and already
legislation was moving forward in Congress calling for Indian casinos to be taxed
in the same manner as Las Vegas gambling facilities. Abramoff knew how to take
care of the Choctaws. He convinced the House Republican leadership that it had
violated a core principle of the new conservative majority: It had raised taxes.
The legislation was scuttled.

With Indian gambling revenue now exceeding $16 billion annually, Abramoff's
success saved the tribes hundreds of millions of dollars. Soon, he was
representing half a dozen other Indian tribes, some paying his firm $2 million or
more a year.

In less than a decade, Abramoff's ties to Republican congressional leaders and
powerbrokers in the conservative movement catapulted him into the highest ranks of
Washington lobbyists. By 2003, Abramoff's clients -- including the Business
Roundtable, Atofina Chemicals, Humana, Primedia Inc. and tribal clients -- paid
his law firm $11.57 million in fees, one of the highest such sums in Washington.

Paving the way for Abramoff's rise were his ties to House Majority Leader Tom
DeLay (R-Tex.), Americans for Tax Reform President Grover Norquist and former
Christian Coalition executive director Ralph Reed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/8/04 WASHPOST A23                                                    Page 2

Abramoff's success lay in his ability to portray clients as exemplars of successful free market competition under attack by overzealous Democrats. On behalf of Indian tribes and other clients, Abramoff convinced the GOP majority that Democrats were bent on regulating and taxing the entrepreneurial vitality out of the U.S. economy. In effect, he turned conservative orthodoxy into a cash spigot.

Rep. Dana Rohrabacher (R-Calif.), said Abramoff convinced him that "it was the conservatives who would be the saviors of the Indians by providing an environment where they could be self-sufficient and run their own affairs instead of being like inner-city welfare recipients."

Now, however, the $66 million that Abramoff and his business partner, public affairs consultant Michael Scanlon, charged Indian tribes has become the focus of separate investigations by a federal grand jury and Congress. The controversy has produced disclosures embarrassing to some of Abramoff's political allies.

Already, the inquiries have revealed that Abramoff and Scanlon -- DeLay's former spokesman -- channeled money to Reed and Norquist's organizations. Reed has been forced to explain receipt of money channeled from casinos through Abramoff; Norquist, in turn, has denied that the payments he received drove the pro-tribe agenda of Americans for Tax Reform.

Abramoff declined to be interviewed for this story. In an e-mailed response to questions from The Washington Post, Abramoff spokesman Peter G. Mirijanian said: "The current controversy has temporarily prevented him from engaging in the activism which animated his life and gave him fulfillment, and this pains him greatly."

Ideologue to Lobbyist

The 1994 Republican takeover of the House and Senate was a crucial moment in Abramoff's transformation from a conservative ideologue into an influential lobbyist. He became a valuable commodity, a conservative K Street figure with direct access to the newly powerful right wing of the Republican Party.

Abramoff, 46, grew up in Margate, N.J., and moved in his early teens to Beverly Hills, where his father was president of the Diners Club credit-card franchises. At Beverly Hills High, Abramoff was an all-conference football lineman and regional weightlifting champion. He graduated from Brandeis University in 1980 and later received a law degree from Georgetown.

Abramoff came to Washington in 1981 after becoming chairman of the College Republicans. The organization has produced some of the party's top operatives: Karl Rove, now President Bush's chief political adviser, was elected chairman in 1973. Lee Atwater, who went on to manage George H.W. Bush's successful 1988 presidential bid, ran southern operations for the Rove campaign.

In 1981, Norquist became Abramoff's executive director at the College Republicans. Reed signed on as an intern and took over as executive director in 1983.

While at the College Republicans, Abramoff, Norquist and Reed quickly earned reputations as zealots. Abramoff wrote in the 1983 annual report: "It is not our

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/8/04 WASHPOST A23

job to seek peaceful coexistence with the Left. Our job is to remove them from power permanently." The group's recruits were required to memorize a speech that included the lines: "Democrats are the enemy. Wade into them! Spill their blood!"

Two years later, Abramoff and Norquist took over Citizens for America, a conservative advocacy group created by drugstore magnate Lewis Lehrman. After the two arranged a costly "summit meeting" of anti-communist leaders in Angola, Lehrman, according to media accounts, let Abramoff and Norquist go.

In 1986, Abramoff became chairman of the International Freedom Foundation, which was secretly financed with $1.5 million a year from the white South African government, according to sworn testimony to the South African Truth and Reconciliation Commission. Mirijanian said Abramoff denies receiving money from the South African government.

Between 1986 and 1994, Abramoff was president of Regency Entertainment Group, a company that financed ideologically conservative movies, including the 1989 film "Red Scorpion."

Abramoff took a job as a Washington lobbyist for the firm Preston Gates Ellis & Rouvelas Meeds in 1994. In its hiring announcement, the firm said that Abramoff "maintains strong ties to Speaker Newt Gingrich, Majority Leader Dick Armey, Majority Whip Tom Delay and [House] Republican Policy Committee Chairman Chris Cox and their staffs."

Using His GOP Ties

Those ties brought the Choctaws to Abramoff. To win their battle, Abramoff sought out DeLay. The two had become friends and allies in the course of Abramoff's work for conservative causes, and Abramoff had supported DeLay's bid to become whip. Abramoff also turned to Norquist.

Norquist formed a coalition of anti-tax organizations to oppose the tax on Indian casino gambling. The coalition lobbied lawmakers, wrote letters and called editorial writers. The Washington Times, a conservative newspaper, ran an editorial declaring that "Republicans should not be in the business of increasing anybody's taxes" and should "jettison the House tax on Indian gambling."

The Choctaw began contributing hundreds of thousands of dollars to Americans for Tax Reform and similar groups. Norquist won't disclose how much, but Abramoff told the Wall Street Journal in 2000 that the Choctaw have given "several million dollars" to outside groups, and that Americans for Tax Reform was a leading recipient.

Abramoff convinced the House whip that not only did the proposal raise taxes, but also that Indian tribes could become Republican allies. Noting that some Indians were moving toward the GOP, DeLay said in 1995 that "people recognize that Jack Abramoff has been an important part of this transition."

Later, Abramoff brought in Reed, who was paid $4.2 million from 2001 to 2003 to mobilize Christians to oppose the plans of those threatening Abramoff's Indian gaming clients. In 2001, Abramoff left Preston Gates and joined the Miami-based law firm Greenberg Traurig LLP.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/8/04 WASHPOST A23                                            Page 4

In 1995, Abramoff took on another major client, the Commonwealth of the Northern
Mariana Islands, an American protectorate in the Pacific. Again, he capitalized on
his ability to exploit conservative ideology.

The Marianas sought to retain exemptions from U.S. immigration and labor laws to
import laborers from China at $3.05 an hour -- $2 under the federal minimum wage
-- to make garments labeled "Made in the U.S.A." Abramoff portrayed the Marianas
as a case study of the success of the free market unfettered by wage and
immigration laws.

DeLay became Abramoff's strongest ally, leading the fight against Democratic
efforts to impose wage, hour and immigration regulations on the protectorate. On a
trip to the Marianas, DeLay told officials, according to media accounts:

"When one of my closest and dearest friends, **Jack Abramoff**, your most able
representative in Washington, D.C., invited me to the islands, I wanted to see
firsthand the free-market success and the progress and reform you have made."

Now, however, DeLay and many of Abramoff's past friends and allies are keeping
their distance. DeLay's staff has issued a statement in his name declaring that
"if anybody is trading on my name to get clients or to make money, that is wrong
and they should stop it immediately."

In an e-mail, Mirijanian said that Abramoff "hopes that eventually his actions
will be seen in context and this difficult period will pass. When that happens, he
will assess how he can best serve the causes and community he cherishes."


                         ---- INDEX REFERENCES ----


NEWS SUBJECT:        (Domestic Politics (GPOL); Upper House (GVUPH);
Political/General News (GCAT); Politics/International Relations (GPIR); Government
Bodies (GVBOD); Legislative Branch (GVCNG); Corrected Items (NCRX); Content Types
(NCAT))


REGION:            (United States (USA); North American Countries (NAMZ))

Language:  EN

OTHER INDEXING:    NAT

EDITION:           FINAL

Word Count: 1533

11/8/04 WASHPOST A23

END OF DOCUMENT


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

OP group caught up in missing tribal contributions
Jon Kamman and Billy House
Copyright 2005 The Arizona Republic
Feb. 27, 2005 12:00 AM
Tracking what happened to $175,000 contributed by two Indian tribes to a political
group called CREA leads from a disgraced lobbyist to an elusive environmental
organization spawned by Gale Norton before she became secretary of the Interior.

The money, which the tribes say they contributed to the group at the direction of a
Washington, D.C., lobbyist now under federal investigation, is unaccounted for in
public records where federal regulations say it should be listed.

The absence of an accounting adds another layer to the mystery of what became of
more than two dozen contributions missing among $300,000 in checks issued by a
Texas tribe to 79 political committees selected by lobbyist Jack Abramoff.

CREA stands for Council of Republicans for Environmental Advocacy. According to its
filings with the Internal Revenue Service as a tax-exempt organization, it has
operated for more than four years without receiving any contributions or making any
expenditures.

The Coushatta Tribe of Louisiana said it issued checks for $50,000 to CREA in 2001
and $100,000 in 2002.

Also, the Tigua Indians, whose Ysleta del Sur Pueblo adjoins El Paso, said they
issued a $25,000 check to CREA in 2002 and included it in a bundle of other
political contributions they sent to Abramoff to distribute. Tribal Lt. Gov. Carlos
Hisa said the check was cashed, but he would not disclose how it was endorsed.

CREA President Italia Federici would not say whether the tribal funds or any other
contributions were received.

"It is the policy of CREA that we do not identify or discuss our contributors," she
said in an e-mail.

The Tiguas' contributions, mostly to the campaign funds or political action
committees of members of Congress, were aimed at winning support for legislation
that would allow the tribe to reopen its casino, which had been closed by state
authorities after protracted litigation over the legality of reservation gambling

02/28/2005

in Texas.

Roy Fletcher, a spokesman for the Coushattas, said changes in tribal leadership
made it unclear why an earlier administration had agreed to contribute to CREA.

Fletcher said current tribal leaders were not aware until The Republic's inquiry
that the tribe had sent a total of $150,000. He said the tribe is looking into how
the checks were endorsed.

In searches of public records where recipients are required to disclose finances,
The Republic found no accounting for approximately $220,000 in contributions from
the two tribes. The amount consists of $175,000 directed to CREA and $45,000 to
other political committees.

CREA's origins date to about 1997, when Norton, then attorney general of Colorado,
organized it with the name "coalition" rather than "council." Federici had been
involved in Norton's 1996 campaign for the U.S. Senate, according to news reports
at the time.

A spokesman for Norton said the Interior secretary has not been involved with CREA
since joining President Bush's Cabinet in 2001.

Norton's leadership of the earlier incarnation of the group became an issue in her
Senate confirmation hearing because other conservationist groups had branded CREA a
front for the interests of oil, mining, chemical and pollution-risk industries.

How and why Abramoff expected at least two, and possibly three, tribes to benefit
from making five- and six-figure contributions to an environmental group remains
unexplained.

Evidence shows that Abramoff inquired in early 2002 whether a third tribe, the
Saginaw Chippewas of Michigan, had approved a $30,000 request for CREA. The tribe
did not respond to the newspaper's questions on whether the money was given.

CREA has two staffers, a mailbox, a Web site and a telephone answering machine. Its
most recent listing of its place of business, an address in the Georgetown area of
Washington, D.C., is no longer valid.

Through a spokesman, Abramoff's attorney issued a statement responding to other
questions involving tribal contributions, but answered inquiries about CREA with
"no comment."

Federici, communicating only by e-mail, said Abramoff "did not, and does not, hold
a position within CREA."

Federici insisted on an "off-the-record" briefing with the newspaper before
deciding whether to be interviewed on the record. The Republic declined, instead
seeking answers for publication.

In an e-mail, Federici expressed concerns over the newspaper's "misperceptions"
about CREA, noting that a recent New York Times story referred to CREA as "a
partisan organization that supports a balanced approach to improving the
environment."

She said CREA conducts "considerable grass-roots lobbying efforts" and praised
CREA's seven-member advisory board as "highly respected environmentalists."

Trying to track the political contributions by the tribes is part of a wider
investigation of Abramoff and public relations consultant Michael Scanlon that is
being conducted by the FBI, the IRS, Norton's Interior Department, other federal

agencies and the Senate Indian Affairs Committee, chaired by Sen. John McCain, R-Ariz.

A grand jury reportedly is looking into Abramoff's and Scanlon's dealings with six tribes that paid them $82 million over several years.

"I think we're a long way from done on this one," McCain said Friday.

"Primarily, we're looking at what happened to all of the money," he said. Part of the inquiry, he added, is focusing on the political contributions.

"The Federal Election Commission (which regulates campaign finances) is looking at it, too," he said.

Two hearings were held last fall on the lobbying scandal. A third is about a month away, he said.

Federal tax code requires so-called 527 political advocacy groups such as CREA to file public disclosures with the Internal Revenue Service if they receive contributions totaling $25,000 or more in one year. Failure to do so is punishable by taxation of the amounts at the highest business rate, 35 percent, and possible daily fines.

Federici did not respond to questions about why most of CREA's reports to the IRS have been submitted under the name "Renew Our Urban Centers Fund."

In connection with the Tigua tribe's political contributions, a spokesman for Abramoff's attorney Abbe Lowell said in a statement, "While Mr. Abramoff solicited contributions, he was not the person to process them and believed they were handled properly at all times.

"It is easy for people to now blame Mr. Abramoff for every problem or issue since the media spotlight has turned on him, but on this one the ultimate use of those funds can only be answered by the recipient organization or entity, not by Mr. Abramoff," the statement continued.

"He simply has no knowledge of any recipient of tribal political contributions that failed to receive their contributions."

Among the Tigua contributions unaccounted for are $2,000 intended for U.S. Sen. Jon Kyl's campaign fund and $1,000 for U.S. Rep. John Shadegg's committee. The two Arizona Republicans said they would have logged such contributions if the checks had been received.

Two top leaders of the House, Majority Leader Tom DeLay, R-Texas, and GOP Whip Roy Blunt, R-Mo., also said through spokesmen that they found no record of receiving Tigua checks made out to their political action committees. DeLay's office said he received a check for his campaign fund but returned it.

Senate hearings last fall exposed what senators called deceitful practices by Abramoff and Scanlon in their dealings with tribes. The pair secretly split profits, backed candidates in tribal elections who would give them multimillion-dollar contracts, and did not reveal to the Tiguas that they had worked behind the scenes for closure of the tribe's casino before obtaining a $4.2 million contract to press for its reopening.

In recent developments, the Coushattas, who operate a resort casino at Kinder, La., and were the most lucrative account for Abramoff and Scanlon, have filed suit in state court for recovery of $32 million they paid the pair.

The Tiguas reached an out-of-court settlement this month with Abramoff's former employer, the Greenberg Traurig law firm of Miami. No amount was disclosed.

Efforts by Abramoff to quietly shepherd legislation through Congress for the Tiguas failed, but not before the principal backer of the measure, GOP Rep. Bob Ney of Ohio, was given $33,000 in political contributions by the Tiguas and taken by Abramoff and Scanlon on a chartered, $150,000 golfing trip to St. Andrews, Scotland.

Reach the reporter at jon.kamman@arizonarepublic.com <mailto:jon.kamman@arizonarepublic.com> or (602) 444-4816.

# EXHIBIT D

Westlaw.

factiva.

11/17/04 CONGTMY (No Page)                                          Page 1

11/17/04 Cong. Testimony (Page Number Unavailable Online)
2004 WL 84559488

Congressional Testimony by Federal Document Clearing House
(c) 2004 CQ Transcriptions, Inc. All Rights Reserved.

**Wednesday, November 17, 2004**

LOBBYING BY INDIAN TRIBES - JOHN MCCAIN

Statement of Senator John McCain  Committee on Senate Indian Affairs

Oversight Hearing on Lobbying Practices Involving Indian Tribes

November 17, 2004

"Is life great or what!!!" exclaimed **Jack Abramoff** in an e-mail to his friend and
business partner Michael Scanlon on February 19, 2002. Few would have quibbled
with Mr. Abramoff at the time. As we learned during the Committee's September 29
th hearing, the two men shared a secret partnership that connived to collect at
least $66 million from six American Indian tribes across the nation.

When Mr. Abramoff sent his February 19 th e-mail, he had already received
approximately $3 million from Mr. Scanlon's companies. Over the next couple years,
he would receive almost $18 million more. The two, however, kept their partnership
hidden from the tribes and hidden from the world. For these two men it was
seemingly all about the money. In February 2002, the money flowed; so, life was
indeed great for **Jack Abramoff** and Michael Scanlon.

At the same time, life was not so good for the Ysleta del Sur Pueblo of El Paso,
Texas. Also known as the Tigua, the Tribe was fighting for its financial life in
the Texas courts and state legislature. According to a September 26, 2004 article
in The Washington Post, the State of Texas had sought a judicial order closing the
Tribe's Speaking Rock Casino. The Post article also reported in some detail how
Mr. Abramoff and Mr. Scanlon had worked behind the scenes to support Texas's
efforts to close the casino. They had participated in a grassroots and public
relations campaign that was designed, in part, to lend political cover to Texas's
legal efforts. Evidence suggests that Mr. Abramoff and Mr. Scanlon also worked
behind the scenes in Texas to quash the Tigua's attempts at a legislative
solution. In an internal e-mail, Mr. Abramoff boasted to a colleague in 2003:

A bill is moving (HB809) in the Texas state house which will enable the Indians in
Texas to have totally unregulated casinos. It passed out of the House Criminal
Jurisprudence Committee by a 6-2 vote. The current Republican Speaker Tom Craddick
is a strong supporter. Last year we stopped this bill after it passed the house
using the Lt. Governor (Bill ratcliff) to prevent it from being scheduled in the
state senate. Former Texas Lt. Governor Ratliff did refuse to schedule the
legislation for a floor vote, the state's legal efforts were successful, and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tigua closed its casino on February 12, 2002.

It was a low point for the Tribe. According to tribal representatives, the revenue generated from the Speaking Rock Casino had helped the tribe lift its members out of poverty, had enabled the Tribe to provide education for its children and health care for its elders, and had given them hope where there was none before. The closure of the casino, according to the Tribe, threatened the promise of a new and better tomorrow for future generations.

In the Tigua's desperation and despair, Mr. Abramoff and Mr. Scanlon found opportunity and hope, not for the Tribe, but for themselves. In the Tribe's misery **Jack Abramoff** and Michael Scanlon saw money. "I'm on the phone with Tigua! Fire up the jet baby, we're going to El Paso!!" wrote **Jack Abramoff** in a February 6, 2002 e-mail. Responding, Michael Scanlon summarized their objective: "I want all their MONEY!!!"

When Mr. Abramoff and Mr. Scanlon approached the Tribe, they painted themselves as sympathetic to the Tribe's plight. In a February 18, 2002 e-mail to Tribal consultant Marc Schwartz, which we have blown up onto a poster board, Mr. Abramoff wrote: Our motivations for this representation are manifold, including the critical importance of not allowing tribal sovereignty to be eroded by the actions of the State of Texas. While we are Republicans, and normally want all Republicans to prevail in electoral challenges, this ill advised decision on the part of the Republican leadership in Texas must not stand, and we intend to right this using, in part, Republican leaders from Washington.

Mr. Abramoff downplayed his primary motivation by writing that "it would be insincere of me to not note that our other motivations include the hope and expectation that, if we succeed, we can expect to have a long term relationship with the tribe by representing their interests on the federal level.".Page 3 of 7 Mr. Abramoff's statement was the height of hypocrisy, the pinnacle of deception. The very injustice he decried, he and Mr. Scanlon had helped to create. With a straight face and without expressed remorse, **Jack Abramoff** and Michael Scanlon solicited the Tribe to retain them to help reopen the Tribe's casino. According to witnesses interviewed by my investigators, neither Mr. Abramoff nor

Mr. Scanlon ever disclosed their role in the lobbying and public relations campaigns waged to close the same Tigua casino. They certainly never disclosed the lucrative partnership they shared. Their duplicity was pervasive. At the same moment they solicited the Tribe, **Jack Abramoff** wrote "I wish those moronic Tiguas were smarter in their political contributions. I'd love us to get our mitts on that moolah!!" That's exactly what **Jack Abramoff** and Michael Scanlon set out to do. The very next day, on February 12, 2002, they traveled by private jet to the Tigua reservation in El Paso. There, they made their pitch.

According to witnesses at that meeting, **Jack Abramoff** offered to help the Tribe for free. He would later repeat that promise in his February 18 e-mail to Mr. Schwartz. But, Mr. Abramoff insisted that the Tribe had to retain Michael Scanlon for the effort to be successful. **Jack Abramoff** claimed that Michael Scanlon was the preeminent expert in grassroots lobbying. Michael Scanlon wasn't cheap, Mr. Abramoff told the Tribe, but he was the best there was in the business. Mr. Scanlon's asking price: $5.4 million. Of course, from the last hearing we know that when Mr. Abramoff advocated Mr. Scanlon's interests, he was advocating his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

own financial interests. Make no mistake: **Jack Abramoff** was not going to work for free.

On February 18, 2002, **Jack Abramoff** submitted to the Tribe a document entitled "Operation Open Doors", a proposal prepared by Michael Scanlon. Mr. Abramoff endorsed the proposal wholeheartedly: "The proposal Mike Scanlon has prepared is, in our view, the best chance the tribe has to overcome the gross indignity perpetuated by the Texas state authorities." Operation Open Doors supposedly entailed a massive undertaking fueled by a nation-wide political operation. This political operation will result in a Majority of both federal chambers either becoming close friends of the tribe or fearing the tribe in a very short period of time. . . Simply put, you need 218 friends in the U.S. House and 51 Senators on your side very quickly, and we will do that through both love and fear. Scanlon said his firm promised to build two customized databases for the Tribe, conduct numerous polls, and wage a grassroots and grasstops campaign.

While he did not guarantee success, Mr. Scanlon wrote "under no circumstances do we believe it could be classified as high risk either." Mr. Scanlon's promises have so far proven empty. Witnesses interviewed by my staff have confirmed that the database was not customized. Scanlon Gould did not even construct it; they sub-contracted out the work for less than $100,000, a small sum that pales in comparison to the $1.8 million he charged the Tribe for it. And, it seems Scanlon Gould failed to provide the vast majority of services to implement the "massive undertaking" the Tribe was told would occur. On February 19, 2002, El Paso Times newspaper reported that the Tribe had to lay off 450 employees as a result of shutting down its casino. It was not enough the two men sought to capitalize on the Tribe's plight, they actually reveled in it.

Mr. Scanlon forwarded the article to Mr. Abramoff advising him "this is on the front page of todays paper while they will be voting on our plan!" It was in response to Mr. Scanlon that Mr. Abramoff dashed off his "Is life great or what?" e-mail. **Jack Abramoff** and Michael Scanlon smelled money. In fact, nineteen minutes later, Mr. Abramoff e-mailed Mr. Scanlon again: "1 hour 45 minutes and counting my friend." The Tribal Council ultimately decided to move forward with the plan, believing Mr. Abramoff's representation that he already had "a couple of Senators willing to ram this through initially."

Key to Mr. Abramoff and Mr. Scanlon's plan was secrecy. No one was to know about their involvement in the effort to assist the Tigua. According to witnesses interviewed by my staff, Mr. Abramoff would take no money from the Tribe to avoid having to register under the Lobbying Disclosure Act. In meetings and telephone conversations with witnesses, **Jack Abramoff** maintained his role was simple. He would have one or more Representatives or Senators slip into a conference report very discrete language allowing the Tigua to re-open their casino. After passage of such an amendment, Michael Scanlon and his company would then run a public relations campaign to beat back any attempts to repeal the language.

Almost immediately, Mr. Abramoff's cover was nearly compromised when he was included on an e-mail list from a tribal representative. Mr. Abramoff was furious. In an e-mail to Mr. Scanlon, Mr. Abramoff wrote, and I will try to redact the profanity so I do not offend anyone,

That f - - - ing idiot put my name on an email list. what a f - - - ing moron. He

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may have blown our cover!! Dammit. We are moving forward anyway and taking their f
– – – ing money.

That the secrecy and hence the effort may have been compromised could not dissuade
Mr. Abramoff from taking the Tribe's money. He was resolved to take the Tribe's
money, whether he could help them or not. Even before the Tigua signed a formal
contract with Scanlon Gould Public Affairs, Mr. Abramoff could not wait for the
money to arrive. On March 3, 2002, he asked Mr. Scanlon "did we get Tigua money?"
Even after the Tribe sent a check for $2.1 million, the two could not contain
their insatiable greed. On March 19, 2002, Michael Scanlon e-mailed **Jack Abramoff**
asking "Is he [Marc Schwartz] happy? Where is our f – – – ing money!" Abramoff
responded ten minutes later, instructing Mr. Scanlon to call Mr. Schwartz and "ASK
HIM FOR OUR DAMN MONEY!!!" By the end of March, the Tribe had paid Scanlon Gould a
total of $4.2 million for what was supposedly going to be a massive public
relations campaign. And, on April 8, 2002, Capitol Campaign Strategies, the alter
ego of Scanlon Gould, paid $2.1 to Mr. Abramoff's company Kay Gold.

During this time, **Jack Abramoff** and Michael Scanlon identified election reform as
the vehicle into which they would insert the Tigua's provision. Of course, only
after the Tribe had paid Scanlon Gould millions of dollars did Michael Scanlon
reassess the likelihood of success. In an April 12, 2002 report to the Tribe, Mr.
Scanlon wrote that "with political cover generated we feel pretty good about our
prospects of tacking the legislation on and getting it through. But please be
advised – we are taking the most high-risk approach to this by using election
reform as a vehicle." Mr. Scanlon's words stand in stark contrast to his earlier
opinion that his efforts could in no way be classified as high risk. Of course, he
now had the luxury of being less optimistic, since he had the Tribe's money in his
pocket.

Despite receiving $4.2 million from the Tribe, **Jack Abramoff** and Michael Scanlon
wanted more. From mid- to late- 2002, **Jack Abramoff** hounded the Tribe for
contributions to the Capital Athletic Foundation, his private charitable
foundation that he used to support the all boys school he had founded and operated
in Maryland. He asked the Tribe to contribute $50,000 to a golf trip to Scotland
sponsored by his Foundation. Ultimately, the tribe declined.

That did not deter Mr. Abramoff and Mr. Scanlon, however. In a September 18, 2002
e-mail, Mr. Abramoff reminded himself "we need more $ for backlash" after the
"Tigua launch." Two and half hours later, Mr. Abramoff wrote to Mr. Scanlon: Did
you speak with Marc Schwartz? I have a great idea. Let's tell him that we are
launching all missiles to get the bill a vote and, therefore, are using all our
resources, so that, once the bill passes, we immediately need more money!! OK?

Approximately one month later, Election Reform became law without the Tigua's
provision. To this day, the Tribe remains unclear on where the $4.2 million it
paid Scanlon went, because it appears it was not used for the purportedly massive
P.R. campaign Mr. Scanlon had promised to wage on their behalf.

Mr. Abramoff's pursuit of more money from the Tribe did not end in 2002. Only last
year, Mr. Abramoff attempted to convince the Tribe to take out life insurance on
its elders, and make Eshkol Academy, the all boys school he founded, the sole
beneficiary. Mr. Abramoff claimed that the proceeds of the policies would go to
his school, which would then pay Greenberg Traurig for the lobbying fees incurred

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the Tigua. I again direct everyone's attention to the poster, which reflects Mr. Abramoff's e-mail to Mr. Schwartz on the subject: Marc, per our discussion, the following short memo describes the opportunity to obtain lobbying funds via the insurance program. This will also greatly benefit our school, which means the whole world to me. If it can work, it's truly a win-win.

On behalf of a registered non-profit charity (such as a school) CFS will enroll Native American elders, 75 years and older, in term life insurance. The premiums will be entirely financed (with both debt and equity) using the insurance policies (no obligation of any kind to the Tribe or Native Americans, or the charity) and repaid by the proceeds of the policy at the demise of the insured. Any remaining funds at that time will accrue to the charity.

From these funds, the school shall pay Greenberg Traurig its fees and any out of pocket costs for a new Washington representation.

The Washington representation work done by Greenberg Traurig made possible as a consequence of this program shall be for the sole benefit of the tribe, including efforts to obtain federal appropriations, grants and other legislative and administrative assistance for the tribe. After brief consideration, the Tigua rejected it, because "it just wasn't right." The story I just shared with you and which we will learn more about today is tragic. **Jack Abramoff** and Michael Scanlon preyed upon the Tribe and its members when they were most vulnerable. They played upon their hopes and fears. They went to El Paso selling salvation and instead delivered snake oil.

Those two men walked away with money that would have gone and should have gone to the children and elders of the tribe. Why? Because **Jack Abramoff** and Michael Scanlon were all about the money.

In closing, I just want to thank the Tigua Tribe, Lieutenant Governor Hisa, and Mr. Schwartz for their invaluable assistance and continuing cooperation in the investigation, and for their participation in today's hearing. Mr. Schwartz told my investigators that after The Washington Post articles broke earlier this year about the other tribes, Mr. Abramoff called him and said don't worry, no one will ever know about the Tigua. Well, Mr. Abramoff, the Committee knows, and now the rest of the world knows too, about the gross indignity it seems you and Mr. Scanlon perpetrated against the Tribe. And I pledge, as a member of the Committee on Indian Affairs, that we will not stop until the complete truth is told.

---- INDEX REFERENCES ----

NEWS SUBJECT:    (Domestic Politics (GPOL); Transcript (NTRA); Political/General News (GCAT); Politics/International Relations (GPIR); Content Types (NCAT); Factiva Filters (NFACT); FCP Executive News Filter (NFCPEX); IWE Filter (NIWE))

REGION:        (United States (USA); North American Countries (NAMZ))

Language:  EN

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT E**

Westlaw.                                                           factiva.

12/11/04 NATJNL (No Page)                                         Page 1

12/11/04 Nat'l J. (Page Number Unavailable Online)
2004 WL 102298733

                         National Journal
         (c) 2004 by National Journal Group Inc. All rights reserved.

                    **Saturday, December 11, 2004**

                      NRCC Lawyer Advising Ney

In the wake of Senate Indian Affairs Committee scrutiny of House Administration
Chairman Bob Ney's involvement in 2002 with former casino lobbyist **Jack Abramoff**,
the Ohio Republican has turned to Don McGahn, the general counsel at the National
Republican Congressional Committee, for legal advice. Ney's link to Abramoff was
one of the subjects of last month's committee hearing regarding the $82 million
that six Indian tribes paid to Abramoff and his partner Michael Scanlon.
According to testimony, Abramoff asked Ney to insert a provision into an election
reform bill that would have enabled the Tigua Indians of Texas to reopen a casino
that had been shut down by a federal court. The court had moved against the
casino, in part, because of a grassroots lobbying effort mounted by former
Christian Coalition leader and consultant Ralph Reed, who was hired by Abramoff
and Scanlon.

Ney has said publicly that he agreed to help the Tiguas after Abramoff told him
that Sen. Chris Dodd, D-Conn., would also back the proposed legislative provision.
But the provision was never added to the election reform bill, and Ney later
charged that he was "duped" by Abramoff; Dodd said he had never agreed to back the
measure.

In trying to win Ney's help in early 2002, Abramoff had a useful ally in Neil
Volz, Ney's former chief of staff who had joined the firm of Greenberg Traurig
where Abramoff was then employed. Volz sent e-mails to Abramoff describing Volz's
contacts on the Tigua matter with aides in Ney's office and on the House
Administration Committee staff, as well as with Ney himself. Volz also
participated in some conference calls with the Tiguas that served as updates on
the effort, and he met with Tigua representatives at least once in Washington,
according to lobbying sources. In addition, Volz flew to Scotland for several days
in August 2002 with Ney, Abramoff, and Reed on a $150,000 junket funded in part by
two other tribes.

Volz, who in 2002 was subject to a one-year ban from lobbying Ney or his staff,
did not return phone calls seeking comment. Ney's office has said that the
congressman doesn't recall any contacts with Volz on the Tigua issue. At
Abramoff's behest, the Tiguas in 2002 contributed $32,000 to two political action
committees affiliated with Ney and his campaign committee.

-- Peter H. Stone

        © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**

Westlaw.

factiva.

12/26/04 WASHPOST A01

Page 1

12/26/04 Wash. Post A01
2004 WL 101232918

The Washington Post
Copyright 2004, The Washington Post Co. All Rights Reserved

Sunday, December 26, 2004

A Section

Tribal Money Linked to GOP Fundraising; Skybox Events Were Not Always Reported to
FEC

Susan Schmidt and Jeffrey H. Birnbaum
Washington Post Staff Writers

For most politicians, fundraising is a dreaded chore. But until recently, Rep.
John T. Doolittle of California and other members of the House Republican
leadership had adopted a painless solution: fundraising events in luxury sports
boxes leased largely with the money of Indian gaming tribes, where supporters
snacked on catered fare in plush surroundings as they watched the Wizards, Caps,
Redskins or Orioles. Doolittle, a Mormon, is an ardent opponent of casino
gambling, so it is somewhat ironic that he would invite supporters to watch the
Wizards play the Sacramento Kings from an MCI Center suite paid for by casino-rich
Indian tribes. But the plaque at the door to Suite 204 did not say Chitimacha or
Choctaw. It said "Jack Abramoff," a name synonymous with largesse and influence in
the GOP-controlled Congress.

Until the power lobbyist's downfall this year, Abramoff spent about $1 million
annually in funds largely provided by his tribal clients to lease four skyboxes --
two at FedEx Field and one each at MCI Center and Camden Yards. Season after
season, he kept them brimming with lawmakers, staffers and their guests, part of a
multimillion-dollar congressional care and feeding project that even the brashest
K Street lobbyists could only watch with awe or envy.

Lobbyists entertain lawmakers and their staffs routinely -- so much so that
congressional rules limit the extent of it to avoid the appearance of impropriety.
But Abramoff and the lobbyists who worked for him took spending for this form of
hospitality to unprecedented heights. They used tribal money, records and
interviews show, to pay for events that appeared to be designed more to help House
Republicans' campaigns and Abramoff's overall lobbying effort than the Indians'
legislative causes. Some members of Congress involved actively opposed Indian
gambling.

"Jack Abramoff had one of the biggest schmoozing operations in town," said Rob
Jennings, president of American Event Consulting Inc., an organization that raises
funds for Republicans.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A list of skybox fundraising events maintained by Abramoff at his former law firm, Greenberg Traurig, lists 72 events for members of Congress between 1999 and 2003. All but eight were put on for Republicans, many of them members of the House leadership. Some of the fundraising events, including Doolittle's, were not reported as required under federal election laws.

A few blocks from MCI Center, Abramoff also wined and dined politicians and their aides at Signatures, his expensive Pennsylvania Avenue restaurant, billing tribal clients for hundreds of thousands of dollars in meals there, sources familiar with the billings said. The Agua Caliente tribe of California, for example, paid Greenberg Traurig as much as $20,000 a month in lobbyists' expenses, much of it for meals at Signatures, a person who has examined the bills said. In some months the tribe was billed for more than 20 luncheon and dinner events.

The Agua Caliente also paid $300,000 toward the cost of the skyboxes one year, tribal Chairman Richard Milanovich said.

Federal investigators are examining tens of millions of dollars in lobbying and public relations fees Abramoff obtained from the tribes. They are also looking into his dealings with members of Congress and their staffs, lawyers involved in the inquiry said. Senior prosecutors in the Justice Department's fraud and public integrity sections are poring over hundreds of thousands of e-mails, computer files and bank records subpoenaed from Abramoff and former associates, including records of campaign contributions and trips, meals and gifts such as the use of skyboxes that Abramoff lavished on members of Congress.

Abramoff, once one of the most powerful lobbyists in Washington, was forced to resign from Greenberg Traurig after disclosures earlier this year about the lobbying and public relations fees he and an associate charged a group of Indian tribes. The Senate Indian Affairs committee has tallied fees from six tribes that total $82 million over a three-year period.

Abramoff's lawyer, Abbe Lowell, said in a statement that "Indian tribes made permissible and lawful contributions to underwrite the use of sports suites for various fundraisers. Whether these contributions were properly reported was the responsibility of the campaigns, not the tribes nor Mr. Abramoff."

Other lobbyists said that it was highly unusual for a single lobbyist to control so many sports boxes. According to John F. Jonas of Patton Boggs LLP, "Personally leasing four skyboxes is highly unusual and excessive. [But] it seems to be in character with his excessive fees."

Although some tribal members complained about the fees and expenses, most of the tribes' leaders were convinced by Abramoff that the spending was necessary to advance their interests in Washington.

The big prize for members of Congress was in the more than $3.5 million in federal campaign contributions that six tribes made at Abramoff's direction, two-thirds of it to Republicans. The meals and the games were added perks that provided settings for Abramoff and the 10 or so lobbyists who worked for him to obtain access to members and ingratiate themselves to congressional aides.

'It Was a Big Draw'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The skyboxes were available to members of Congress for the asking, Jennings said. "The word was out among fundraisers," he said. Politicians could sell skybox tickets to supporters for $500 to $1,000, said Jennings, who arranged six events in the skyboxes for two of his clients, House Transportation Committee Chairman Don Young (R-Alaska) and Rep. Barbara Cubin (R-Wyo.). "It was a venue that was fun to use," Jennings said. "It was a big draw."

Abramoff or one of the lobbyists who worked for him at Greenberg Traurig, and earlier at the firm now known as Preston Gates & Ellis LLP, arranged the fundraisers, former Abramoff associates said.

"It was kind of Jack's box. It was owned by Jack, not Greenberg Traurig. He was very proud of it," said a former associate from Greenberg Traurig. "Everything was always catered; Jack would pay for the catering. It was about $1,000 an event."

Keeping track of events, catering and ticket distribution required the nearly full-time attention of an administrative assistant, said two former Abramoff associates familiar with the logistics of the box management. Abramoff billed the tribes for the costs associated with the skyboxes through a company he created called Sports Suites LLC.

Doolittle, one of dozens of House members to use the skyboxes, was particularly close to Abramoff, former Abramoff associates said. The fundraiser list, obtained by The Washington Post, indicates that he was signed up to use boxes at MCI Center and Camden Yards on five occasions. Doolittle's spokeswoman, Laura Blackmann, said the congressman used the MCI Center box for a fundraiser, but only once, on Feb. 25, 1999.

Of the other four occasions Doolittle is listed on Abramoff's fundraiser log, Blackmann said: "Abramoff may have reserved it, but we did not use it."

In enacting limits on congressional gifts, Congress set the value of skybox tickets at $49, under the $50 limit. Using that calculation, the donation of a box with space for 20 people for a fundraising event would have a value of almost $1,000.

Doolittle's federal election records do not show that he paid for the use of the boxes or reported their value as an in-kind contribution, a lapse Blackmann acknowledged. "It was an in-kind contribution, and it was an oversight that it wasn't reported, but we are taking steps to correct that," she said recently.

An event planning firm operated by Doolittle's wife, Julie, which did work with an Abramoff-sponsored charity, was issued a subpoena for documents this summer in the Justice Department inquiry.

A candidate for office who does not fully disclose such contributions can be subject to a fine to be determined by the Federal Election Commission. The more flagrant the violation, the steeper the fine tends to be.

Abramoff's most powerful ally on the Hill, House Majority Leader Tom DeLay (R-Tex.), another gaming opponent, held a fundraiser in the MCI Center box for the performance of the Three Tenors on May 7, 2000, according to the list of events maintained in Abramoff's office. The list also shows he held an event in a box at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FedEx Field on Sept. 18, 2000.

DeLay spokesman Stuart Roy said that DeLay's fundraising aides remember sending out invitations for the Three Tenors event to reward donors and that the event probably occurred. There was no obligation to report the use of the box under federal law, he said, because the site was used for an event that benefited DeLay's state political action committee.

The office found no record of the use of Abramoff's box for a fundraiser at a Redskins-Dallas Cowboys game on Sept. 18, 2000, as listed in Abramoff's records. "We don't have anything indicating it was offered or utilized," Roy said. "We just don't know."

Rep. J.D. Hayworth (R-Ariz.) hosted four fundraising events in Abramoff boxes but did not pay for the use of the boxes or report them as gifts, his spokesman confirmed. After he was asked about the fundraisers, Hayworth's chief of staff said the congressman intends to amend his FEC reports to correct the oversight.

Hayworth, co-chairman of the Native American Caucus, did have contact with the tribes Abramoff and his team represented.

After The Post questioned Hayworth's office about his failure to disclose his skybox fundraising events, an aide said staffers had contacted the FEC about the mistake and planned to amend the congressman's filings. Abramoff's firm never sent a letter telling the Hayworth campaign the value of the in-kind contributions, said Joe Eule, Hayworth's chief of staff. "From talking to other people," Eule said, "this is how things happened over there. People would request these letters, and they'd never be forthcoming."

Fundraising events were held at only a fraction of the many games at the three venues. The rest of the time, the boxes were filled with Abramoff's lobbyists and congressional staffers they sought to cultivate. Members of his lobbying team typically carried around wads of tickets to dole out to Hill aides.

Abramoff not only lobbied staffers, he regularly hired them. Three former aides to DeLay worked as lobbyists for Abramoff at Greenberg Traurig: former deputy chiefs of staff Tony Rudy and Bill Jarrell; and former DeLay spokesman Michael Scanlon, who formed a public relations company that worked in tandem with Abramoff.

Other Hill veterans joined Abramoff's lobbying team and entertained their former congressional colleagues in the skyboxes, including former aides for Doolittle, Sens. Harry M. Reid (D-Nev.), John Breaux (D-La.) and Conrad Burns (R-Mont.), and Young, the representative from Alaska.

A Lawmaker Under Scrutiny

One member of the House leadership already under scrutiny for his ties to Abramoff, House Administration Committee Chairman Robert W. Ney (R-Ohio), used the MCI Center box, and his chief of staff was later hired by Abramoff. A Senate panel investigating Abramoff released e-mails last month showing that Abramoff directed a Texas tribe to contribute $32,000 to Ney in 2002, days after Ney took steps to sponsor legislation sought by the tribe.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Abramoff's fundraising log shows an event for Ney at MCI Center on March 15, 2001. FEC records show that Abramoff and three men associated with him in a Florida-based casino cruise line called Suncruz each donated $1,000 to Ney that day.

Ney had been helpful to them the year before, when Abramoff and a partner, Adam Kidan, were embroiled in acrimonious efforts to buy Suncruz. In an unusual step, Ney criticized the cruise line's owner, Gus Boulis, in statements placed in the March 30, 2000, Congressional Record, putting pressure on Boulis to sell; he then praised Kidan as Suncruz's new owner when the sale went through.

The following year, five weeks before the MCI Center fundraiser for Ney, Boulis was slain gangland style in a case that is under investigation. The FBI also is investigating possible bank fraud in the purchase of Suncruz, law enforcement sources said. An attorney for Abramoff said he and the banks involved "were victims of the wrongdoing of others."

Neil Volz, Ney's chief of staff, joined Abramoff's lobbying team in early 2002. Last month, Ney amended his FEC reports to reflect in-kind contributions of $1,470 from Volz for fundraising events at MCI Center in 2002 and 2003.

Kidan, contacted for this article, said Suncruz contributed $310,000 toward the cost of the skyboxes in 2000.

Abramoff's other tribe-funded perk for House Republican leaders was his downtown restaurant, Signatures. DeLay and others occasionally met for private lunches in the back room, a source familiar with the restaurant's management said.

Many meal receipts for members, staff and Abramoff's team were turned over to Greenberg Traurig; the firm then billed the tribes, said this source and others, including people associated with the tribes. Signatures, said the source, was a money drain on Abramoff, operating at a deficit of tens of thousands of dollars a month.

The person who has seen bills sent to the Agua Caliente tribe said they sometimes listed the lobbyists present and the guests who were entertained, but not always.

On occasions when fundraising events were at Signatures, said Lowell, "either tribes or the campaigns themselves properly underwrote the use of the restaurant and, again, the reporting requirements belong to the campaigns."

Jill Perry, director of marketing and communications for Greenberg Traurig, said in a statement that "the conduct by Mr. Abramoff which has come to light since he left Greenberg Traurig is antithetical to the way we do business and contrary to our firm's values and culture. We continue to conduct a comprehensive internal investigation of these matters."

Researcher Derek Willis contributed to this report.


---- INDEX REFERENCES ----


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT G**

Council of
Republicans for
Environmental
Advocacy

*Dave B*
*Michael R*
*Wayne*
*COPY*

www.crea-online.org

## FAX COVER PAGE

Date: February 21, 2002

To: ERIC Ruff

Fax: 208-5133

From: Italia

Notes: Here is the info we talked about ———

Page one of 10
If you do not receive this fax in its entirety, please call (202) 625-7110.

1429 G Street, NW, #408      Washington, D.C. 20005      (202) 625-7110

# Council of
# Republicans for
# Environmental
# Advocacy

1429 G Street, NW ▪ Number 408
Washington, DC 20005
202.625.7110
www.crea-online.org

## Memorandum

| | |
|---|---|
| To: | Eric Ruff |
| From: | Italia Federici |
| Date: | February 21, 2001 |
| Re: | press clippings |

Hi Eric:

Here are two articles that were forwarded to me today. You can see from one that Ralph Reed and his firm are involved somehow. From what I have been told, Ralph is working with Doolittle (don't know whether for free or as a paid consultant), and has been bending the ear of Karl Rove and possibly even the President about land-in-trust and gaming issues.

I am also hearing that Ralph has involved James Dobson and Phyllis Schlafley with this. Supposedly, Dobson is planning to run ads and they mention Gale by name. He is anti-gambling and is incensed about land being set aside for gaming or that could potentially become the site of gaming. He has slammed Tom DeLay and is not known for his even temper.

I was also told that the Conservative Action Team (CATs) members have been asked to sign a letter to Gale and the President slamming DOI for the California and Louisiana situations. I was told they have congressional 50 signatures. I tried to verify this. I called Tom Tancredo (friend of Gale and mine and member of CATs) to ask him what he knew. He is in Turkey until Sunday night. You may be able to call someone you know to find out what they have heard.

At any rate, it looks like Doolittle is not giving up and that the conservatives a being mobilized. The email with Ralph Reed's name indicates that he is engaged somehow.

Just wanted to give you a heads-up about what I've been hearing...

--Italia



-----Original Message-----
From: abramoffj@gtlaw.com [mailto:abramoffj@gtlaw.com]
Sent: Thursday, February 21, 2002 4:22 PM
To: italia@crea-online.org
Subject: FW: Study: Casino could cost state up to $55 million in taxes


FYI

-----Original Message-----
From: Ralph Reed [mailto:ralph@censtrat.com]
Sent: Thursday, February 21, 2002 4:01 PM
To: 'abramoffj@gtlaw.com'
Subject: FW: Study: Casino could cost state up to $55 million in taxes

Fyi

----------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Glen Wilkins <glen@censtrat.com>
To: Ralph Reed <ralph@censtrat.com>; Eric Criss <eric@censtrat.com>
Sent: Thu Feb 21 17:24:36 2002
Subject: Study: Casino could cost state up to $55 million in taxes

FYI,
Study: Casino could cost state up to $55 million in taxes
By ALAN SAYRE
The Associated Press
2/21/02 11:27 AM
If the Jena Band of Choctaws opens a second reservation casino in
southwestern Louisiana, the state stands to lose up to $55 million in taxes
per year, while the Lake Charles region could see up to 800 jobs evaporate,
according to an economic study.
Following secret negotiations, Gov. Mike Foster last month signed a compact
with the 241-member tribe for a reservation casino at Vinton. Foster has
said he had no choice but to negotiate with the tribe.

The Lake Charles region is a stronghold of legalized gambling with four riverboat casinos, another reservation casino run by the Coushatta tribe at Kinder and a slot-machine casino at the Delta Downs race track. The Jena Choctaws want to build a Las Vegas-style complex with a casino, golf course, hotel and convention facilities.

The impact study was put together by McNeese University professors Michael M. Kurth and Daryl V. Burckel for government bodies in Calcasieu Parish.

On Wednesday night, the Calcasieu Parish Police Jury and the Lake Charles City Council voted to oppose the Jena Choctaw project, which has to win approval from the federal Bureau of Indian Affairs.

Calcasieu Parish's legal counsel, Allen Smith, said he believes the governor "exceeded his legislative authority" in signing the compact because state law allows him to only sign compacts with Indian tribes that were recognized and held land as of July 1990. The Jena Choctaws were recognized in 1994 and have no reservation.

However, federal law allows a tribe to have a casino on its initial reservation, which the Jena Choctaws plan to use the Vinton land for.

Much of the McNeese study indicates that another reservation casino in the region would displace gambling revenue from other casinos, cutting jobs from the riverboats, as well as the Coushatta casino.

The land casino also could imperil Pinnacle Entertainment Inc.'s plans for a $225 million riverboat casino resort in Lake Charles, the study said.

The loss in tax money would occur because state government would get far less of each dollar lost by gamblers, the study said.

Riverboats pay a 21.5 percent tax on gross gambling revenue -- the amount of money won at the tables and in the slot machines before any expenses are computed. The Jena Choctaw compact calls for the state -- through a contribution -- to get 15.5 percent of casino profit, while 6 percent would go to local governments. Federal law does not permit direct taxation of Indian casinos.

The study calculated that the state might not see any more than 4.5 percent of a Vinton reservation casino's gross gambling winnings, if the casino won $290 million per year.

The state likely would lose $32 million to $55 million annually in taxes, while local governments would take a tax hit of $7 million to $17 million annually, the study said.

The proposed location of the Jena Choctaw casino, at the second exit on Interstate 10 coming in from Texas, would give the gambling hall an enormous advantage over other casinos, the study said.

Because of its location, a large number of its employees would be expected to live and spend much of their incomes in southeastern Texas, rather than Louisiana. Many of the spinoff jobs likely would be based in Texas, the study said.

"To allow the Choctaws to operate a casino on the border with Texas where it would also enjoy significant locational advantages over the Lake Charles riverboats and the Coushatta casino would choke development of the gaming industry in southwestern Louisiana, with no apparent benefit to state or local governments," the report concluded.

A spokesman for the Jena Choctaws, Sandy Kaplan, could not be reached for comment Thursday.

Copyright 2002 Associated Press. All rights reserved.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.



# Foreign Correspondence

By The Louisiana Expatriate

February 20, 2002

All bad precedents begin as justifiable measures. - Julius Caesar, 1st century BC

Scalped Again by Great White Father

I've been following the ongoing controversy about the Jena Choctaws' casino in Vinton but I've refrained from comment since most of the relevant facts hadn't yet come to light. But now that the "secret" deal between the Jenas and the Great White Father (known to us as Big Daddy) has finally been unearthed, it's time for another Internet Ass Whippin'.

Big Daddy's credibility has been dropping like the value of Enron stock lately and his negotiating a secret casino deal with the Jenas only confirms what we already knew: Great White Father speak with forked tongue. Now we learn that Louisiana is to receive 15.5% of the net profits from the Jenas' casino, not "15% of gambling proceeds" as Big Daddy originally reported (after he emerged from hiding, that is). This is a BIG difference!

The 15.5% is supposed to go toward education in Louisiana. Haven't we been through this same song and dance before?

A discussion of the many different ways that profits can be calculated is beyond the scope of this article but suffice it to say that any good accountant can, through manipulation of the numbers, turn a profit into a loss on paper - and do it legally. With the kind of money generated by an Indian casino the Jenas can afford to hire the best accountants available.

Nothing in the compact gives Louisiana the right to conduct an independent audit, so we're effectively stuck with whatever numbers the Jenas give us.

I don't doubt that the casino will provide some money to Louisiana and Calcasieu Parish but the amount will be a lot smaller than anyone expects. Not that it matters all that much, since Big Daddy and the lege are more than willing to forgive casino tax debt to the state (i.e., Harrah's) to "save jobs." They set a really great precedent with that one.

The bottom line will be that Louisiana and Calcasieu Parish will realize no tangible net benefits from the Jenas' Vinton casino operation. And Big Daddy knows it.

What's really interesting is the requirement for the state of Louisiana to not only openly advocate the Jenas' position but to assist them in obtaining land for the casino.

Does this mean that Louisiana has to subsidize the Jenas' legal fees if there are court challenges? Does it also mean that Louisiana is on the hook for acquiring the land for the casino and giving it to the Jenas? Who owns the land they're looking at?

Exactly what has Big Daddy obligated the state for? More to the point, what is this deal going to cost us in the long run? I can't shake the feeling that there's something fundamentally crooked about any deal that gets negotiated "under cover of darkness" and then hidden from scrutiny for weeks after. It's what the deal DOESN'T say that's going to bite us in the ass.

The Jena compact begs far more questions than it answers. And Big Daddy isn't answering any of them. At least, not to anyone's satisfaction.

Since we now know that Big Daddy isn't above clandestinely negotiating deals and hiding them from us, what else is he up to that we don't (yet) know about?

The more we learn about this deal the sleazier it looks. The way the compact is written, the Jenas are getting the gold mine and Louisiana's mullets are getting the shaft.

But, then, look who negotiated the deal.

Like I always say, follow the money and you shall find the truth. And something tells me that Big Daddy is the place to start the search

— End —

# EXHIBIT H

Westlaw.

factiva.

11/17/04 DESERTSUN B1                                                    Page 1

11/17/04 Desert Sun B1
2004 WL 99086147

The Desert Sun
(c) Copyright 2004, The Desert Sun. All Rights Reserved.

**Wednesday, November 17, 2004**

Local; B

Indian lobbying probe resumes today

Doug Abrahms
Staff

Senate hearings enter second phase of lengthy investigation  Palm Springs

Glance: Agua Caliente donation/lobbying list

$201,000 to Republican and Democrat candidates in federal races in 2003 and 2004

$457,000 to Democrat and Republican candidates in federal races in 2001 and 2002

$36,000 to 527 political groups between 2000 and 2004

$10 million to **Jack Abramoff's** and Michael Scanlon's firms for lobbying work.

$300,000 to Abramoff for skyboxes in Washington sports stadiums, including
FedExField where the Washington Redskins play.

Source: Center for Responsive Politics, Senate testimony

By Doug Abrahms

Desert Sun Washington bureau

The probe into Indian lobbying - including $10 million of lobbying for the Palm
Springs-based Agua Caliente Band of Cahuilla Indians - widens today with more
Senate hearings into whether high-powered Washington figures may have overcharged
gaming tribes for services.

Members of a Texas tribe that paid a Republican lobbyist for help to reopen their
casino will testify before the Senate Indian Affairs Committee, as Agua Caliente
chairman Richard Milanovich did in late September.

Texas officials closed the El Paso casino owned by the Tigua Indians of Texas in
2002 because it violated state gambling laws. The tribe was seeking **Jack Abramoff's**
help to lobby for federal legislation to reopen its casino, which remains closed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Tiguas are one of at least six large casino tribes that paid more than $66 million to Abramoff and political consultant Michael Scanlon over the past few years, according to information released by the Senate Indian Affairs Committee. That includes about $10 million paid by the Agua Caliente.

Today's hearing is the second of a series that will stretch into next year.

The Justice Department and at least two federal agencies are conducting investigations as well.

A Montgomery County, Md., judge froze Abramoff's assets this month in connection with a lawsuit over unpaid wages filed by workers at a religious school that Abramoff founded.

Abramoff declined to answer questions at the Senate committee hearing in September. Scanlon, a former aide to House majority leader Tom Delay, R-Texas, is scheduled to appear before the committee Wednesday but could decline to answer questions as well.

Abramoff and Scanlon secretly helped elect tribal members to some governing councils, and some of those councils turned around and awarded large lobbying and political consulting contracts to the men, committee documents showed. They also persuaded tribes to donate money to GOP political candidates, party organizations or even charities set up by both men.

"It is a cesspool of greed," Sen. Byron Dorgan, D-N.D, said in September. "It's not about politics. It's about corruption."

The Senate investigation is the first large-scale scandal involving tribal gambling, which has grown from almost nothing in the early 1990s to a $16 billion industry today with 377 gambling casinos and bingo halls nationwide.

Senators and Indian leaders have said that tribes were victims of the two Washington insiders.

Agua Caliente Chairman Richard Milanovich told the committee that his tribe paid Scanlon and Abramoff more than $10 million in a two-year period, much of it for work surrounding the Agua Caliente's gambling compact with the state. Milanovich, who opposed hiring the men, later learned Scanlon and Abramoff had worked with other council members to manipulate a tribal election and gain control.

The new council then agreed to lucrative contracts with the men and contributed to candidates and charities they suggested, he said. The Agua Calientes ended their relationship with Abramoff and Scanlon in April and have hired a lawyer to try to get reimbursed.

Other tribes involved include the Saginaw Chippewa in Michigan, Pueblo Sandia of New Mexico, the Mississippi Band of Choctaws and the Coushatta Tribe of Louisiana.

---- INDEX REFERENCES ----

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT I**

Westlaw.

10/21/2004 TLI 4                                                                                       Page 1
10/21/2004 Legal Intelligencer 4
(Publication page references are not available for this document.)

The Legal Intelligencer
Vol. 231, No. 79
Copyright (c) 2004 by American Lawyer Media, ALM, LLC

October 21, 2004

National News

MORE WOES FOR GREENBERG TRAURIG IN FEES SCANDAL

Kate Ackley and Andy Metzger
ALM

Troubles continue for Greenberg Traurig's Washington, D.C., office in the wake of a furor over fees that were charged to Native American gaming clients.

On Oct.11, the firm said lobbying partner Kevin Ring had exited the firm. The announcement came just as information surfaced about payments made to Ring by one of the players at the center of the controversy.

In 2002, Ring accepted $135,000 from Capitol Campaign Strategies LLC, the public relations firm owned by Michael Scanlon. Scanlon - along with ex-Greenberg Traurig lobbyist **Jack Abramoff** - is the subject of Senate and federal law enforcement probes into millions of dollars in fees collected from Native American clients and the alleged manipulation of tribal elections for Abramoff's and Scanlon's financial gain.

Meanwhile, new details have come to light about the complex nature of Abramoff's business dealings. Abramoff, who resigned from Greenberg Traurig in March, has as many as 10 companies registered in his name or to his home address in Silver Spring, Md.

It's not clear what type of business all of Abramoff's companies conduct. But property and public financial records, as well as documents released by the Senate, show that some of the companies collected checks from clients and Scanlon and owned some of Abramoff's assets, most notably his home.

The payments to Ring were revealed in financial documents provided to Influence, an ALM publication on the business of lobbying, by a source close to the investigations. The source, who spoke on the condition of anonymity, said the payments were meant as referral fees for business sent to Scanlon.

Another Greenberg Traurig lobbying partner, Michael Smith, received $20,000 from Scanlon's firm in 2002, the documents reveal. Greenberg Traurig, in a statement released late on Oct. 11, said Smith was staying with the firm.

Ring's departure is just the latest in a series of blows to Greenberg Traurig's government relations practice. In March, Abramoff - the firm's top lobbying rainmaker - left as his business dealings with Scanlon were made public. Members of the lobbying team close to Abramoff soon exited as well, with most landing at Cassidy & Associates. Greenberg Traurig turned over e-mails and other documents relating to Abramoff to comply with Senate subpoenas. The firm also hired a lawyer to conduct an internal investigation.

Ring declined comment, but his attorney, Richard Hibey, a partner with Miller & Chevalier, said on Oct. 11,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/21/2004 TLI 4                                                                                                      Page 2
10/21/2004 Legal Intelligencer 4
(Publication page references are not available for this document.)

'Kevin has taken all the necessary steps for the return of the money. It's being effected as we speak.'

Hibey said Ring started the process of returning the money seven to eight months ago and added that the recipient most certainly will not be Scanlon or anyone else with Capitol Campaign Strategies. But Hibey declined to say whom the recipient or recipients would be.

Hibey also said that Ring resigned from the firm. Jill Perry, a spokeswoman from Greenberg Traurig, said in a written statement simply that Ring 'is no longer with the firm' and said she could not comment further.

As for Smith, Perry said in the statement, 'Facts that have emerged regarding Michael Smith have been considered as part of our investigation, and he remains a shareholder in good standing with the firm.'

Perry added: 'We have been engaged in an intensive internal investigation and have taken such actions as we have deemed appropriate.'

Perry declined to answer questions about whether the firm had a policy regarding referral fees paid to its partners and other professionals, or what its policies are on other sources of outside income. Joe Reeder, the Greenberg Traurig partner in charge of the mid-Atlantic region, referred all questions to Perry.

## GREENBERG PRAISED

Greenberg Traurig has been praised by members of the Senate Select Committee on Indian Affairs for cooperating with its investigation into Abramoff and Scanlon. The firm was portrayed by senators as a victim at the committee's Sept. 29 hearing on the Abramoff affair. 'Credible law firms were taken advantage of,' said Sen. Tim Johnson, D-S.D.

But given Abramoff's high-profile business ventures and the newly uncovered payments from Scanlon to the other two Greenberg Traurig partners, questions remain about how a firm with hundreds of legal and lobbying professionals would have been unable to see what was going on with Abramoff. It's also unclear whether Greenberg Traurig will be able to use ignorance of Abramoff's activities as a defense against investigations and possible litigation - especially now that other employees have been connected to Scanlon's firm.

Most of Abramoff's businesses are limited liability companies with few public reporting requirements. The information for this article was gleaned from what public records do exist: registrations filed with the state of Maryland, publicly available credit filings required under the Uniform Commercial Code, Internal Revenue Service records, and e-mails and other documents released by Senate investigators.

Some of Abramoff's ventures are clearer than others, such as his restaurant companies, LIVSAR and Archives. The Capital Athletic Foundation, a group to which some of Abramoff's Native American tribal clients donated, helped fund the Jewish preparatory school founded by Abramoff, according to several news accounts.

Yet others, like Yamohu LLC and SVJA LLC, remain a mystery. Abramoff's spokesman, Peter Mirijanian, did not respond to questions about the nature of each of the businesses.

Whatever their purpose, some of the businesses controlled by Abramoff handled large amounts of cash.

E-mails, checks and other documents released by the Senate Indian Affairs Committee - many of them subpoenaed from Greenberg Traurig - show Abramoff and Scanlon collecting tens of millions of dollars and shuffling the money through their foundations and side businesses. The transactions, Senate investigators contend, were designed to blur just how much cash was being collected and where it was coming from.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to documents released by the Senate, one Maryland-based limited liability company, Kaygold, received numerous checks from Scanlon's Capitol Campaign Strategies - including checks for more than $1 million. One such check written on Sept. 12, 2002, was in the amount of $2,266,250.

In a July 9, 2002, e-mail exchange released by the Senate, Abramoff writes to Scanlon: 'Subject: Did we get a CCS check for Kaygold today? ... How much is?'

Scanlon's reply: '800k.'

Scanlon has been subpoenaed by the Senate, but he has declined to show up on the grounds that the subpoena was not valid because it was improperly served. Scanlon is represented by Stephen Braga of the D.C. office of Baker Botts. Braga declined comment on any of the allegations concerning Scanlon, citing the pending federal investigation into the matter.

Abramoff's business dealings outside lobbying have not always been successful.

The most notable problems stem from Abramoff's ill-fated investment in SunCruz, a Florida casino company. Awash in legal tangles with the estate of the company's former owner, SunCruz declared bankruptcy, and Abramoff relinquished his 35 percent stake in the company.

In June, Abramoff sued Adam Kidan, one of his partners in the venture, claiming he was forced into signing a personal guarantee that left him responsible for $60 million in loans used to purchase the company, according to The Miami Herald. The newspaper said Wells Fargo Foothill and Citadel Equity Fund have asked a federal judge to force Abramoff to pay up. Abramoff wants the obligation voided. The case is still pending.

This article originally appeared in The Legal Times, a publication of ALM.

10/21/2004 TLI 4

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT J**

Westlaw.

factiva.

9/28/04 WASHPOST A01

Page 1

9/28/04 Wash. Post A01
2004 WL 93179609

The Washington Post
Copyright 2004, The Washington Post Co. All Rights Reserved

**Tuesday, September 28, 2004**

A Section

Foundation's Funds Diverted From Mission; Records Detail Spending GOP Lobbyist
Abramoff

R. Jeffrey Smith
Washington Post Staff Writer

The Capital Athletic Foundation's Web site portrays youths at play: shaking hands
over a tennis net, learning how to hold a bat, straining for a jump ball. Its text
solicits donations for what it describes as "needy and deserving" sportsmanship
programs. In its first four years of operation, the charity has collected nearly
$6 million. A gala fundraiser last year at the International Spy Museum at one
point attracted the Washington Redskins' owner as its chairman and was to honor
the co-founder of America Online.

But tax and spending records of the Capital Athletic Foundation obtained by The
Washington Post show that less than 1 percent of its revenue has been spent on
sports-related programs for youths.

Instead, the documents show that **Jack Abramoff**, one of Washington's high-powered
Republican lobbyists, has repeatedly channeled money from corporate clients into
the foundation and spent the overwhelming portion of its money on pet projects
having little to do with the advertised sportsmanship programs, including
political causes, a short-lived religious school and an overseas golf trip.

The foundation's brief history -- now the subject of a federal investigation --
charts how Abramoff attached himself to House Majority Leader Tom DeLay (R-Tex.)
and, in so doing, became a magnet for large sums of money from business interests.
It also demonstrates how easily large amounts of such cash flowed through a
nonprofit advocacy group to support the interests of a director.

Internal records state, for example, that Abramoff and his wife, Pam -- who are
listed as the foundation's sole directors -- spent more than 70 percent of its
revenue from 2001 to 2003, or $4.03 million, on a Jewish school that Abramoff
founded in Columbia. The Eshkol Academy operated for two years and schooled two of
his sons before closing this spring with unpaid bills, faculty members said.

The records also state that $248,742 of the foundation's income went toward buying
a house near Abramoff's in Silver Spring, titled in the name of a company directed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by Abramoff and fellow lobbyists from Greenberg Traurig, the Washington law firm where he worked until March. It was initially a school dormitory but is now slated to be sold, with proceeds benefiting the company.

Other recorded expenditures include $500 to help finance a memorial dinner two years ago in honor of the Angolan rebel Jonas Savimbi, and $150,225 for a golf trip to Scotland aboard a private jet. Abramoff's guests on the August 2002 trip included two fellow lobbyists, the Republican chairman of the House Administration Committee and a senior official at the General Services Administration.

Those and other expenditures by the foundation have sparked wide-ranging investigations by the Justice Department, the Internal Revenue Service and two congressional committees. A source familiar with the scope of the probes said a grand jury has asked questions concerning whether Abramoff used the foundation to conceal payments from clients and shelter income from taxation. A Senate hearing on Abramoff's lobbying activities and billing practices is planned for tomorrow.

Abbe D. Lowell, Abramoff's attorney, declined to respond to detailed questions about the Capital Athletic Foundation and its activities but said -- as Abramoff has -- that its critics are pursuing a "political and improper agenda." Abramoff publicist Andrew Blum said both the foundation and the Eshkol Academy were "real and properly run charitable institutions which supported real programs that made a real difference in the lives of children in our community."

Abramoff, Blum said, "has not used any charity improperly for his own benefit."

Ties to Indian Tribes

The investigation into Abramoff's financial activities began this spring after The Post disclosed that he and public relations executive Michael Scanlon, a former spokesman for DeLay, had received at least $45 million from Indian tribes that operate gambling casinos. The tribes also had donated $2.9 million to federal candidates since 2001.

After Abramoff became their lobbyist, three tribes -- the Saginaw Chippewa Indian Tribe of Michigan, the Mississippi Band of Choctaw Indians and the Coushatta Tribe of Louisiana -- contributed more than $2.02 million to the Capital Athletic Foundation, according to foundation tax records. The Choctaws also gave $1.07 million to the National Center for Public Policy Research, a nonprofit group for which Abramoff is a board member, according to the center's tax records.

Saginaw Chippewa officials have told federal investigators that they made the donations because Abramoff told them it would impress DeLay, a fellow golf buff whom Abramoff described in a 1995 letter to Arnold Palmer as his "very close personal friend."

The tribe donated $25,000 to the Capital Athletic Foundation in 2002 and another $25,000 to the National Republican Congressional Committee the following year, tribal attorney Henry Buffalo said. The lawyer said tribal leaders assumed that if they gave money, "Mr. DeLay would recognize that in some way," and if they needed legislative help, "Mr. DeLay would be able to look on that more favorably than not."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Stuart Roy, DeLay's spokesman, responded that many lobbyists exaggerate their influence with powerful lawmakers.

The ties between Abramoff and DeLay go back a long way. Since 1997, Abramoff and his wife have contributed $40,000 to DeLay's political action committees, and last year the Capital Athletic Foundation donated $25,000 to the DeLay Foundation for Kids, a charity the lawmaker founded. Abramoff has long been a member of DeLay's Congressional Council, which DeLay describes in promotional materials as a "special group of supporters."

Blum, Abramoff's publicist, said that "in the over 10 years that Jack Abramoff has known Congressman Tom DeLay, each has properly supported the other's charitable causes, each has properly followed the rules of lobbying and disclosure, and each has only properly advocated positions on national policy in which they both believe."

DeLay has also shown support for causes important to Abramoff's clients. A source close to Abramoff who asked not to be named because of the continuing grand jury investigation said Abramoff lobbied DeLay's office to organize a June 2003 letter -- co-signed by DeLay, House Speaker J. Dennis Hastert (R-Ill.), Majority Whip Roy Blunt (R-Mo.) and Deputy Whip Eric I. Cantor (R-Va.) -- that endorsed a view of gambling law benefiting the Coushattas' desire to block gambling competition by another tribe.

The letter, sent to Interior Secretary Gale A. Norton, said the House leaders opposed a plan by the Jena Band of Choctaw Indians to open a casino at a non-reservation site, expected at the time to be outside Shreveport, La., not far from a casino owned by the Coushattas. The intent of the letter, the source said, was to protect the income from the Coushattas' casino -- about $300 million a year.

V. Heather Sibbison, a lobbyist at the time for the Jena Band, said: "I do this for a living, and I have never seen a letter like that before. It was incredibly unusual for that group of people, who do not normally weigh in on Indian issues, to express such a strong opinion about a particular project not in any of their home states."

DeLay spokesman Roy did not address whether Abramoff had contacted DeLay about the letter but said: "The majority leader has been consistent in his opposition to the expansion of gambling. Accusations and insinuations to the contrary are simply attempts to make a sexier story."

Using School as a 'Front'

Abramoff and his wife created the Capital Athletic Foundation in 1999 as a limited-liability company. He initially listed his home as the foundation's principal office, and in September 2002 he filed an operating agreement with the state of Maryland that said "all profit or loss shall be allocated to Abramoff," as well as any cash remaining at the end of each year.

In 2000, the foundation's purpose was described in tax documents as providing "gifts to schools in the Wash DC area in order to provide and enhance academic and athletic programs for children." Its Web site said the foundation would make

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9/28/04 WASHPOST A01                                                    Page 4

lifetime Spirit of America awards, issue certificates of achievement to schools
that emphasized athletics and appoint national ambassadors of sportsmanship.

There is no indication those things happened. Abramoff was the foundation's sole
donor that year, giving $12,850, and the Yeshiva of Greater Washington was the
sole grant recipient, getting $11,824.

In 2001, the foundation's reported income rose to more than $1.24 million, largely
on the strength of a $1 million donation by the Coushatta Tribe of Louisiana, a
$177,415 donation made in Abramoff's name and a $50,000 donation by Foxcom
Wireless, an Israeli-financed telecommunications company seeking the House
Administration Committee's approval to install cell phone antennas throughout
House office buildings. The firm Abramoff worked for, Greenberg Traurig,
registered as a lobbyist for Foxcom in 2003.

Catherine Zatloukal, president and chief executive of the company, which is now
named MobileAccess Networks, did not respond to questions about the firm's
donation to the foundation.

As to the Coushattas' donation, Abramoff and Scanlon told them "where to send
money" in Washington, said Roy Fletcher, a spokesman for the tribe. Fletcher and
tribal lawyer Kent Hance said tribal leaders concluded eventually that the money
was being used to pay for a luxury box at FedEx Field, where Abramoff would lobby
for them during Redskins games.

For all its new wealth, the foundation recorded just two major grants that year.
It paid a Web designer $50,510 to create an Internet presence for the Eshkol
Academy, and it spent $115,930 on a Judaic studies home-schooling program that
Abramoff created.

In 2002 the foundation, which on the Web site listed as its address a mail drop on
Pennsylvania Avenue, collected more than $2.56 million from nine donors, including
$991,749 from Abramoff. Other major donors, according to tax records, included
three Indian tribes and the National Center for Public Policy Research.

By that time, the Eshkol Academy had leased office space to use for classes and
enrolled several dozen students, some of whom paid annual tuition of more than
$12,000. The Capital Athletic Foundation contributed more than $1.85 million to
the academy that year, enough to pay a handful of teachers and a dean. The school
also bought two Zamboni ice-cleaning machines, even though it did not own a hockey
rink.

In 2003, the foundation took in more than $2.15 million, including a $250,000
donation from the National Center for Public Policy Research, a $400,000 donation
by Abramoff, a $950,000 donation from Scanlon's consulting firm and a $500,000
donation from the International Interactive Alliance, an Internet casino group
that employed Abramoff as a lobbyist, according to tax records. The foundation
gave $2.13 million to the Eshkol Academy that year.

E-mails at the time showed Abramoff pushing for more money for his enterprise. He
sent an e-mail to Scanlon in February 2003 stating: "Please make sure the next
$1M[illion] from Coushatta for me goes to Eshkol Academy directly. Please tell
them that we are 'using the school as our conduit for some of activities.' " The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

e-mail added that "if that won't fly with them, use CAF," referring to the Capital Athletic Foundation, or the National Center for Public Policy Research.

Abramoff repeated the request in e-mails in March and April. The Eshkol Academy "is our front group," the first e-mail said. The second said: "I really need to get those funds into Eshkol asap. Let me know what we have to do."

Scanlon replied in an e-mail, obtained by federal authorities, that he could not direct the money to Eshkol because he did not have any invoices from the school.

Stephen L. Braga, an attorney for Scanlon, confirmed that the request to direct a Coushatta payment to the foundation "was received by Mr. Scanlon's firm" but said "no attempt was made by Mr. Scanlon or anyone at his firm to comply with that request. Furthermore, Mr. Scanlon never made any of the representations to tribal leaders that were suggested." Braga also said that any payment made to the Capital Athletic Foundation by Scanlon's firm in 2003 is "wholly unrelated" to Abramoff's e-mailed requests for money.

Lowell, Abramoff's attorney, did not dispute the e-mails but said whether Abramoff distributed his fees "to charities directly or asked his employers or clients to make charitable contributions on their own, the bottom line is that the money went and was used by legitimate charities for proper charitable purposes."

Major Expenses

A social highlight for the foundation was to have been a $1,000-a-plate fundraiser in March 2003 at the International Spy Museum chaired by Washington Redskins owner Daniel M. Snyder and Fox News commentator Tony Snow. Its aim, according to invitations, was to honor James V. Kimsey, the co-founder and former chairman of America Online.

Snyder, Kimsey and Abramoff are all members of the Washington Redskins Leadership Council charity. The Capital Athletic Foundation donated $4,000 to the council in 2002, according to the foundation's tax records. Kimsey's chief of staff, Peter Kirsch, said that to his knowledge the dinner was rescheduled several times and then canceled; Redskins publicist Karl Swanson said that Snyder "lent" his name to the function at Kimsey's request but never attended.

A planner for the event said it was finally held in December. Nothing in the foundation's books indicates that the dinner raised more than a few thousand dollars.

Travel was another major foundation expense, totaling $240,416 in 2001 and 2002, records show. More than half of that was spent in August 2002 on the chartered jet that flew at least six people -- including Abramoff, House Administration Committee Chairman Robert W. Ney (R-Ohio), lobbyist and former Christian Coalition leader Ralph Reed, and then-General Services Administration chief of staff David Safavian -- to St. Andrews, Scotland, with a stopover in London on the way back.

None of those on the plane would say precisely how they spent their time, although two people confirmed that they played golf in St. Andrews. Ney spokesman Brian J. Walsh said Ney thought the trip's purpose was to raise money for the foundation, but Walsh did not cite any fundraising events.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Noam Neusner, a spokesman for Safavian -- who has been nominated for a senior position at the Office of Management and Budget -- said the trip was "primarily for golfing." "It had no business orientation to it," Neusner said, noting that Safavian paid back $3,100 for his expenses.

Researcher Lucy Shackelford contributed to this report.


---- INDEX REFERENCES ----


NEWS SUBJECT:      (Domestic Politics (GPOL); Political/General News (GCAT); Page-One Story (NPAG); Politics/International Relations (GPIR); Content Types (NCAT))


REGION:            (United States (USA); North American Countries (NAMZ))

Language:   EN

OTHER INDEXING:    NAT

EDITION:           FINAL

Word Count: 2483

9/28/04 WASHPOST A01

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT K**

**02-26-2005**

# Lobbying & Law - Abramoff's and DeLay's Foreign Adventures

- Advertisement -

Peter H. Stone (E-mail this author)
© National Journal Group, Inc.

A few years ago, a prominent business lobbyist recalls, he was playing golf with Rep. Tom DeLay, R-Texas, when the then-House majority whip dropped the name of another lobbyist who he thought might be a helpful ally. Hire Jack Abramoff, the lobbyist recalls DeLay advising him.

The lobbyist, who asked not to be identified, was taken aback by DeLay's bold pitch. "The reason I was so shocked was because at the time, I'd never heard of Abramoff," the lobbyist said in an interview.

Since the time of that golf outing -- and especially within the past year -- Abramoff's name has been mentioned often in Washington. A federal grand jury and the Senate Indian Affairs Committee are probing allegations of misconduct by Abramoff and his associate Michael Scanlon, a public-relations man and a former DeLay aide, involving some $66 million that six Indian tribes with casino operations paid the two men for representing the tribes both inside and outside the Beltway.

In his public statements over the past year, DeLay has sought to distance himself from Abramoff, who during his glory days on K Street often used DeLay's name to try to drum up business and to round up political donations.

Asked by reporters about Abramoff not long after the first stories on the scandal broke last year, DeLay said it would be wrong if "anybody is trading on my name to get clients or make money." And when National Journal recently asked DeLay's office to comment on the story on the golf outing, a spokesman for the now-House majority leader said, "It sounds like a hypothetical golf game that never took place, so it would be hard for me to respond."

Nonetheless, the ties between the powerful Texan and the former superlobbyist stretch back a decade and were forged and sustained by Abramoff's fundraising prowess and other lobbying stratagems. From 1997 through early 2004, Abramoff and his wife personally contributed $40,000 to DeLay's campaigns and his political action committee, ARMPAC, according to the Center for Responsive Politics. Further, at least two of Abramoff's American Indian tribe clients, the Louisiana Coushattas and the

- Advertisement -

Saginaw Chippewas, donated $38,000 to ARMPAC.

Some of Abramoff's clients and at least one conservative ally also helped underwrite trips taken by DeLay, as well as by some key staffers who later became lobbyists and in three cases worked with Abramoff.

"To the casual observer, it was a pretty simple deal," recalls one former GOP House leadership aide. "Jack raised money for the pet projects of DeLay and took care of his top staff. In turn, they granted him tremendous access and allowed him to freely trade on DeLay's name."

House travel records and interviews with GOP lobbyists suggest that Abramoff curried favor with DeLay and tried to boost his clients' causes through trips. As far back as 1997, Abramoff accompanied DeLay on foreign excursions to such places as London, Moscow, and the Northern Mariana Islands. In at least one instance, on a trip to England and Scotland in mid-2000, congressional gift rules may have been violated; Abramoff apparently filed a report with his law firm showing he picked up some of DeLay's expenses.

The trip's sponsor was the National Center for Public Policy Research, a little-known conservative think tank on whose board Abramoff served until several months ago. The 2000 trip, from May 25 to June 3, mixed business with pleasure. DeLay had a meeting with former British Prime Minister Margaret Thatcher and conservative leaders in Scotland, and played golf at Scotland's storied St. Andrews.

According to the House travel records filed by DeLay's office -- and verified separately by the center -- the center picked up roughly $28,000 in expenses for DeLay and his wife, Christine, as well as $28,000 for DeLay's then-Chief of Staff Susan Hirschmann and her husband, and $14,000 for DeLay aide Tony Rudy, who, some two years later, joined Abramoff as a lobbying partner at the firm Greenberg Traurig. Total expenses for the trip were close to $70,000.

Separately, National Journal has obtained a copy of an expense voucher for the same trip that Abramoff filed with Preston Gates & Ellis, the law firm where he was then a leading lobbyist and rainmaker. Abramoff's voucher lists the purpose of the trip as "client relations" and names "MS Choctaw" as the client account to which the expenses were allocated. At the time, Abramoff and Preston Gates were representing the Mississippi Choctaws, a tribe that runs casinos.

The voucher shows that Abramoff was accompanied by DeLay and his wife; Hirschmann and her husband; and Ed Buckham, DeLay's former chief of staff who had also become a lobbyist. Among the big-ticket expenses that Abramoff listed for reimbursement was a bill for the DeLays at the Four Seasons Hotel in London in the amount of $4,285.35. The voucher shows that the total reimbursement for expenses was $13,318.50. For some reason, it shows that both Abramoff and Buckham were owed that amount.

Under House gift rules, a member, officer, or employee may not accept travel expenses from a registered lobbyist, agent of a foreign principal, or a lobbying firm. The rule stipulates that the prohibition applies even when the lobbyist, agent, or firm is later

reimbursed for those expenses by a non-lobbyist client.

"It's clear from House rules that while a member may accept reimbursement for travel from certain sources, they may not receive travel expenses from a registered lobbyist, agent of a foreign principal, or a lobbying firm," said Stan Brand, a former House counsel and a partner at the law firm Brand & Frulla.

"It certainly appears from Abramoff's expense voucher that House ethics rules were violated by a lobbyist having paid for lodging expenses of Representative DeLay and his chief of staff," said Fred Wertheimer, the president of Democracy 21, who added that the apparent violation was another reason for the House Standards of Official Conduct (Ethics) Committee to investigate whether Abramoff did financial favors for members and staffers.

Responding to questions about Abramoff being on the trip and the billing for some DeLay expenses, a DeLay spokesman said he couldn't confirm Abramoff's presence. "We did everything we were supposed to do and disclosed the expenses that the national center provided us," said DeLay aide Dan Allen. "We have no control over what somebody may have done beyond that. This is the first time we are hearing of this expense report."

A spokesman for Abramoff's attorney, Abbe Lowell, issued a broad statement saying that the ongoing Senate and Justice Department investigations make it impossible for Abramoff to defend his work "in the public arena."

A spokesman for Preston Gates said that the firm would not comment for this story.

The Senate committee that is investigating Abramoff has raised the issue of foreign travel in another context. At a hearing last year, testimony revealed that in 2002, Abramoff solicited $100,000 from two Indian tribes to help pay for a golfing junket to Scotland in August of that year that included House Administration Committee Chairman Bob Ney, R-Ohio, Abramoff, and other lobbyists. The nonprofit Capital Athletic Foundation, which was run by Abramoff and to which the Choctaws and the Coushattas each donated $1 million, sponsored the trip.

The Senate and Justice Department probes are also looking into allegations related to the work that Abramoff and Scanlon did for their Indian tribe clients between 2001 and early 2004, including charges that the duo secretly split at least $42 million in fees that were paid to companies run by Scanlon. Investigators are also probing some of the millions of dollars in contributions that the tribes made, at Abramoff's suggestion, to a few nonprofit groups and reportedly some political campaigns.

Regarding the 2000 trip to England and Scotland, the National Center for Public Policy Research declined through an attorney to comment on whether Abramoff had helped to arrange financing for the trip, or whether he had done fundraising while he was a board member of the center.

According to the center's 990 disclosure forms filed with the Internal Revenue Service from 2000 to 2003, Abramoff seems to have had clout in the group: During this period, one of the center's largest payments to an individual or group was a "consulting" fee of

$1.28 million in 2003 paid to Kaygold, a private company that Abramoff apparently controlled.

The national center also declined comment on that payment. The Washington Post has reported that the center received a $1.07 million donation from the Mississippi Choctaws.

Abramoff had long successfully lobbied DeLay and his staff on Choctaw matters. In 1995, for instance, he worked with DeLay and other House conservatives to kill a proposed tax on Indian gambling, an issue that was a top priority to the Choctaws. Moreover, DeLay and a few of his key staffers had also enjoyed the tribe's resort facilities; according to House travel records in the summer of 1998, DeLay, his wife, and Susan Hirschmann spent a couple of days at the Choctaws' resort, which included a casino, golf course, and spa, in Mississippi.

And the 2000 trip to the British Isles wasn't the only foreign excursion involving DeLay and Abramoff that the center sponsored. In August 1997, the center sponsored a trip to Russia for DeLay and several of his top staffers. The one-week trip was described on DeLay's travel disclosure forms as a fact-finding mission. It involved meetings with Russian officials, including then-Prime Minister Victor Chernomyrdin, and religious leaders concerned about religious freedom. The bill for DeLay and his entourage, including Hirschmann and Buckham, totaled about $60,000.

Abramoff, who was there for at least part of the Russia trip, was registered at the time to lobby for a Bahama-based company called Chelsea Commercial Enterprises, whose principals lived in Moscow. According to the Bahama company's lobbying registration, Chelsea was trying to "generate support" for the Russian government's policies in the areas of bilateral trade and "progressive market reforms."

Other trips over the years also seemed to help Abramoff ingratiate himself with DeLay and his top staffers. For instance, Abramoff and DeLay famously spent time together in the Northern Marianas on trips that combined business with golf and other entertainment. For the Northern Marianas, DeLay was Abramoff's leading ally in a successful effort in Congress to let the islands keep a cherished exemption from U.S. labor and immigration law. This exemption allowed garment makers there to pay imported laborers $2 an hour less than the minimum wage in the United States. On a New Year's trip to the Marianas to ring in 1998, DeLay, according to media reports, called Abramoff "one of my closest and dearest friends."

GOP operatives say that all the travel with DeLay helped to boost Abramoff's stature with his clients and, ultimately, his bottom line. "Jack's business model was growing clients rather than getting new ones," one GOP operative recalls. "DeLay was instrumental, in Jack's mind. If the clients equate Jack with DeLay, then obviously Jack's in a strong position to increase his retainer. Foreign trips were part of the work-hard, play-hard DeLay philosophy. To that end, Jack Abramoff was director of travel for DeLay Inc."

## Need A Reprint Of This Article?
National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication. Click here to order, or call us at 202-266-7230.

**EXHIBIT L**

**washingtonpost.com**

# Gambling Interests Funded DeLay Trip

Later in 2000, Lawmaker's Vote Helped Defeat Regulatory Measure

By James V. Grimaldi and R. Jeffrey Smith
Washington Post Staff Writers
Saturday, March 12, 2005; Page A01

An Indian tribe and a gambling services company made donations to a Washington public policy group that covered most of the cost of a $70,000 trip to Britain by House Majority Leader Tom DeLay (R-Tex.), his wife, two aides and two lobbyists in mid-2000, two months before DeLay helped kill legislation opposed by the tribe and the company.

The sponsor of the week-long trip listed in DeLay's financial disclosures was the nonprofit National Center for Public Policy Research, but a person involved in arranging DeLay's travel said that lobbyist Jack Abramoff suggested the trip and then arranged for checks to be sent by two of his clients, the Mississippi Band of Choctaw Indians and eLottery Inc.

The dates on the checks coincided with the day DeLay left on the trip, May 25, 2000, according to grants documents reviewed by The Washington Post. The Choctaw and eLottery each sent a check for $25,000, according to the documents. They now say that they were unaware the money was being used to finance DeLay's travels.

But Amy Ridenour, president of the National Center, said that, when the trip was arranged, Abramoff promised he would secure financial backing. She said that even without Abramoff's efforts, the National Center would have borne the cost of the trip, which was intended to allow the group to network with conservative British politicians and included an outing to the famous St. Andrews golf course in Scotland.

"We paid for the trip," Ridenour said. "This trip was going to be paid for by the National Center, regardless of whether we got the donations from the Choctaw or eLottery."

House ethics rules allow lawmakers and their staffs to have travel expenses paid only for officially connected travel and only by organizations directly connected to the trips. The rules also require that lawmakers accurately report the people or organizations that pay for the trips. They prohibit payments by registered lobbyists for lawmakers' travel.

DeLay's spokesman, Dan Allen, said: "The trip was sponsored, organized and paid for by the National Center for Public Policy Research, as our travel disclosures accurately reflect and what the National Center has publicly said."

Abramoff's attorney, Abbe David Lowell, declined to comment. Abramoff, the National Center and the flow of money between them are now being investigated by a federal task force and by the Senate Committee on Indian Affairs; DeLay was admonished three times last year for infringements of House ethics rules.



Featured Advertisement  XEROX.

Advertisement

THINGS YOU DON'T NEED NERDS FOR:

To prove an ethics violation, investigators would have to show that DeLay and his staff knew the gambling interests were funding the trip, said Jan W. Baran, a Wiley Rein & Fielding LLP ethics lawyer who often represents Republicans. "If somebody is doing some backdoor financing, how would the member know?"

Abramoff, a member of the National Center's board, joined the DeLays on the May 25 to June 3, 2000, trip, which DeLay's congressional office has said included a stop in London and a visit with Margaret Thatcher, along with the golf outing at St. Andrews, where colleagues say Abramoff has a membership.

DeLay, an avid golfer, listed the purpose of the trip on a report filed with the House clerk as "educational." He was majority whip at the time and brought his wife, Christine, and two top staff members -- Tony Rudy from the whip's office and chief of staff Susan Hirschmann, as well as her husband, David Hirschmann, according to filings with the House clerk that indicated the total cost of transportation, lodging and meals was $70,265.

**Internet Gambling Bill Killed**

Two months later, in July 2000, DeLay and 43 other Republicans joined 114 Democrats in killing the Internet Gambling Prohibition Act, which would have made it a federal crime to place certain bets over the Internet and was opposed by eLottery and the Choctaws. The bill was supported by 165 Republicans and 79 Democrats but fell about 25 votes short of passage; because of a parliamentary maneuver, it required a two-thirds majority vote.

DeLay spokesman Allen said that DeLay voted against the bill because it had exemptions for jai alai and horse and dog racing. Rudy later that year went to work for Abramoff as a lobbyist.

The Choctaw Indians run a highly profitable casino near Philadelphia, Miss., that bankrolls their community activities and has subsidized an extensive lobbying effort in Washington. The tribe donated a total of $65,000 to Ridenour's group in 2000 and $1.07 million in 2002.

The Choctaw money was intended to help the center create a program to build support for the idea that Indian casinos could drive prosperity for poor tribes, Ridenour said. "We were trying to tell the Choctaw story," she said. On its Web site, the center attributes the following statement to DeLay: "The National Center is The Center for conservative communications."

Asked about the DeLay trip to Britain, tribal lawyer Bryant Rogers said: "The tribe did not authorize the use of any money for this purpose. . . . If it occurred, it occurred without the tribe's knowledge."

ELottery is a Connecticut company that provides Internet services to state lotteries. One version of the gambling legislation contained a provision that would have severely restricted state lottery sales over the Internet. Edwin J. McGuinn, president of eLot Inc., the parent of eLottery, said the provision would have killed his company. "We wouldn't have been able to operate," he said.

McGuinn said he was unaware that eLottery's $25,000 check was meant to pay for DeLay's trip. Of the donation to the National Center, he said: "It certainly was our impression that any and all moneys were being positioned to get the attention and focus of our cause."

DeLay today describes himself as a longtime opponent of any expansion of gambling. But in a House floor speech six months after his trip to Britain, he praised the head of the Mississippi Band of Choctaw Indians as a "champion of peace and prosperity" and placed in the Congressional Record an editorial

praising chief Phillip Martin for enriching the tribe through the "construction of a casino."

The editorial, from the magazine Indian Country Today, noted that Martin had also wisely positioned his tribe "to solidify friendships with Republican powerhouses." It said -- in an apparent reference to Abramoff -- that the tribe and its chief had hired "quality lobbyists as their new wealth allowed" and successfully persuaded Republican leaders that the tribal revenue from gambling and other ventures should not be taxed.

Three and a half weeks after DeLay's Jan. 3, 2001, speech saluting Martin "for all he has done to further the cause of freedom," at least one of DeLay's aides went on a trip via private jet to the Super Bowl in Tampa arranged and financed by one of Abramoff's companies. Sources familiar with the trip said the guests were also taken out to an Abramoff-owned gambling ship that was anchored near Tampa.

No one on DeLay's staff filed a report disclosing the trip, a task required by House rules for "the receipt of travel expenses from private sources" but not for government-funded or political travel.

DeLay spokesman Allen said: "The staffer went down to participate in a National Republican Congressional Committee party, so it was considered political travel. The staffer never saw Abramoff during the trip."

The Internet gambling legislation was the only issue Abramoff and his employer at the time, Preston Gates Ellis & Rouvelas Meeds LLP, mentioned in lobbying disclosure records when they reported earning $440,000 in fees from eLottery in 2000. The Internet gambling bill was one of several legislative issues listed in a separate lobbying disclosure for the firm's efforts on behalf of the Choctaw, which paid Preston Gates $880,000 in 2000.

### Expense Voucher Submitted

The trip to Britain by the DeLays previously attracted notice because Abramoff submitted an expense voucher to Preston Gates seeking a reimbursement of $12,789.73 to cover expenses for meals, hotels and transportation incurred by the DeLays, the Hirschmanns and a former DeLay chief of staff -- lobbyist Ed Buckham -- who also went on the trip.

House ethics rules prohibit registered lobbyists such as Abramoff from paying for a lawmaker's expenses. But the Preston Gates records state that Abramoff told his firm he paid $4,285.35 for the DeLays' stay at London's Four Seasons Hotel, plus $5,174.64 for the Hirschmanns' stay. He also reported spending $800 on transportation for the group between May 25 and May 29.

The existence of the voucher and a portion of its contents were reported last month in the National Journal. The voucher's tally of expenses differs from the account given by DeLay in a signed report to the House clerk on June 30, 2000, in which he reported that total lodging for the couple over nine nights cost Ridenour's group $3,840. Susan Hirschmann's separate, signed report also gave a different figure from Abramoff; she stated that lodging expenses for her husband and her for this period amounted to $3,360.

Both the DeLays and the Hirschmanns reported their meal expenses during the trip as $2,000 per person, or roughly $200 a day.

Last week, DeLay told reporters that he had reported the trip "as we are supposed to do." He said that, to his knowledge, the National Center "paid for the trip."

DeLay told Cox News Service earlier this month: "I went to London to meet with conservatives in England and Scotland and talk about the things we had been doing in the Republican, conservative House. They wanted to dialogue to see if they could adopt some the things that we had done."

A person who went on the trip but spoke on the condition of anonymity because of the controversy said that DeLay talked with Thatcher about her efforts to help end the Cold War and with others about trade issues. An aide to Thatcher confirmed that the meeting occurred.

Abramoff was a member of the board of the National Center from about 1997 until last October, when the center accepted his resignation.

Stanley Brand, a former Democratic counsel to the House and an ethics specialist, said arrangements in which funds are passed through an intermediary to pay for a lawmaker's travels breach ethics rules if the lawmaker who benefited "knew or should have known" the origin of funds.

Brand said the House ethics committee, if it opens an investigation, would have to decide whether the circumstances of the travel "should have put a reasonable person on notice that it was paid for by someone else."

*Researchers Alice Crites, Lucy Shackelford and Don Pohlman contributed to this report.*

© 2005 The Washington Post Company

Advertising Links                                                          What's this?

**International Businesses at Hoover's**
An authority for international business and company information, including public and private company profiles, industry overviews, financials, officers, competitors, news links and more.
www.hoovers.com

**International Business with Telphin**
Telphin unlimited international calls to all your business partners. IP-phones with direct local numbers. $19-$49.
www.telphin.com

**International Business Training**
IBT offers a comprehensive collection of reference books and self-study courses with topics ranging from export documentation to import procedures to NAFTA.
www.i-b-t.net

**EXHIBIT M**

J. Dennis Hastert
Fourteenth District
Illinois



(202) 225-0600

**Office of the Speaker**
**United States House of Representatives**
**Washington, DC 20515**

June 10, 2003

The Honorable Gale A. Norton
Secretary
United States Department of Interior
1849 C Street, N.W.
Washington, DC 20240

Dear Secretary Norton:

We write to express our concerns over recent attempts of certain Indian tribes to develop off-reservation casino sites. We strongly believe that these attempts run counter to Congressional intent and pose a serious threat to the current regulatory scheme that governs Indian gaming.

When Congress passed the Indian Gaming Regulatory Act ("IGRA") in 1988, they did not intend to authorize "reservation shopping" by Indian tribes. Indeed, IGRA presumptively prohibits gaming on all after-acquired lands and only permits off-reservation gaming under extremely limited circumstances. However, some Indian tribes are apparently attempting to take advantage of IGRA's provisions and move into lucrative casino markets far from their reservations and lands where they have a historical connection.

This problem is not new to the Interior Department. During the negotiation for the tribal-state compact between the State of New York and the Seneca Tribe, you stated, "Tribes are increasingly seeking to develop gaming facilities in areas far from their reservations, focusing on selecting a location based on market potential rather than exercising governmental jurisdiction on existing Indian lands...IGRA does not envision that off-reservation gaming would become pervasive...I am extremely concerned that the principles underlying the enactment of IGRA are being stretched in ways Congress never imagined when enacting IGRA." We agree with your statement; "Congress in enacting IGRA, struck a delicate balance between State and tribal interests that did not create an absolute right to off-reservation gaming."

The delicate balance of which you spoke is now being tested. We strongly urge the Department of Interior to enforce IGRA and to carefully scrutinize all efforts to acquire off-reservation land to acquire a favorable casino location. This matter has received a great deal of attention recently because of the ongoing attempt by the Jena

PRINTED ON RECYCLED PAPER

Band of Choctaw Indians to take off-reservation land into trust for gaming, but there are many similar attempts already in force across the country with more certain to come.

If the Department of Interior permits Indian tribes to establish a reservation, take lands into trust and build a casino in areas with little or no present or historical connection, the Department of Interior will effectively sanction reservation shopping. This would establish a dangerous precedent whereby tribes could, and would, locate casinos in any state where gaming is allowed.

We strongly urge you to consider the consequences of allowing tribes to construct gaming facilities in areas where they have no historical connection. Thank you for your time and consideration of this important matter.

Sincerely,

J. Dennis Hastert
Speaker

Tom DeLay
Majority Leader

Roy Blunt
Majority Whip

Eric Cantor
Chief Deputy Whip

**EXHIBIT N**

Source: <u>News & Business</u> > <u>News</u> > <u>By Individual Publication</u> > <u>W</u> > **The Washington Post** ⓘ
Terms: **jack abramoff and gun lake** (<u>Edit Search</u> | <u>Suggest Terms for My Search</u>)

*Abramoff Cited Aid Of Interior Official; Conflict-of-Interest Probe Is Underway The Washington Post August 28, 2005 Sunday*

Copyright 2005 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

August 28, 2005 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1896 words

**HEADLINE:** Abramoff Cited Aid Of Interior Official; Conflict-of-Interest Probe Is Underway

**BYLINE:** Susan Schmidt, Washington Post Staff Writer

**BODY:**

Indicted lobbyist **Jack Abramoff** claimed in e-mails sent in 2002 that the deputy secretary of the interior had pledged to block an Indian casino that would compete with one of the lobbyist's tribal clients. Abramoff later told two associates that he was trying to hire the official.

A federal task force investigating Abramoff's activities has conducted interviews and obtained documents from Interior Department officials and Abramoff associates to determine whether conflict-of-interest laws were violated, according to people with knowledge of the probe. It can be a federal crime for government officials to negotiate for a job while being involved in decisions affecting the potential employer.

The two former Abramoff associates, who spoke on the condition of anonymity because they are under scrutiny in the investigation, said Abramoff told them in late 2003 that he was trying to arrange for his firm, Greenberg Traurig LLP, to hire J. Steven Griles, then deputy interior secretary. Federal investigators are interested in those discussions and in job negotiations Abramoff may have had with a second department official, according to sources.

Abramoff told associates that he believed Griles was "committed" to blocking an effort by the **Gun Lake** Indian tribe to build a casino near Grand Rapids, Mich., according to the content of e-mail messages reviewed by The Washington Post. Abramoff said the blocking would involve an environmental challenge to the project, a tactic also proposed by Michigan business leaders opposed to the casino. Abramoff fought the project because it would draw business from a casino operated by his clients, the Saginaw Chippewas.

Environmental concerns ended up delaying action on the **Gun Lake** casino. The project was cleared last May by the Interior Department.

**Gun Lake** was not the only casino that Abramoff tried to derail through his departmental contacts. The Post has reported on e-mails indicating the lobbyist enlisted Griles to stop a Louisiana tribe's proposed casino, which threatened another Abramoff client.

Griles, who left the Interior Department earlier this year to form a consulting firm, "said he never had anything to do with the **Gun Lake** casino issues," a spokeswoman at his company said. He did not comment on any job discussions with Abramoff. A spokesman for Abramoff also declined to comment. Greenberg Traurig, citing the ongoing investigation, had no comment on possible job talks with department officials.

In a separate case, Abramoff and a business partner were indicted this month on federal wire fraud and conspiracy charges in Florida. They are accused of providing lenders with a counterfeit financial document to consummate their purchase of a casino cruise line in 2000. Allegations of fraud emerged after the seller was later killed in a gangland-style hit.

The Washington probe, being conducted by the Justice Department's fraud and public corruption unit, focuses on Abramoff's lobbying work on Capitol Hill for Indian tribes for which he and public relations executive Michael Scanlon were paid $82 million. Scanlon, one of about a dozen congressional staffers who went to work with Abramoff, had served as press spokesman for House Majority Leader Tom DeLay (R-Tex.).

The Justice Department task force, which includes the FBI and the IRS, is looking into Abramoff's dealings with lawmakers and their staffs. Investigators from the Interior Department's inspector general's office, part of the task force, have been asking witnesses about the **Gun Lake** casino project, according to people who have had contact with the investigators.

The task force also is examining Abramoff's relationships and influence with officials of the Bush administration, as highlighted by the previously undisclosed **Gun Lake** e-mails. The e-mails show how Abramoff relied on the president of a conservative group, Italia Federici, to intercede with Griles, who was her friend.

Copies of Abramoff's e-mails referencing Griles and Federici were obtained from a variety of sources, including the Interior Department. Some e-mails involving **Gun Lake** were read to The Post by a person who declined to release them because of the federal probe.

Department officials said the **Gun Lake** process was proper, adding that they could not comment further because of the ongoing investigation into Abramoff's contacts with Interior.

The **Gun Lake** tribe, formally known as the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, in 2001 began seeking approval for a casino on 147 acres near Grand Rapids.

As part of its application, the tribe prepared an environmental assessment and was close to approval by the end of 2002. The tribe was not asked to produce an environmental impact statement, or EIS, a much more detailed study.

On Dec. 4, 2002, Abramoff received an e-mail from Saginaw Chippewas tribal representative Chris Petras, who said that **Gun Lake's** proposal was moving forward rapidly. A public comment period on the tribe's environmental assessment was expected to be the last step before the Bureau of Indian Affairs -- a part of the Interior Department -- cleared the way.

That same day, Abramoff sent an urgent e-mail to Federici, president of the Council of Republicans for Environmental Advocacy.

"This is a disaster in the making," Abramoff wrote. "This is the casino we discussed with

Steve and he said that it would not happen. It seems to be happening! The way to stop it is for Interior to say they are not satisfied with the environmental impact report. Can you get him to stop this one asap? They are moving fast. Thanks Italia. This is a direct assault on our guys, Saginaw Chippewa."

Federici posted a quick reply: "I will call him asap." She met with Griles in his office two days later, according to a copy of Griles's schedule released under the Freedom of Information Act. Federici did not respond to interview requests for this article.

Federici's group, CREA, was founded in the 1990s by conservative anti-tax activist Grover Norquist and Gale Norton, now secretary of the interior. It has received financial backing from chemical and mining interests, leading some environmentalists to brand it a front for industrial polluters. Abramoff directed tribes he represented to donate $225,000 to CREA from 2001 to 2003.

Days after he appealed to Federici for help with Griles, Abramoff reassured the Saginaw Chippewas tribal representative. "The meeting with Griles went well. We have a lot to do but we'll get there," he told Petras in a Dec. 12, 2002, e-mail.

Scanlon weighed in the following week, suggesting technical roadblocks to stop the casino. "Hey, I think a real quick way to blow this **Gun Lake** thing out of the water is to have BIA reject the land into trust, or lay some stipulation on their application that would buy us some time," Scanlon wrote Abramoff on Dec. 16. "Any word from Griles on this?"

Abramoff wrote back: "I thought the way to do this is to have them reject the EIS, which I believe Griles has committed to do."

In the first half of 2003, the **Gun Lake** tribe remained under the impression that its application was about to be approved. But in July of that year, the Department of Justice's Indian law section raised concerns about the project and sought to have the tribe prepare an environment impact statement.

Federal investigators are examining the circumstances that led the section to raise its objections, according to people who have been interviewed in the probe.

Thomas L. Sansonetti, then the associate attorney general overseeing the Indian law section, told Interior Department officials that his office did not want to take on the burden of defending the department if it was sued by Michigan opponents of **Gun Lake** on environmental grounds.

In an interview this month, Sansonetti said that he wanted to have a strong defense in the event of a lawsuit. He said he was not moved by the **Gun Lake** tribe's offer to provide legal assistance for any court case.

Sansonetti said he first heard about **Gun Lake** from the Interior Department's solicitor's office. "I think there was a concern with the [environmental assessment] being sufficient all along," he said.

Sansonetti said he has attended events sponsored by Federici's group. He said he had no communication with Griles or Abramoff about **Gun Lake** and said he is unaware of any investigation of the matter. He left the Justice Department this year to join a Wyoming law firm.

Asked to comment on how his tribe's application was handled, **Gun Lake** leader D.K. Sprague issued a statement complaining of the cost of the delay in the casino application and urging "a thorough investigation" by the Justice Department task force. "We have been

denied our federal rights, economic self-sufficiency, and jobs that will benefit our community," he said.

In addition to **Gun Lake,** in 2003 Abramoff and Griles were active in an effort to stop a casino proposed by the Jena Band of Choctaws in Louisiana, rivals of another Abramoff client.

Late in that year, Griles, who was generally not involved in Indian issues, presented Interior officials with a binder containing legal arguments and congressional letters opposing the Jena plan. Griles acknowledged to colleagues that the binder had probably been put together by Abramoff, according to one former senior department official, who spoke on the condition of anonymity.

In March, The Post reported that Griles's involvement in the Jena case led to a clash with other Interior Department officials, including former legal counsel Michael G. Rossetti. A spokeswoman for Griles commented for that article, saying that he "didn't participate in any decision-making process regarding the Jena Band and gaming."

In April, the Interior Department solicitor's office dropped opposition to the **Gun Lake** tribe's casino application. The tribe subsequently received approval for its casino.

A group of Grand Rapids business leaders, who had long argued that the casino would harm the city's renewal plans and should undergo a more extensive environmental review, immediately sued the Interior Department.

One of those involved in the legal action was Peter F. Secchia, a major GOP fundraiser who served as an ambassador for President George H.W. Bush. In December 2002, he told the Kalamazoo Gazette that he was going all-out to block the casino, so much so that he spoke to presidential political adviser Karl Rove about it at a White House Christmas party for donors.

"I talked to Rove, and he put me in touch with his guy in charge of this kind of operation. I'm going to do my damnedest on this one. This is really important to us," Secchia told the Gazette that December.

In a recent interview, Secchia said he has spoken not only to Rove but also to President George W. Bush and Vice President Cheney about what he sees as the negative impact of the proliferation of tribal casinos. Both men, he said, told him it was a legislative issue. "Karl told me to talk to [congressional] committee people," he said, and put him in touch with the White House office of intergovernmental relations.

Secchia said he has not talked to officials at Interior or Justice about **Gun Lake.** He said he has never had contact with Abramoff, who is out on $2.25 million bond and is to be arraigned next week in Miami in the casino fleet case.

**LOAD-DATE:** August 28, 2005

Source:  News & Business > News > By Individual Publication > W > **The Washington Post** ⓘ
Terms:  **jack abramoff and gun lake**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, November 30, 2005 - 11:58 AM EST

**EXHIBIT O**

Westlaw.                                                          NewsRoom

11/1/05 ROLLCALL (No Page)                                        Page 1


11/1/05 Roll Call (Pg. Unavail. Online)
2005 WLNR 17630331

Roll Call (USA)
Copyright 2005 Roll Call Inc.  All rights reserved.

November 1, 2005

Abramoff's Interior Ties at Issue

By John Bresnahan ROLL CALL STAFF

J. Stephen **Griles**, the former deputy secretary of the Interior who has attracted
intense scrutiny over his dealings with ex-GOPlobbyist Jack Abramoff, is set to
testify before the **Senate Indian Affairs** Committee on Wednesday, according to a
witness list for the hearing.

**Griles**, who left the Interior Department in January, was called by Indian Affairs
Chairman JohnMcCain (R-Ariz.) to appear before the committee to answer questions
on the department's actions on behalf of the Coushatta Tribe of Louisiana, an
Abramoff client, in a casino dispute with another tribe, the Jena Choctaws. McCain
is investigating allegations of fraud perpetrated by Abramoff and his business
partner, Michael Scanlon, against a half-dozen Indian tribes that paid them more
than $80 million in a three-year period.

**Griles** is the highest-ranking Bush administration official to become publicly
enmeshed in the Abramoff scandal, and his scheduled appearance on Wednesday
surprised those who have been following the case.

"This a big deal, a really big deal, if **Griles** testifies," said a GOPsource who
has been interviewed by federal agents conducting their own Abramoff probe.

According to a memo circulated by the Indian Affairs Committee late Saturday
night, "Documents in the Committee's possession also raise a question of whether
Mr. Abramoff had improper contact with senior Interior Department officials
regarding tribal issues that were before the Department."

Italia Federici, a GOPenvironmentalist who is close to Interior Secretary Gale
Norton, is also expected to appear before the committee. Federici served as a
conduit between Abramoff and **Griles** during the Coushatta-Choctaw dispute,
according to media reports, and she was also an intermediary with the Interior
Department when Abramoff sought help for a Michigan-based tribal client. Federici
is president of the Council of Republicans for Environmental Advocacy; Abramoff
had some of his tribal clients donate tens of thousands of dollars to CREA,
including the Coushattas.

**Griles** is now a partner in the lobbying firm Lundquist, Nethercutt &**Griles**,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and he represents such clients as the American Petroleum Institute, Newmont Mining Corp., Gold Fields Mining and the Quapaw Indian Tribe of Oklahoma. Former Rep. George Nethercutt (R-Wash.) is one of **Griles'** partners.

According to The Washington Post, Abramoff used his ties to **Griles** in a bid to help fight off a casino request by the Jena Choctaws, a casino that would have threatened the Coushattas' own highly lucrative gaming facility. **Griles** went as far as carrying a binder of materials prepared by Abramoff into a high-level department meeting on the Coushatta-Choctaw dispute. Abramoff also reportedly tried to hire **Griles** away from Interior in late 2003.

**Griles** did not return a call seeking comment for this article.

The inspector general at the Interior Department is still reviewing any contacts that Abramoff had with department officials, including **Griles**, according to Dan DuBray, Interior Department spokesman, and a Justice Department task force is looking into the matter as well. Abramoff was indicted in August in Florida on federal mail and wire fraud charges related to the purchase of a Miami-based casino cruise ship line.

Abramoff's old firm, Greenberg Traurig, is also set to have a representative at Wednesday's hearing.

Fred Baggett, who chairs the national government affairs practice with Greenberg, is slated to appear. Greenberg Traurig has shelled out millions of dollars in payments to some of Abramoff's old tribal clients in an effort to head off legal action against the firm, although the Coushattas have sued Abramoff, Scanlon and Greenberg Traurig in state court for an undisclosed amount, although the pair raked in $32 million in fees from the tribe.

Jill Perry of Greenberg Traurig confirmed that Baggett would appear on Wednesday. Perry said this was the first time that anyone from the firm had been invited to testify before Indian Affairs. "We have been cooperating with all ongoing investigations [of Abramoff] and will continue to do so," Perry said.

Kevin Sickey, chairman of the Coushattas and a former tribal policeman, will testify on Abramoff and Scanlon's work for the tribe.

Also scheduled to appear is William Worfel, a formal tribal council member who served as the main tribal contact for Abramoff and Scanlon.

In addition, Chris Cathcart, a former associate at Scanlon's Capitol CampaignStrategies, is on the witness list for Wednesday's hearing. Abramoff and Scanlon used phony front groups, created with Coushatta money, to gin up public opposition to the Choctaws' casino bid, and conservative activist and grass-roots strategist Ralph Reed was called in to assist their campaign as well.

---- INDEX REFERENCES ----

COMPANY: AMERICAN PETROLEUM INSTITUTE; NEWMONT MINING CORPORATION HOLDING CO

NEWS SUBJECT: (Legal (1LE33); Government Litigation (1GO18))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P

Westlaw.                                                    **News**Room

11/3/05 WP-BUS (No Page)                                          Page 1


11/3/05 Wash. Post (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 17731764

Washington Post
Copyright 2005 The Washington Post

November 3, 2005

Former Officials Face Off Over Abramoff Contact

By Susan Schmidt and James V. Grimaldi

WASHINGTON _ Interior Secretary Gale Norton's former legal counselor Wednesday
accused J. Steven **Griles**, the department's recently departed second in command, of
improperly trying to meddle in decisions affecting tribal clients of lobbyist Jack
Abramoff.

Former legal counselor Michael Rossetti, seated beside **Griles** before the **Senate
Indian Affairs** Committee, said he repeatedly rebuffed **Griles's** efforts, and at one
point confronted him in front of other officials. He accused **Griles** of attempting
to do Abramoff's bidding on an issue affecting the Coushatta tribe of Louisiana,
an Abramoff gambling client.

``I wanted Mr. **Griles** to know I had my eye on him because I was worried about it _
whether founded or not, I was worried about it,'' said Rossetti. He said he
demanded to know from **Griles** ``whose water was he carrying,'' Rossetti testified.

**Griles**, flushed and agitated, denied aiding Abramoff. ``I don't recall intervening
on behalf of Mr. Abramoff, ever,'' he said. ``There was no special relationship
with Abramoff in my office.''

The face-off between two former senior Bush administration officials was the
latest twist in the unfolding story of Abramoff's efforts to influence Congress
and executive branch agencies. A Justice Department public corruption task force
is investigating the former GOP lobbying powerhouse; Wednesday's hearing was the
fourth the committee has held to look into the $82 million Abramoff and associates
received from tribal clients over three years.

The panel's chairman, Sen. John McCain, R-Ariz., called the saga ``a complex and
tangled web ... a story alarming in its depth and breadth of potential wrongdoing.
It is breathtaking in its reach.''

One witness _ Italia Federici, depicted in e-mails as a go-between from Abramoff
to **Griles** _ refused to appear, citing prior family considerations. U.S. marshals
have been looking for her since last week to serve her a subpoena, and McCain said
he would require her to come before the committee on her own.


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McCain questioned **Griles** about a discussion he had with Abramoff about joining his lobbying firm in September 2003, two months before **Griles's** confrontation with Rossetti. McCain cited an e-mail obtained by the committee in which Abramoff told his lobbying colleagues that he had met with **Griles** and expected him to join their team.

``This cannot be shared with anyone not on this distribution list,'' Abramoff wrote. ``I met with him tonight. He is ready to leave Interior and will most likely be coming to join us. He had a nice sized practice before he joined Interior, and expects to get that and more rather soon. I expect he will be with us in 90-120 days. This will restrict what he can do for us in the meantime,'' wrote Abramoff, but said **Griles** ``gave me some suggestions'' on several tribal related issues.

**Griles** told the panel he had been offered a job, but immediately declined it and told Interior Department ethics officials about the overture.

Interior Department spokesman Daniel DuBray said that **Griles** did confer with an ethics officer over the job offer. He said he could not comment further on Wednesdays hearing, citing the investigations into ``all aspects of Mr. Abramoff's contacts with the department _ both direct contacts and those which may have been conducted by surrogates.''

Much of Wednesday's hearing centered on **Griles's** dealings with Federici, who introduced **Griles** and Abramoff to each other around the time of President Bush's election. Federici, a former Norton campaign aide in the secretary's native Colorado, is president of a conservative environmental group Norton founded with anti-tax crusader Grover Norquist.

Abramoff had his tribal clients sent at least $250,000 to the group _ Council of Republicans for Environmental Advocacy _ between 2001 and 2003.

``The question is why,'' McCain said. He said e-mails show that Abramoff and his team ``believed that Ms. Federici had `juice' at the Department of Interior and deemed her `critical' to his tribal lobbying practice.'' In numerous e-mails, Federici told Abramoff she had or would raise the lobbyists' concerns with **Griles**.

The Washington Post reported earlier this year that Federici and **Griles** had a personal relationship that is an element in the investigation into Abramoff's influence at the department.

``I recall a few conversations where she asked me to call Abramoff,'' said **Griles** Wednesday, adding that he remembered calling Abramoff on one occasion.

**Griles** said the only time he remembered Abramoff being in his office was for a ``photo op'' with the former chief of the Coushatta tribe on Feb. 5, 2002. That meeting occurred as Abramoff and the Coushattas were in the midst of a furious effort to prevent another Louisiana tribe, the Jena Band of Choctaw Indians, from winning concessions at the Interior Department that would pave the way for them to open a casino.

Rossetti said **Griles** repeatedly sought to intervene in the department's two-year

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/3/05 WP-BUS (No Page)                                          Page 3

consideration of the Jena matter. ``He had a very keen interest,'' Rossetti
testified, and made ``constant requests to be involved in meetings.'' Rossetti
said he tried to block the efforts because he did not want Norton to be vulnerable
to criticism that the normal decision-making process had not been followed.

**Griles** denied he had ever sought to weigh in on tribal issues during his tenure at
the department, which lasted from 2001 until last year.

But Rossetti said that in late 2003, with Norton about to make a decision on the
Jena, **Griles** presented him with a binder full of legal arguments and congressional
letters arguing against the Jena bid. Rossetti demanded to know where it had come
from, and after much discussion, he testified, **Griles** acknowledged it had come to
him ``by way of Mr. Abramoff.''

``Mr. Rossetti has a different memory than I have on that issue,'' said **Griles**. He
said he showed the binder to Rossetti and asked him to share it with Norton,
recalling that he asked, ``Please make sure she knows all sides of this issue.''

``I do not know and did not know where it came from,'' **Griles** said. He said his
secretary was called down to pick it up at the department's front desk, and once
it was placed in his office, he thought he should give it to Rossetti because it
was now an official Interior Department document.

In a statement Wednesday, Andrew Blum, spokesman for Abramoff, said the lobbyist
was in the ``impossible position'' of not being able to give his side of the story
because of the ongoing investigations.

              ---- INDEX REFERENCES ----

REGION:  (USA (1US73); Americas (1AM92); Louisiana (1LO72); North America (1NO39))

Language:  EN

OTHER INDEXING:  (BUSH; CONGRESS; COUSHATTA; COUSHATTAS; DEPARTMENT OF INTERIOR;
ENVIRONMENTAL ADVOCACY; GOP; **GRILES**; INTERIOR DEPARTMENT; JENA; JENA BAND OF
CHOCTAW INDIANS; JUSTICE DEPARTMENT; **SENATE INDIAN AFFAIRS** COMMITTEE)  (Abramoff;
Andrew Blum; Bush; Daniel DuBray; Federici; Gale Norton; Griles; Grover Norquist;
Italia Federici; J. Steven Griles; John McCain; McCain; Michael Rossetti; Norton;
Rossetti)

Word Count: 1297
11/3/05 WP-BUS (No Page)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT Q**

# THE HILL

**The Newspaper
for and about
the U.S. Congress**

Search The Hill

To understand gasoline pricing for consumers,

**Wednesday November 30,
2005**

- The Hill -    - Subscribe -    - Advertise -    - Feedback -

NOVEMBER 3, 2005

**HOME**

**NEWS**

Campaign 2006
Business
  & Lobbying
The Executive
Under the Dome

**COMMENT**

Editorials
Letters
Op-Eds
Dick Morris

CONDI'S STAR IS
RISING

Albert Eisele
John Fortier
Andrew Glass
Ben Goddard
David Keene
Josh Marshall
Lynn Sweet
Byron York
POLLSTERS:
David Hill
Mark Mellman

**FEATURES**

Capital Living
Hillscape
Social Scene
Capitol
Ambitions
Uncommon Lives
Restaurant
Review
Book Reviews

**CLASSIFIEDS**

Employment
For Rent
Employer
Spotlight
All Ads

**RESOURCES**

PR Newswire
Write Your
  Congressman

# NEWS

## Abramoff fire hits DoI

*By Josephine Hearn*

A former top official in the Interior Department drew fire from a Senate panel yesterday amid accusations that he tried to use his position and influence to help clients of former GOP lobbyist Jack Abramoff, the subject of multiple criminal investigations.

While J. Steven Griles, who served as deputy Interior secretary from 2001 to 2005, defended himself to members of the Senate Indian Affairs Committee, another expected witness, Republican environmentalist Italia Federici, was a no-show, prompting committee Chairman John McCain to call for another hearing focusing specifically on her.

"They've just been unable to locate her," McCain said, indicating that she had yet to be served with the committee's subpoena. "But I believe the U.S. Marshals will do their duty as they did in the Old West."

The hearing was the fourth and expected to be the final in a series McCain has conducted to examine Abramoff's dealings with Indian-gaming tribes. Abramoff and his associate Michael Scanlon have been accused of bilking tribes out of more than $82 million in public relations and lobbying fees over the course of several years. Abramoff was recently indicted in Florida on an unrelated charge dealing with his acquisition of a casino boat chain. He remains under criminal investigation by the Department of Justice.

Federici, president of the Council of Republicans for Environmental Advocacy (CREA), was scheduled to testify alongside Griles and surprise witness Michael Rossetti, a former counsel to Interior Secretary Gale Norton. At issue was the question of whether Griles, at Federici's prompting, had tried to influence official decisions in 2003 to benefit a client of Abramoff's, the Coushatta Tribe of Louisiana.

Rossetti testified that Griles had sought to insert himself into discussions of a proposal by the Jena Band of Choctaw Indians to build gambling operations close to the Louisiana-Texas border. Such an operation posed a threat to the Coushattas' nearby casino.







Cogeneration.

>> Learn more

DOW

Living.
Improved daily.



Is
one cent
enough for
public
health
research?

**PREVIOUS ISSUES**

**Last Six**

**HealthWatch**





Try
THE HILL
Health Watch
For 30 Days!
▶ RISK FREE

Rossetti testified that Griles made "constant requests to be involved in meetings that stood in stark contrast to the way we had sort of constructed a process to handle these so that the secretary would have preserved unto herself the full prerogatives of the decision before her."

At one point, Rossetti confronted Griles about his interest in the issue.

"I was alarmed that Mr. Griles all of a sudden had an inexplicable desire to be involved in this particular issue…who's water was he carrying on this issue?" Rossetti said.

Griles testified that he had never influenced the department's decisions to benefit Abramoff's clients.

"I don't recall intervening on behalf of Mr. Abramoff's clients ever," Griles said. "I have to my recollection never gone to a decision-making meeting on the Jena Band."

Griles went on to say that he did not recall having conversations with Federici about the Jena Band, although published reports have suggested that Federici acted as a liaison between Abramoff and Griles.

The Coushattas and Abramoff's other tribal clients contributed at least $250,000 to Federici's group, CREA, between 2001 and 2003. CREA was originally founded by Norton and anti-tax activist Grover Norquist.



Are frivolous lawsuits raising your healthcare costs?

☐ Yes ☐ No

During the hearing, Indian Affairs Committee aides presented e-mails that appeared to call some of Griles' assertions into question, but those e-mails and other documents had not been released to reporters as of press time.

Aside from the focus on Griles, the hearing emphasized Abramoff's interaction with the Coushattas. Abramoff and Scanlon referred to the tribe as their "money train," according to McCain's opening statement, and ultimately extracted $32 million from the tribe.

McCain chronicled the evolution of $3.17 million that the Coushattas ostensibly used to underwrite the "Louisiana Battleground Program," a grassroots organizing effort. Abramoff funneled one million dollars of the money through his then-employer Greenberg Traurig in order to "pump up" the firm's publicly disclosed lobbying revenues. He then sent it to a non-profit group he controlled, the Capital Athletic Foundation.

Of the remaining money, $2.17 million, $1.4 million was withdrawn by Scanlon, a small portion was paid to vendors for legitimate work, and $115,000 was earmarked for Scanlon's wedding, which ultimately did not take place.

After the hearing, an Abramoff spokesman released a statement defending his boss.

"With an ongoing political investigation being directed by the U.S. Senate and an investigation at the Department of Justice, Mr.

**Survey Results:**

71%

29%

Yes      No



AMA

www.patientsactionnetwork.or
Ads by Goooooogle

Abramoff is put into the impossible position of not being able to defend himself in the public arena until the proper authorities have had a chance to review all accusations," the statement said.

At the beginning of the hearing, Sen. Craig Thomas (R-Wyo.) made a brief appearance and asked that McCain draw the hearings on Abramoff to a close.

"It's my understanding that the Justice Department really has the role in doing this," Thomas said. "I think we ought to limit ourselves to what our role ought to be as a legislative committee."

After the committee issued a subpoena for Federici last week, Federici wrote a letter dated Oct. 26 to committee staff saying that her participation in the hearing would be "impossible," said a source familiar with the matter. The date was the anniversary of her father's death, and she was planning to be out of town.

The committee also heard testimony from Fred Baggett, head of the lobbying practice at Abramoff's former employer, Greenberg Traurig.

The hearing enjoyed a rare moment of levity when William Worfel, a former member of the Coushattas' tribal council, apologized for a critical letter he had written to McCain in April 2004 as the committee was beginning its probe.

"A letter drafted for me by Michael Scanlon to this committee was addressed to Sen. John McCain," Worfel said. "As this process has moved forward, I have learned Sen. John McCain is a national hero. I can assure you that my father, a Vietnam war veteran and a Korean War veteran would whip my...butt if I had any role in disrespecting Sen. McCain."

STRAIGHT TO YOUR DESKTOP

**Tipsheet**

Delivered FREE every Friday.

Be ahead of the curve

as The Hill reports on what's next in Congress.



WANT TO REPRINT ARTICLES FROM THE HILL?
212-924-2283

**Privacy Policy | Terms and Conditions**

© 2005 The Hill
1625 K Street, NW Suite 900
Washington, DC 20006
202-628-8500 tel | 202-628-8503 fax

**EXHIBIT R**

Westlaw.                                                                    **News**Room

11/18/05 LAT-BUS (No Page)                                                  Page 1

11/18/05 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 18598054

Los Angeles Times
Copyright 2005 Los Angeles Times

November 18, 2005

Abramoff Ally Clashes With Senators

By Mary Curtius

WASHINGTON -- The head of a Republican environmental group clashed repeatedly Thursday with senators who accused her of trying to improperly influence federal officials to advance the interests of tribes represented by controversial lobbyist Jack Abramoff.

Italia Federici, president of the Council of Republicans for Environmental Advocacy, told a skeptical **Senate Indian Affairs** Committee that she believed Abramoff's tribal clients donated $500,000 over three years to her organization because they were generous, not because they hoped she would help them thwart efforts by competing tribes to open casinos.

Federici has emerged as a key figure in the examination of the tactics Abramoff used to become one of Washington's best-connected lobbyists -- tactics now under federal investigation.

Her testimony came as the committee is wrapping up a lengthy inquiry into Abramoff's collection of $82 million in fees from tribal clients. The investigation has raised questions about whether Abramoff defrauded the tribes and improperly used his relationships with powerful lawmakers and administration officials to lobby on behalf of his clients.

Abramoff, indicted earlier this year in an unrelated case, has repeatedly denied wrongdoing.

The scandal surrounding Abramoff has touched powerful lawmakers, including former House Majority Leader Tom DeLay (R-Texas), whose trip to a Scottish golfing resort in 2000 with the lobbyist has come under scrutiny. DeLay, who once described Abramoff as a close friend, has denied any wrongdoing and has asked the House ethics committee to investigate his travels.

Sen. John McCain (R-Ariz.), chairman of the Indian Affairs panel, and Sen. Byron Dorgan (D-N.D.), pressed Federici to explain e-mails Abramoff sent to her in 2002, asking her to contact then-Deputy Secretary of the Interior J. Steven **Griles**. ( Abramoff wanted to enlist **Griles** in his effort to defeat applications from tribes seeking to open casinos that might hurt similar businesses run by Abramoff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/18/05 LAT-BUS (No Page)                                    Page 2

tribal clients.

``Any objective observer would see that there is a clear connection between
contributions to your organization and work that you would have been doing on
behalf of Mr. Abramoff with the Department of the Interior,'' McCain told Federici.

But she insisted that there was no quid pro quo.

``I never asked Steve to put the kibosh on anything,'' she said. ``I was
responding to Jack -- at the time, he was a friend -- in a way that I would
respond to any friend who had a need or a question.''

But Abramoff, in an e-mail exchange, portrayed a very different relationship.
``Unfortunately, she is critical to me,'' he responded in March 2003 to an
associate who had asked, ``Do we owe them or something?'' The associate had posed
the question because, he said, Federici expected Abramoff to pay for a reception
her group was hosting at a Washington restaurant the lobbyist owned.

Federici, in her testimony, said she had ``political'' conversations with **Griles**
and other Interior officials, passing on warnings to them from Abramoff that the
casino permits they were considering were opposed by leading conservative
activists and lawmakers. She said she did not know that Abramoff was funding the
anti-casino campaign of conservative activist Ralph Reed and others.

In testimony to the committee earlier this month, **Griles** insisted he had no
special relationship with Abramoff and had given him no special access. But
another former senior official at the agency contradicted much of **Griles'**
testimony. Michael Rosetti, who had served as the department's counsel, told the
committee he had become alarmed by what he viewed as **Griles'** strong interest in
Indian tribal gaming issues.

Federici said she has been friends with **Griles** for at least a decade. She also
helped establish the group she now heads with Gale Norton, secretary of the
Interior since 2001. Upon joining the Cabinet, Norton handed control of the group
to Federici.

McCain has said that his committee's inquiry has turned up no evidence on
wrongdoing by Norton.

Echoing other Abramoff associates who have testified before the committee,
Federici insisted that she had been duped by the lobbyist.

``I had no reason in 2002 to believe that Mr. Abramoff was anything other than a
truthful, friendly, charismatic, well-liked and well-respected Republican advocate
in Washington,'' Federici said. When she found out that Abramoff had funded the
anti-casino campaign, Federici said, ``I felt tremendously manipulated.''

McCain grew so angry with Federici's interruptions of his questions -- and at what
he said were her unresponsive answers -- that he twice threatened to find her in
contempt of Congress. Federici appeared unshaken by the threats, or by McCain and
Dorgan repeatedly saying they found her testimony hard to believe.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/18/05 LAT-BUS (No Page)                                              Page 3

According to documents and testimony gathered by the panel, Abramoff used money collected from tribes to fund other organizations he established -- including a Jewish school for boys and a sniper training clinic in the West Bank of Israel -- that the tribes knew nothing about.

McCain has said he intends to issue a report on the committee's

findings early next year.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legislation (1LE97); Government (1GO80))

INDUSTRY:  (Entertainment (1EN08); Casinos (1CA80); Gaming Industry (1GA25))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (CABINET; DELAY; DEPARTMENT OF; ENVIRONMENTAL ADVOCACY; HOUSE MAJORITY LEADER TOM DELAY; INDIAN AFFAIRS; NORTON; **SENATE INDIAN AFFAIRS COMMITTEE**; WEST BANK)  (Abramoff; Abramoff Ally Clashes; Byron Dorgan; Dorgan; Echoing; Federici; Griles; Interior; Interior J. Steven Griles; Italia Federici; Jack; Jack Abramoff; John McCain; McCain; Michael Rosetti; Ralph Reed)

Word Count: 1031
11/18/05 LAT-BUS (No Page)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT S**

Westlaw.                                                                NewsRoom


11/18/05 WP-BUS (No Page)                                                Page 1


11/18/05 Wash. Post (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 18603136

                          Washington Post
                  Copyright 2005 The Washington Post

                         November 18, 2005

          Head of Republican Environmental Group Spars With Senators

                          By Susan Schmidt

WASHINGTON _ ``Unfortunately, she is critical to me.''

That's how former lobbyist Jack Abramoff once summed up his relationship with
Italia Federici, the president of a Republican environmental group. He told
colleagues that although Federici's help was expensive, it was important. Over
three years, he directed Indian tribes he represented to contribute about $500,000
to her group.

On Thursday, Federici proved a combative witness before the **Senate Indian Affairs**
Committee. She tangled with senators demanding explanations for a stack of e-mails
that suggest she exploited a personal relationship with former Interior deputy
secretary J. Steven **Griles** to secretly help Abramoff lobby the department and
obtain inside information affecting Abramoff's tribal clients.

Federici said she had been manipulated by Abramoff. She acknowledged that the
lobbyist had arranged for the tribes to donate to her group, the Council of
Republicans for Environmental Advocacy. Because he was a friend and donor, she
said, she went along with his requests _ ``once every other week, once a month'' _
to contact **Griles**.

Committee Chairman John McCain, R-Ariz., and the ranking Democrat, Sen. Byron
Dorgan of North Dakota, cast Federici as a paid conduit for Abramoff's
influence-peddling with the department.

``It looks to me like you got paid for things that had nothing to do whatever with
your organization,'' Dorgan said. ``It looks to me like you were working for Mr.
Abramoff and you were getting paid by Indian tribes to do it.''

Federici told the committee: ``He did ask me for assistance, but it was not the
body of work I did.'' She said she was ``responding to Jack as a friend, as I
would respond to any friend who had a need or question.'' Federici said she
learned later about Abramoff's lobbying practices now under investigation. ``I
didn't know he was doing the things he was doing,'' she said.

``I come from a pretty small town but I think I can spot a pretty big lie,''

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/18/05 WP-BUS (No Page)                                                Page 2

Dorgan told Federici. She insisted, ``I am not lying to this committee.''

Typical of the many requests Abramoff made to Federici was an e-mail dated Dec. 2, 2002, in which he sought **Griles's** help in scuttling a casino plan by the Jena Band of Choctaw, a Louisiana tribe seen as competition by his clients: ``It seems the Jena are on the march again.. if you can, can you make sure Steve squelches this again? thanks!!''

Asked to explain Abramoff's request and what she did with it, Federici responded: ``We work with people every day with varying levels of decorum.'' It was a response that drew a puzzled scowl from McCain, who said at one point: ``Your answers are so bizarre.''

**Griles** testified earlier this month that he never got involved in tribal issues at Interior and said his relationship with Abramoff was no different than that with any lobbyist.

McCain, exasperated Thursday with Federici's ``non-responsive'' answers and combative demeanor, threatened to cite her for contempt. Federici accused McCain of conducting a ``witch hunt'' directed at her because her group had opposed one of his bills on oil drilling in Alaska.

Federici said her group had no contact with the tribes that contributed, and did not get involved in any tribal issues. But she said she did not question Abramoff's solicitation of tribal contributions because he was known as a philanthropist.

Abramoff's requests were often paired with discussions of contributions for Federici's group. On April 3, 2003, Abramoff sent her an ``urgent alert'' about an Interior policy change. ``Any way to see if this is something coming from the top?'' he asked. Federici responded, ``I will definitely see what i can find out. I hate to bug you, but is there any news about a possible contribution ... .''

McCain questioned whether the exchange was a quid pro quo.

On a school funding issue affecting the Saginaw Chippewa Tribe, an Abramoff client, Abramoff asked Federici to call **Griles**. ``We're really going to need someone from the top down to tell (Acting Assistant Secretary of Indian Affairs) Aurene Martin ... that this money is going to the Saginaw, period.''

``Got it,'' Federici replied.

On Thursday she told the Senate panel that she had merely meant to register receipt of the e-mail. While she always agreed to Abramoff's requests, ``I attempted to reach Steve many times more than I actually did.''

Federici's group was co-founded by Gale Norton before she joined the Bush administration as Interior secretary. In one e-mail, Abramoff told a colleague that Federici's group was ``our access to Norton.''

McCain said the committee has found no evidence that Norton knew Abramoff was trading on her name. Dan DuBray, Norton's press secretary, said she ``was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

aware of these activities.'' He added: ``Mr. Abramoff's contact with the department _ both his direct contacts and those which may have been conducted by surrogates _ are being reviewed by the office of the inspector general and others.''

Much of Abramoff's effort against the Jena tribe involved getting members of Congress to weigh in. At least 33 lawmakers who wrote letters to Norton opposing the Jena casino received more than $830,000 in Abramoff-related donations between 2001 and 2004, according to an Associated Press tally.

Among those who wrote letters was House Speaker Dennis Hastert, R-Ill., who held a fund-raiser at Abramoff's Signatures restaurant on June 3, 2003, that collected at least $21,500 for his Keep Our Majority political action committee from the lobbyist's firm and tribal clients. A week later, Hastert wrote Norton to urge her to reject the Jena casino.

Senate Democratic Leader Harry Reid of Nevada sent a letter to Norton on March 5, 2002, also signed by Sen. John Ensign, R-Nev. The next day, the Coushatta Tribe of Louisiana issued a $5,000 check to Reid's tax-exempt political group, the Searchlight Leadership Fund. A second Abramoff tribe also sent $5,000 to Reid's group. Reid ultimately received more than $66,000 in Abramoff-related donations from 2001 to 2004.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Government (1GO80))

REGION:  (USA (1US73); Michigan (1MI45); Americas (1AM92); Louisiana (1LO72); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AURENE MARTIN; COMMITTEE; COUSHATTA TRIBE OF LOUISIANA; ENVIRONMENTAL ADVOCACY; FEDERICI; HASTERT; HOUSE SPEAKER DENNIS HASTERT; INDIAN; INDIAN AFFAIRS; INTERIOR; JENA; JENA BAND OF CHOCTAW; LOUISIANA; REPUBLICAN ENVIRONMENTAL GROUP; SAGINAW; SAGINAW CHIPPEWA TRIBE; SEARCHLIGHT LEADERSHIP FUND; SENATE; **SENATE INDIAN AFFAIRS** COMMITTEE)  (Abramoff; Bush; Byron Dorgan; Dan DuBray; Dorgan; Gale Norton; Griles; Harry Reid; Head; J. Steven Griles; Jack; Jack Abramoff; John Ensign; John McCain; McCain; Norton; Reid; Typical)

Word Count: 1200
11/18/05 WP-BUS (No Page)
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT T**

March 18, 2005

Ms. Sue Ellen Sloca
Office of the Secretary
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

    **BY FAX:** 202-219-2374

    Re:    <u>Freedom of Information Act Request</u>

Dear Ms. Sloca:

    Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, <u>et seq.</u>

    This request relates to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

    This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

    Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts.

Ms. Sue Ellen Sloca
March 18, 2005
Page Two

We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs. As used in this request "and" also means "or," and "or" also means "and." As used in this request, "any matter within the jurisdiction of the Bureau of Indian Affairs" includes, but is not limited to, any matter also within the jurisdiction of the Office of the Secretary.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts and notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe **each** document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (*emphasis added*). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular

Ms. Sue Ellen Sloca
March 18, 2005
Page Three

part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt . . . "); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). f it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

### Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process used by the Department of the Interior to approve tribal bids for casinos on Indian lands.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

Ms. Sue Ellen Sloca
March 18, 2005
Page Four

### Conclusion

Please respond to this request in writing within twenty (20) days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the twenty-day period, please call me within that time period. I can be reached at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Sincerely,

Melanie Sloan
Executive Director

cc: Bureau of Indian Affairs

**EXHIBIT U**



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



March 21, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296**, seeking:

> "This request related to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.
>
> This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.
>
> Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all

1

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

Today we are sending a partial initial response, consisting of 218 documents containing 5038 pages on 1 CD ROM in TIFF Format (except for an Index to Calendars which is in Microsoft Word).

As noted during our telephone conversation on Friday, the documents include travel records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until March 29, 2004. We are also sending some correspondence from Conrad Burns to DOI, and another folder, the Jena Band of Choctaw documents, both sets of which were released under previous FOIA requests, and are therefore readily available. To recap our conversation, we are now searching the Secretary's Automated Correspondence Indexing System for correspondence between all of the relevant parties you named, and will notify you when those searches are completed. In addition we will provide you with calendar information for Secretary Norton and former Deputy Secretary Griles through November 2004 as soon as it completes the review process. We have also made a referral to BIA for their direct response to you.

**Deleted from some of the documents enclosed, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)), is the following information:**

> **Fixed conference call codes**
> **Agency credit card numbers**
> **Government cellular phone numbers**
> **Homeland security-related information**

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

*Conference Call Codes*
Conference call codes are codes that allow access to telephone conference calls.[1] Release of non-variable access codes linked to telephone conference calls scheduled at standard, fixed intervals could allow individuals not authorized to participate in these calls to eavesdrop on them, and so circumvent security precautions established to protect the privacy of agency deliberations. Therefore, we have determined that fixed conference call codes belong to the category of information likely to result in harmful circumvention under "high 2."

*Credit Cards*
The Department of Justice has determined that agency credit card numbers belong to the category of information likely to result in harmful circumvention under "high 2". Specifically, the Department of Justice lists agency credit card numbers as an example of "high 2" information. (Freedom of Information Act Guide and Privacy Act Overview, 128 (May 2000 ed.)) Additionally, the United States District Court for the District of Columbia has held agency credit card numbers to fall within the "high 2" exemption. The court based its determination on the possibility of misuse and fraud of agency credit cards. Judicial Watch, Inc. v. United States Dep't. of Commerce, 83 F.Supp.2d 105, 110 (D.D.C. 1999).

*Cellular Phone Numbers*
Two courts have held that telephone numbers constitute trivial administrative matters with no genuine public interest. Hale v. Department of Justice, 973 F.2d 894, at 902 (10th Cir., 1992); Voinche v. Federal Bureau of Investigations, 46 F.Supp.2d 26, at 30 (D.D.C. 1999). The redacted information pertains to the numbers assigned to the cellular phone numbers provided to federal employees by the government. The release of this information would not shed significant light on an agency personnel

---

[1] Generally, access codes are variable, that is, they are viable only for a given conference call at a specified time on a specified date. The release of variable access codes, after their expiration, would not risk circumvention of a legal requirement because none of these numbers could be used to obtain access to a telephone conference call.

rule or practice; nor does the public have a substantial interest in the redacted information. Finally, the information redacted bears no relation to the substantive contents of the records released. Therefore, we have determined that government cellular phone numbers fall under the category of information withholdable under Exemption 2.

*Homeland Security Information*
Information concerning the need to protect facilities and national assets from security breaches and harm that reasonably could be expected to enable someone to succeed in causing the feared harm is necessarily protected under "high 2." The redacted information could be used by those intending to plan an act of terrorism on U.S. soil to obtain an advantage over the government by gaining insight into what the government perceives as areas of vulnerability. This type of information is directly related to homeland security and is properly withheld under exemption 2.

**Also, information has been deleted from one of these documents, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege "exempt[s] those documents . . . normally privileged in the civil discovery context." National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege "protect[s] the decisionmaking process of government agencies" and "encourage[s] the frank discussion of legal and policy issues" by ensuring that agencies are not "forced to operate in a fish bowl." Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional

4

and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept. of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one "prepared in order to assist an agency decisionmaker in arriving at his decision," and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents that reflect the personal opinions of the writer rather than the policy of the agency." Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the "deliberative process" if "the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Id.

The portions of the documents that have been withheld pursuant to Exemption 5 do not contain or represent formal or informal agency policies or decisions. The contents have been held confidential by all parties. Public dissemination of this information would most certainly have a chilling effect on the agency's deliberative processes. It would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

**Also deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), are the following categories of information pertaining to the individuals named in the records:**

> **dates of birth**
> **birthdays**
> **home addresses**
> **home and cell telephone numbers**
> **pager numbers**
> **time and attendance data**
> **hotel/rental car confirmation numbers**
> **names of individuals not selected for employment**
> **personal, family and medical appointments**
> **names of security personnel providing protection to Secretary**
> **information pertaining to individuals not selected for employment by**
> **the Department    (names, telephone numbers, etc.)**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

5

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

    (1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

    (2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")

    (3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

**Also deleted from one of the documents enclosed pursuant to Exemption 7E of the FOIA (5 U.S.C. § 552 (b)(7)(E)), is the following information:**

**phone number of FBI employee**

Exemption 7(E) affords protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigation or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

The Office of the Secretary has determined that the phone numbers of individuals employed by the Federal Bureau of Investigation are not routinely disclosed to the

public because public access to this number could reasonably be expected to expose the individual to harassment and/or hinder the individual's ability to carry out his/her law enforcement investigations.

We have concluded, therefore, that there are sound grounds for withholding it, pursuant to exemption 7E of the FOIA (5 U.S.C. § 552 (7)(E)).

**Deleted, additionally, from one of the documents enclosed pursuant to Exemption 7F and 7C of the FOIA (5 U.S.C. § 552 (b)(7)(C) & (F)), is the following information:**

  **names of security personnel providing protection to Secretary**

Exemption 7(C) provides protection for personal information in law enforcement records. It allows an agency to withhold law enforcement information the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

Exemption 7(F) permits the withholding of information necessary to protect the physical safety of a wide range of individuals. This exemption provides protection to "any individual" when disclosure of information about him "could reasonably be expected to endanger [his] life or physical safety."

The Office of the Secretary has determined that disclosure of the names of the individuals assigned to protect the Secretary on specific occasions in the past could reasonably be expected to endanger not only the individuals to whom this information pertains but also the Secretary of the Interior, should these same individuals be assigned to protect the Secretary on future occasions.

We have concluded, therefore, that there are sound grounds for withholding it, pursuant to exemption 7C and 7F of the FOIA (5 U.S.C. § 552 (7)(C) & (F)).

Lisa Lance, Tim Murphy, Cindy Cafaro, Robin Friedman, Donald S. Harris, and Stephanie Yu, Attorney-Advisors in the Office of the Solicitor, were consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter.) Your appeal letter must be marked, both on its envelope

7

and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $2.00, calculated as follows:

| 1 | CD ROM disk | @ $ 2.00 per disk |
|---|---|---|

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

**PRIVACY ACT notice**: *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of*

8

*the information you submit.  Also, e-mail is not necessarily secure against interception.  If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

**EXHIBIT V**

# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, DC 20240



April 12, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296**, seeking:

> "This request related to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.
>
> This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.
>
> Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all

1

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

As you will recall, by telephone we agreed that, aside from the referral to BIA, which will answer you directly, within the Office of the Secretary you would accept appointment records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until at least well into 2004, and for all of the parties and topics mentioned, and the index results of a search of the Secretary's Automated Correspondence Indexing System.

On March 21, 2005 we sent a partial response which included calendars for some Department of Interior officials, including Secretary Norton and former Deputy Secretary Griles, (from the beginning of their tenure through March 29, 2004, the records readily available because of previous FOIA requests), and which included material previously released under other FOIA requests addressing related subjects.

Today we are sending a second partial response which includes the indexes generated as a result of the searches of the Secretary's Automated Correspondence Indexing System.

**Deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), are the following categories of information pertaining to the individuals named in the records:**

> **Names of constituents**
> **Names of private citizens expressing views**
> **Names of persons recommended for positions**

2

**Name of person applying for position**
**Personal information about individuals**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.
(2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")
(3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Robin Friedman, Attorney-Advisor in the Office of the Solicitor, was consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you

may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter.) Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $28.14, calculated as follows:

| | | |
|---|---|---|
| ½ hour of Managerial Search Time | @ $ | 12.25 per ¼ hour |
| 28 Pages | @ $ | .13 per page |

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

This concludes the response within the Office of the Secretary, except for the calendars for Secretary Norton and former Deputy Secretary Griles for the time period March 30, 2004 through approximately December 31, 2004. These documents are currently under review, and you may expect to receive them shortly.

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

*PRIVACY ACT notice*:  *Before you choose to contact us, electronically, there are a few things you should know.  The information you submit, including your electronic address, may be seen by various people.  We will scan a copy of your request into our electronic OS FOIA administrative/image file.  We will key the information that you provide to us into our electronic OS FOIA tracking file.  We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration.  You may be contacted by any of these individuals.   In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit.  Also, e-mail is not necessarily secure against interception.  If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

# EXHIBIT W

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



TAKE PRIDE®
IN AMERICA

April 27, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296**, seeking:

> "This request related to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.
>
> This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.
>
> Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all

1

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

As you will recall, by telephone we agreed that, aside from the referral to BIA, which will answer you directly, within the Office of the Secretary you would accept appointment records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until at least well into 2004, and for all of the parties and topics mentioned, and the index results of a search of the Secretary's Automated Correspondence Indexing System.

On March 21, 2005 we sent a partial response which included calendars for some Department of Interior officials, including Secretary Norton and former Deputy Secretary Griles, (from the beginning of their tenure through March 29, 2004, the records readily available because of previous FOIA requests), and which included material previously released under other FOIA requests addressing related subjects.

On April 12, 2005 we sent a second partial response which included the indexes generated as a result of the searches of the Secretary's Automated Correspondence Indexing System.

Today we are sending the final response, which includes calendar information for Secretary Norton and former Deputy Secretary Griles until near the end of 2004, comprising 18 documents with 630 total pages.

**2.    Portions of some of these documents have been deleted, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)).  The following category of information has been deleted:**

> **direct phone number of agency employees**
> **access codes and conference call numbers**

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

We have determined that direct phone numbers of agency employees belong to the first category of exemption 2 data: internal matters of a relatively trivial nature. The courts have held that such telephone numbers constitute trivial administrative matters with no genuine public interest. *Hale v. Department of Justice*, 973 F.2d 894, at 902 (10th Cir., 1992; *Voinche v. Federal Bureau of Investigation*, 46 F.Supp.2d, at 30 (D.D.C. 1999); see, FREEDOM OF INFORMATION ACT OVERVIEW (May 2002 ed.), at p. 135.

**A Portion has been deleted, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency. (5 U.S.C. § 552 (b)(5)). As such, the privilege exempts those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept of Health & Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d

1136, 1143-44 (D.C. Cir. 1975).  A predecisional document is one prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.  Maricopa Audubon Society v. United States Forest Service, 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

That portion of the document that has been withheld pursuant to Exemption 5 is both predecisional and deliberative.  It contains recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of its author.   It does not contain or represent formal or informal agency policies or decisions.  Furthermore, it is the result of frank and open discussions among employees of the Department of the Interior.  Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.


**Portions of some of these documents have also been deleted, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)).  The following categories of information pertaining to the individuals named in the records have been deleted:**

> **home addresses**
> **home and cell telephone numbers**
> **personal information pertaining to families of individuals**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's

4

right to disclosure.

    (1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

    (2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")

    (3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Attorney-Advisor, in the Office of the Solicitor, was consulted in reaching this decision. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making this decision.

## 3.    Appeal Rights

If you believe that the decision to withhold this information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience), and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $10.45, calculated as follows:

| | |
|---|---|
| ¼ hour of Managerial Search Time | @ $  12.25 per ¼ hour |
| 1 CD Rom Disk | @ $   2.00 per disk |

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

This concludes the response within the Office of the Secretary. (We are still conducting the search for your other pending FOIA request, OS-2005-00331, and you should expect to hear from us shortly with respect to that FOIA request.)

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

**PRIVACY ACT notice**: *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of*

6

*the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

**EXHIBIT X**

# CREW | citizens for responsibility and ethics in washington

April 5, 2005

By Email

Ms. Linda Thomas
Office of the Secretary
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
email: osfoia@nbc.gov

Re: FOIA Request OS-2005-00296

Dear Ms. Thomas:

On March 18, 2005, Citizens for Responsibility and Ethics in Washington ("CREW") filed a Freedom of Information Act ("FOIA") request with the Department of the Interior (Request OS-2005-00296) seeking records, regardless of format and including electronic records and information, relating to the following:

> [A]ny contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman Tom DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

CREW's March 18, 2005 FOIA request also sought:

> [A]ny records, dating from January 1, 2001, to the present, from any office of the Department of the Interior, including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of

Indian Affairs regarding the Agua Caliente Tribe of Palm Spring, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

By letter dated March 21, 2005, your office acknowledged receipt of CREW's FOIA request, and stated that you were sending CREW a partial response consisting of 218 documents. In a follow-up telephone conversation between Melanie Sloan and Sue Ellen Sloca, we were advised that the Department of the Interior ("DOI") had also produced certain travel records, and was sending some additional documents, which CREW has now received. In addition, your office stated it was searching the Secretary's Automated Correspondence Indexing system for correspondence between all the relevant parties named in CREW's FOIA request and would also provide CREW with certain additional calendar information.

In a subsequent telephone conversation, CREW also requested that DOI search electronic records for responsive information within the parameters of CREW's FOIA request. You indicated that, notwithstanding the language of our March 18, 2005 FOIA request specifying that the records we sought included electronic records, a request for such records should be considered as a new FOIA request in light of the prior discussions between our offices. While we do not agree that a new FOIA request is necessary, we are nevertheless submitting this letter outlining the additional documents we seek and ask that, if necessary, you consider this letter to constitute a FOIA request and process it accordingly. It is our understanding that even if deemed a new FOIA request, it will be combined with our March 18, 2005 FOIA request and processed simultaneously.

Specifically, CREW seeks all electronic records relating to any contact, dating from January 1, 2001, to the present, that any of the following individuals may have had with the individuals and entities outlined in our March 18, 2005 FOIA request relating to any matter within the jurisdiction of the Bureau of Indian Affairs, and all contacts the following individuals had with the six Indian Tribes listed in our request:

Secretary Gale Norton
William D. Betterberg, Director, Office of Policy Analysis
James E. Carson, Associate Deputy Secretary
Tom Fulton, Deputy Assistant Secretary, Land and Minerals Management
J. Steven Griles, former Deputy Secretary
Kit Kimball, Director, Office of External and Intergovernmental Affairs
Ann Klee, Counselor to the Secretary
Michael Rossetti, Counselor to the Secretary
Lynn Scarlett, Assistant Secretary for Policy, Management and Budget

Brian Waidmann, Chief of Staff
Sue Ellen Woolridge, Deputy Chief of Staff
William G. Myers, III, Solicitor
Lawrence Jensen, Counsel, Office of the Solicitor
Mathew E. McKeown, Special Assistant, Office of the Solicitor
David W. Anderson, Assistant Secretary, Indian Affairs
Ross Swimmer, Special Trustee for Indian Affairs
George T. Skibine, Director, Office of Indian Gaming Management
Aurene Martin, Principal Deputy Assistant Secretary, Indian Affairs

In addition, to the extent not listed above, we seek all electronic records relating to the above-delineated contacts for the individuals who occupied the following positions in DOI's Bureau of Indian Affairs from January 1, 2001, to the present:

Director, IIT Office of American Indian Trust
Director, IAE Office of Audit and Evaluation
Deputy Director, IAE Office of Audit and Evaluation
Director, ISC Office of Self Governance
Compact Negotiation Manager, ISC Office of Self Governance
Compact Negotiation Specialist, ISC Office of Self Governance
Director, OIE Office of Indian Education Programs
Deputy Director, OIE Office of Indian Education Programs
Chief, 13 Branch of Management Information Services
Chief, 30 Division of Planning/Oversight and Evaluation
Chief, 30 Branch of Planning
Deputy Commissioner of Indian Affairs
Director, 120 Congressional and Legislative Affairs
Legislative Coordinator, 120 Congressional and Legislative Affairs
Director, 130 Indian Gaming Management Staff
Secretary, 130 Indian Gaming Management Staff
Management Analyst, 130 Indian Gaming Management Staff
Director, Office of Trust Responsibilities
Director, Office of Information Resources Management
Director, Office of Tribal Services
Secretary, Division of Tribal Government Services
Chief, Branch of Tribal Enrollment
Chief, Branch of Tribal Relations
Director, Office of Management and Administration
Director, Office of Economic Development

In addition, we request all documents, regardless of format, medium or physical characteristics, that relate in any way to a meeting Secretary Norton had on November 8, 2002, with Clint Bolick, Grover Norquist, Chip Mellor and Sue Ellen Wooldridge. Our

request includes, but is not limited to, any telephone messages, voice mail messages, daily agenda and calendar information about this meeting, whether in-person or over the telephone, agendas for this meeting, minutes of this meeting, e-mail regarding this meeting, e-mail or facsimiles sent as a result of this meeting, and any transcripts or notes of this meeting.

If it is DOI's position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). Please refer to our FOIA request of March 18, 2004, for an explanation of what the Vaughn index must include.

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portions of a record shall be provided to any person requesting such records after deletion of the portions which are exempt . . ."). For a further explanation of the agency's responsibilities in this regard, please see CREW's March 18, 2005 FOIA request.

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process used by the Department of the Interior to approve tribal bids for casinos on Indian lands.

CREW is a non-profit corporation, organized under section 501(C)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request us not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases. Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

Please respond to this request in writing within twenty (20) days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available

within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request, or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period, at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such a determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Finally, we really appreciate the timeliness and professional courtesy your office has shown to date, and look forward to working with you in a continued cooperative manner.

Sincerely,

Anne L. Weismann
Staff Attorney

# EXHIBIT Y

## United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



FOIA #06207

JUL 2 9 2005

Ms. Anne L. Weismann
CREW
11 Dupont Circle, NW, 2nd Floor
Washington, DC 20036

Dear Ms. Weismann:

This letter is in response to your Freedom of Information Act (FOIA) request of April 5, 2005, regarding electronic records between the Agua Caliente Tribe, Tigua Tribe, Saginaw Tribe, Mississippi Band of Choctaw Indians, Coushatta Tribe, and Jena Band of Choctaw Indians and Mr. George T. Skibine, Director, Office of Indian Gaming Management. We have reviewed our files and were unable to locate any records responsive to your request.

Under 43 CFR 2.28, you may appeal this response by writing to the Freedom of Information Act Appeals Officer, Office of Information Resources Management, U.S. Department of the Interior, MS-5312 MIB, Washington, DC 20240. Your appeal must be received no later than 30 workdays after the date of this letter or 30 workdays after receipt of any records that are provided to you. The appeal should be marked, both on the envelope and the face of the appeal letter, with the legend "Freedom of Information Appeal." Your appeal should be accompanied by a copy of your original request and this letter, along with any information you have which leads you to believe the records do in fact exist, including where they might be found, if the location is known to you.

Sincerely,

Willie S. Chism

Freedom of Information Act Officer
Office of Information Policy

**EXHIBIT Z**

## Anne Weismann

| | |
|---|---|
| **From:** | Anne Weismann [aweismann@citizensforethics.org] |
| **Sent:** | Monday, September 26, 2005 8:56 AM |
| **To:** | 'OSFOIA@nbc.gov' |
| **Subject:** | Attn: Linda Thomas |

Linda, per our conversation, CREW is requesting under the Freedom of Information Act additional documents that were provided to other FOIA requesters in response to the following FOIA requests:

    OS-2005-00-228
    OS-2005-00-249
    OS-2005-00-272
    OS-2005-00-413

For the reasons set forth in our earlier related FOIA requests, we are also requesting a waiver of the fees associated with the processing of this request.  If there are any questions, please contact me at 202-588-5565.

Thank you for you prompt attention to this matter.

Anne Weismann

**EXHIBIT AA**



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



September 27, 2005

Ms. Anne L. Weismann, Staff Attorney
CREW (Citizens for Responsibility and Ethics in Washington)
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Weismann:

On September 26, 2005, you filed a Freedom of Information (FOIA) request seeking:

"Additional documents that were provided to other FOIA requesters in response to the following FOIA requests:

OS-2005-00-228
OS-2005-00-249
OS-2005-00-272
OS-2005-00-413."

These particular records were selected because of our phone conversations in which you asked for any documents which your organization had not yet received but which had been sent to a particular author of a news story. An examination of our records identified the above FOIA requests as those containing such records.

With respect to your request:

1. We have classed your request as an "other-use" request. This means that we have determined that it is neither a "commercial use request" nor one placed by a member of the news media or a representative of an educational or non-commercial scientific institution. As an "other-use requester", you are entitled to receive 2 hours of search time and 100 pages of duplication of responsive records without charge before being asked to pay for document search and reproduction. Additionally, the Department of the Interior does not bill requesters for FOIA fees incurred in processing "other-use requests" when their fees do not exceed $30.00 after the subtraction of their entitlements, because the cost of collection would be

1

after the subtraction of their entitlements, because the cost of collection would be greater than the fee collected. (See 43 CFR § 2.18(a). Because we are able to make an immediate final response which results in a fee below $30.00, it is not necessary to make a determination regarding fee waiver.

2. In final response to your request, we are enclosing 4 Folders containing a total of 146 documents consisting of 659 total pages as TIFF Images on 1 CD Rom Disc.

**Portions of some of these documents have been deleted, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)). The following category of information has been deleted:**

> **Agency credit card numbers**
> **Conference call telephone numbers with pin numbers**
> **Names of security personnel**

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

The Department of Justice has determined that agency credit card numbers belong to the category of information likely to result in harmful circumvention under "high 2". Specifically, the Department of Justice lists agency credit card numbers as an example of "high 2" information. (Freedom of Information Act Guide and Privacy Act Overview, 206, (May 2004 Edition.)) Conference call codes are codes that allow access to telephone conference calls.[1] Release of non-variable access codes linked to telephone conference calls scheduled at standard, fixed intervals could allow individuals not authorized to participate in these calls to eavesdrop on them, and so circumvent security precautions established to protect the privacy of agency deliberations. Therefore, we have determined that fixed conference call codes also belong to the category of information likely to result in harmful circumvention under "high 2." Finally, the individual names of law enforcement officials including security officers also are protected from release by Exemption 2, because they are internal personnel practices of an agency, the release of which could provide an opportunity for circumvention of the law.

---

[1] Generally, access codes are variable, that is, they are viable only for a given conference call at a specified time on a specified date. The release of variable access codes, after their expiration, would not risk circumvention of a legal requirement because none of these numbers could be used to obtain access to a telephone conference call.

**A portion of one of these documents has also been deleted pursuant to Exemption 4 of the FOIA (5 U.S.C. § 552 (b)(4)):**

> **Bank account information on bank draft check**

Exemption 4 protects trade secrets and commercial or financial information, obtained from a person, which is privileged or confidential. This exemption is intended to protect both the interests of commercial entities that submit proprietary information to the Government and the interests of the Government in receiving continued access to it. Information is considered "confidential" if disclosure of it "is likely to cause substantive harm to the competitive position of the person from whom the information was obtained." National Parks & Conservation Ass'n. v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).

The organization listed on the check, "Bush-Cheney'04, Inc.", is considered a "person," under the law, because the term "person" includes a wide range of entities including corporations. This corporation has a clear commercial interest in the safeguarding of its bank account information. This information represents proprietary financial information which would not customarily be provided to the public. Public release of it in response to this FOIA request would cause potential harm to its security interests in safeguarding its financial information.

**In addition, portions of some of these documents have been deleted, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege exempts those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Serv., 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and

3

(3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one prepared to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

The portions of the documents that have been withheld pursuant to the deliberative process aspect of Exemption 5 are both predecisional and deliberative. They contain recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of their authors. They do not contain or represent formal or informal agency policies or decisions. Furthermore, they are the result of frank and open discussions among employees of the Department of the Interior. Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

In addition, some of the withheld material constitutes privileged communications between attorney and client. Exemption 5 permits the withholding of "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." See, e.g., Mead Data Central, Inc. v. Dep't of The Air Force, 556 F.2d at 252-63 (D.C. Cir. 1977).

**Finally, portions of some of these documents have been deleted pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)). The following categories of information pertaining to the individuals named in the records have been deleted:**

>    **Cellular telephone numbers**
>    **Home telephone numbers**

      **Personal email addresses**
      **Home addresses**
      **Social security number**
      **Personal information about government employees**
      **Personal FAX number**
      **Home addresses**
      **Employment information including resignation information**
      **Names of constituents**
      **Names of private citizens expressing views**
      **Names of persons recommended for positions**
      **Name of person applying for position**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

    (1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

    (2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties").

    (3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to

5

be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Robin Friedman, and Don Harris, Attorney-Advisors in the Office of the Solicitor, were consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) from your receipt of these documents. Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $19.50, calculated as follows:

| ½ | hour of Professional Search Time | @ $ | 8.75 per ¼ hour |
| 1 | CD Rom disk | @ $ | 2.00 per disk |

However, as an "other-type requester", you are entitled to up to two hours of search time without charge. (See 43 C.F.R. § 2.17(a)(4).) That leaves only the $2.00 charge for the CD Rom Disk. However, as a matter of policy the Department of Interior does not charge for the processing of FOIA fees when the cost is below $30.00, since the cost of collection exceeds the amount collected. Therefore, your fee is $0.00. As noted above, this renders unnecessary the consideration of your request for fee waiver.

This concludes the response within the Office of the Secretary.

If you have any questions regarding any of the issues discussed in this letter, you may contact Linda Thomas by phone at 202-208-7294, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS

**EXHIBIT BB**



CREW | citizens for responsibility and ethics in washington

October 20, 2005

**FREEDOM OF INFORMATION ACT APPEAL**

FOIA Appeals Officer
U.S. Department of the Interior
1849 C Street, N.W.
Mail Stop 7456, MIB
Washington, D.C. 20240

Dear Sir/Madam:

By letter dated September 27, 2005, and enclosed with this appeal, Sue Ellen Sloca, FOIA Officer, Office of the Secretary, U.S. Department of the Interior (Interior), responded to a Freedom of Information Act (FOIA) request filed by Citizens for Responsibility and Ethics in Washington (CREW) on September 26, 2005, and also enclosed with this appeal. CREW hereby appeals that response for the reasons set forth below. In addition, based on Interior's September 27, 2005 response as well as information made available to CREW through a *Washington Post* article of August 28, 2005, CREW also hereby appeals Interior's responses of March 21, 2005, April 12, 2005, and April 27, 2005, to CREW's FOIA request of March 18, 2005, copies of which are enclosed herein. Finally, based on that same information, CREW hereby appeals Interior's response of July 29, 2005, to CREW's FOIA request of April 5, 2005, copies of which are enclosed with this appeal.

<b>CREW's March 18, 2005 FOIA Request</b>

Our March 18, 2005 FOIA request sought records, regardless of format and including electronic records and information, relating to the following:

> [A]ny contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of

the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman Tom DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

CREW's March 18, 2005 FOIA request also sought:

[A]ny records, dating from January 1, 2001, to the present, from any office of the Department of the Interior, including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Spring, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

In response, Interior made three separate releases of documents on March 21, 2005, April 12, 2005, and April 27, 2005. Interior's partial response of March 21, 2005, consisted of calendars for some of the Interior officials designated in CREW's March 18, 2005 FOIA Request, including Secretary Norton and former Deputy Secretary Griles. Interior's second partial response of April 12, 2005, consisted of indices generated as a result of the searches of the Secretary's Automated Correspondence Indexing System. Interior's final response of April 27, 2005, consisted of additional calendar information for Secretary Norton and former Deputy Secretary Griles. In addition, Interior's final response also stated the following: "This concludes the response within the Office of the Secretary."

### CREW's April 5, 2005 FOIA Request

On April 5, 2005, CREW sent a follow-up FOIA request to Interior requesting all electronic records relating to any contact, dating from January 1, 2001, to the present, that any of the following individuals may have had with the individuals and entities outlined in CREW's March 18, 2005 FOIA request relating to any matter within the jurisdiction of the Bureau of Indian Affairs, and all contacts the following individuals had with the six Indian Tribes listed in our request:

Secretary Gale Norton
William D. Betterberg, Director, Office of Policy Analysis

2

James E. Carson, Associate Deputy Secretary
Tom Fulton, Deputy Assistant Secretary, Land and Minerals Management
J. Steven Griles, former Deputy Secretary
Kit Kimball, Director, Office of External and Intergovernmental Affairs
Ann Klee, Counselor to the Secretary
Michael Rossetti, Counselor to the Secretary
Lynn Scarlett, Assistant Secretary for Policy, Management and Budget
Brian Waidmann, Chief of Staff
Sue Ellen Woolridge, Deputy Chief of Staff
William G. Myers, III, Solicitor
Lawrence Jensen, Counsel, Office of the Solicitor
Mathew E. McKeown, Special Assistant, Office of the Solicitor
David W. Anderson, Assistant Secretary, Indian Affairs
Ross Swimmer, Special Trustee for Indian Affairs
George T. Skibine, Director, Office of Indian Gaming Management
Aurene Martin, Principal Deputy Assistant Secretary, Indian Affairs

In addition, CREW sought all electronic records relating to the above-delineated contacts for the individuals who occupied the following positions in DOI's Bureau of Indian Affairs from January 1, 2001, to the present:

Director, IIT Office of American Indian Trust
Director, IAE Office of Audit and Evaluation
Deputy Director, IAE Office of Audit and Evaluation
Director, ISC Office of Self Governance
Compact Negotiation Manager, ISC Office of Self Governance
Compact Negotiation Specialist, ISC Office of Self Governance
Director, OIE Office of Indian Education Programs
Deputy Director, OIE Office of Indian Education Programs
Chief, 13 Branch of Management Information Services
Chief, 30 Division of Planning/Oversight and Evaluation
Chief, 30 Branch of Planning
Deputy Commissioner of Indian Affairs
Director, 120 Congressional and Legislative Affairs
Legislative Coordinator, 120 Congressional and Legislative Affairs
Director, 130 Indian Gaming Management Staff
Secretary, 130 Indian Gaming Management Staff
Management Analyst, 130 Indian Gaming Management Staff
Director, Office of Trust Responsibilities
Director, Office of Information Resources Management
Director, Office of Tribal Services
Secretary, Division of Tribal Government Services
Chief, Branch of Tribal Enrollment

3

Chief, Branch of Tribal Relations
Director, Office of Management and Administration
Director, Office of Economic Development

Finally, CREW's April 5, 2005 FOIA request sought all documents, regardless of format, medium or physical characteristics, that relate in any way to a meeting Secretary Norton had on November 8, 2002, with Clint Bolick, Grover Norquist, Chip Mellor and Sue Ellen Wooldridge.

Interior responded to CREW's April 5, 2005 FOIA request by letter dated July 29, 2005. According to Interior, it had "reviewed [its] files and w[as] unable to locate any records responsive to [CREW's] request."

<h2 align="center">CREW's September 26, 2005 FOIA Request</h2>

On August 28, 2005, *The Washington Post* published an article detailing the involvement of former Deputy Secretary Griles in an effort by Jack Abramoff, a prominent Republican lobbyist who is currently under indictment and the subject of other criminal and congressional probes, to block an Indian casino, Gun Lake, that would have competed with one of Abramoff's tribal clients. Susan Schmidt, Abramoff Cited Aid of Interior Official, *The Washington Post*, August 28, 2005 (attached). The article cited to emails reviewed by *The Washington Post* that documented Griles' involvement with the Gun Lake casino, as well as emails "indicating the lobbyist enlisted Griles to stop a Louisiana tribe's proposed casino, which threatened another Abramoff client." Id. According to the article, "[c]opies of Abramoff's e-mails referencing Griles and Federici [also the subject of CREW's FOIA requests] were obtained from a variety of sources, including the Interior Department." Id.

Because none of the documents Interior had provided CREW in response to CREW's two prior FOIA requests included any of the referenced e-mails, CREW contacted Linda Thomas, the FOIA Officer who had handled CREW's two Interior FOIA requests. As a result of that conversation and at the recommendation of Ms. Thomas, CREW filed a third FOIA request on September 26, 2005 (attached), requesting documents that were provided to other FOIA requesters (but not CREW) in response to four FOIA requests: OS-2005-00-228, OS-2005-00-249, OS-2005-00-272, and OS-2005-00-413.

Interior responded to this third FOIA request on September 27, 2005, and produced a total of 146 documents. Of note, none of these documents was an e-mail.

CREW hereby appeals Interior's responses to CREW's FOIA requests of March 18, 2005, April 5, 2005, and September 26, 2005, on the ground that Interior failed to conduct an adequate search. As *The Washington Post* article of August 28, 2005, documents, there are existing email exchanges by Interior Department officials, including former Deputy Secretary Griles, concerning the very subjects of CREW's three FOIA requests. Yet, despite three separate requests and, presumably, three separate searches by Interior, Interior has not yet produced, or

otherwise accounted for, these email exchanges. Under these circumstances, Interior's searches were clearly inadequate. *See* Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351, 227 U.S.App.D.C. 253, 260 (D.C. Cir. 1983); Truitt v. Dep't of State, 897 F.2d 540, 542, 283 U.S.App.D.C. 86, 88 (D.C. Cir. 1990). This is particularly the case given that Interior had the benefit of *The Washington Post* article when it searched for documents responsive to CREW's FOIA request of September 26, 2005, yet still failed to locate the missing emails. *See* Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 28, 334 U.S.App.D.C. 20, 28 (D.C. Cir. 1998) (agency's search deemed unreasonable if, during that search, agency "discovered information suggesting the existence of documents that it could not locate without expanding the scope of its search.").

Moreover, CREW was not aware of the inadequacy of Interior's prior searches until the August 28, 2005 *Washington Post* article detailing existing emails relevant and responsive to CREW's earlier FOIA requests. At that time CREW acted diligently, by filing a third FOIA request aimed at capturing those emails. Under these circumstances, CREW has clearly acted in as expeditious manner as possible.

Accordingly, because Interior has failed to conduct an adequate search to locate all documents responsive to CREW's three FOIA requests, Interior should be directed to conduct another search to locate the missing emails.

Sincerely,

ANNE L. WEISMANN
Chief Counsel
Citizens for Responsibility and Ethics
  in Washington

Enclosures

5



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240



September 27, 2005

Ms. Anne L. Weismann, Staff Attorney
CREW (Citizens for Responsibility and Ethics in Washington)
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Weismann:

On September 26, 2005, you filed a Freedom of Information (FOIA) request
seeking:

> "Additional documents that were provided to other FOIA requesters in
> response to the following FOIA requests:
>
> OS-2005-00-228
> OS-2005-00-249
> OS-2005-00-272
> OS-2005-00-413."

These particular records were selected because of our phone conversations in
which you asked for any documents which your organization had not yet received
but which had been sent to a particular author of a news story. An examination of
our records identified the above FOIA requests as those containing such records.

With respect to your request:

1.  We have classed your request as an "other-use" request. This means that we
have determined that it is neither a "commercial use request" nor one placed by a
member of the news media or a representative of an educational or non-
commercial scientific institution. As an "other-use requester", you are entitled to
receive 2 hours of search time and 100 pages of duplication of responsive records
without charge before being asked to pay for document search and reproduction.
Additionally, the Department of the Interior does not bill requesters for FOIA fees
incurred in processing "other-use requests" when their fees do not exceed $30.00
after the subtraction of their entitlements, because the cost of collection would be

1

after the subtraction of their entitlements, because the cost of collection would be greater than the fee collected. (See 43 CFR § 2.18(a). Because we are able to make an immediate final response which results in a fee below $30.00, it is not necessary to make a determination regarding fee waiver.

2. In final response to your request, we are enclosing 4 Folders containing a total of 146 documents consisting of 659 total pages as TIFF Images on 1 CD Rom Disc.

**Portions of some of these documents have been deleted, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)). The following category of information has been deleted:**

> **Agency credit card numbers**
> **Conference call telephone numbers with pin numbers**
> **Names of security personnel**

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

The Department of Justice has determined that agency credit card numbers belong to the category of information likely to result in harmful circumvention under "high 2". Specifically, the Department of Justice lists agency credit card numbers as an example of "high 2" information. (Freedom of Information Act Guide and Privacy Act Overview, 206, (May 2004 Edition.)) Conference call codes are codes that allow access to telephone conference calls.[1] Release of non-variable access codes linked to telephone conference calls scheduled at standard, fixed intervals could allow individuals not authorized to participate in these calls to eavesdrop on them, and so circumvent security precautions established to protect the privacy of agency deliberations. Therefore, we have determined that fixed conference call codes also belong to the category of information likely to result in harmful circumvention under "high 2." Finally, the individual names of law enforcement officials including security officers also are protected from release by Exemption 2, because they are internal personnel practices of an agency, the release of which could provide an opportunity for circumvention of the law.

---

[1] Generally, access codes are variable, that is, they are viable only for a given conference call at a specified time on a specified date. The release of variable access codes, after their expiration, would not risk circumvention of a legal requirement because none of these numbers could be used to obtain access to a telephone conference call.

**A portion of one of these documents has also been deleted pursuant to Exemption 4 of the FOIA (5 U.S.C. § 552 (b)(4)):**

**Bank account information on bank draft check**

Exemption 4 protects trade secrets and commercial or financial information, obtained from a person, which is privileged or confidential. This exemption is intended to protect both the interests of commercial entities that submit proprietary information to the Government and the interests of the Government in receiving continued access to it. Information is considered "confidential" if disclosure of it "is likely to cause substantive harm to the competitive position of the person from whom the information was obtained." National Parks & Conservation Ass'n. v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).

The organization listed on the check, "Bush-Cheney'04, Inc.", is considered a "person," under the law, because the term "person" includes a wide range of entities including corporations. This corporation has a clear commercial interest in the safeguarding of its bank account information. This information represents proprietary financial information which would not customarily be provided to the public. Public release of it in response to this FOIA request would cause potential harm to its security interests in safeguarding its financial information.

**In addition, portions of some of these documents have been deleted, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege exempts those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Serv., 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and

(3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one prepared to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

The portions of the documents that have been withheld pursuant to the deliberative process aspect of Exemption 5 are both predecisional and deliberative. They contain recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of their authors. They do not contain or represent formal or informal agency policies or decisions. Furthermore, they are the result of frank and open discussions among employees of the Department of the Interior. Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

In addition, some of the withheld material constitutes privileged communications between attorney and client. Exemption 5 permits the withholding of "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." See, e.g., Mead Data Central, Inc. v. Dep't of The Air Force, 556 F.2d at 252-63 (D.C. Cir. 1977).

**Finally, portions of some of these documents have been deleted pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)). The following categories of information pertaining to the individuals named in the records have been deleted:**

> **Cellular telephone numbers**
> **Home telephone numbers**

4

Personal email addresses
Home addresses
Social security number
Personal information about government employees
Personal FAX number
Home addresses
Employment information including resignation information
Names of constituents
Names of private citizens expressing views
Names of persons recommended for positions
Name of person applying for position

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1)   First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2)   Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties").

(3)   Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to

5

be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Robin Friedman, and Don Harris, Attorney-Advisors in the Office of the Solicitor, were consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) from your receipt of these documents. Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $19.50, calculated as follows:

| ½ | hour of Professional Search Time | @ $ | 8.75 per ¼ hour |
| 1 | CD Rom disk | @ $ | 2.00 per disk |

However, as an "other-type requester", you are entitled to up to two hours of search time without charge. (See 43 C.F.R. § 2.17(a)(4).) That leaves only the $2.00 charge for the CD Rom Disk. However, as a matter of policy the Department of Interior does not charge for the processing of FOIA fees when the cost is below $30.00, since the cost of collection exceeds the amount collected. Therefore, your fee is $0.00. As noted above, this renders unnecessary the consideration of your request for fee waiver.

This concludes the response within the Office of the Secretary.

If you have any questions regarding any of the issues discussed in this letter, you may contact Linda Thomas by phone at 202-208-7294, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS

1413 MIB, Washington, D.C. 20240.   Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

Enclosures

***PRIVACY ACT notice***:  *Before you choose to contact us, electronically, there are a few things you should know.  The information you submit, including your electronic address, may be seen by various people.  We will scan a copy of your request into our electronic OS FOIA administrative/image file.  We will key the information that you provide to us into our electronic OS FOIA tracking file.  We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration.  You may be contacted by any of these individuals.   In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit.  Also, e-mail is not necessarily secure against interception.  If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

## Anne Weismann

**From:**     Anne Weismann [aweismann@citizensforethics.org]
**Sent:**     Monday, September 26, 2005 8:56 AM
**To:**       'OSFOIA@nbc.gov'
**Subject:** Attn: Linda Thomas

Linda, per our conversation, CREW is requesting under the Freedom of Information Act additional documents that were provided to other FOIA requesters in response to the following FOIA requests:

> OS-2005-00-228
> OS-2005-00-249
> OS-2005-00-272
> OS-2005-00-413

For the reasons set forth in our earlier related FOIA requests, we are also requesting a waiver of the fees associated with the processing of this request. If there are any questions, please contact me at 202-588-5565.

Thank you for you prompt attention to this matter.

Anne Weismann


**CREW** | **citizens for responsibility and ethics in washington**

Press Coverage

# Abramoff Cited Aid Of Interior Official

## Conflict-of-Interest Probe Is Underway

By Susan Schmidt, The Washington Post

August 28, 2005

Indicted lobbyist Jack Abramoff claimed in e-mails sent in 2002 that the deputy secretary of the interior had pledged to block an Indian casino that would compete with one of the lobbyist's tribal clients. Abramoff later told two associates that he was trying to hire the official.

A federal task force investigating Abramoff's activities has conducted interviews and obtained documents from Interior Department officials and Abramoff associates to determine whether conflict-of-interest laws were violated, according to people with knowledge of the probe. It can be a federal crime for government officials to negotiate for a job while being involved in decisions affecting the potential employer.

The two former Abramoff associates, who spoke on the condition of anonymity because they are under scrutiny in the investigation, said Abramoff told them in late 2003 that he was trying to arrange for his firm, Greenberg Traurig LLP, to hire J. Steven Griles, then deputy interior secretary. Federal investigators are interested in those discussions and in job negotiations Abramoff may have had with a second department official, according to sources.

Abramoff told associates that he believed Griles was "committed" to blocking an effort by the Gun Lake Indian tribe to build a casino near Grand Rapids, Mich., according to the content of e-mail messages reviewed by The Washington Post. Abramoff said the blocking would involve an environmental challenge to the project, a tactic also proposed by Michigan business leaders opposed to the casino. Abramoff fought the project because it would draw business from a casino operated by his clients, the Saginaw Chippewas.

Environmental concerns ended up delaying action on the Gun Lake casino. The project was cleared last May by the Interior Department.

Gun Lake was not the only casino that Abramoff tried to derail through his departmental contacts. The Post has reported on e-mails indicating the lobbyist enlisted Griles to stop a Louisiana tribe's proposed casino, which threatened another Abramoff client.

Griles, who left the Interior Department earlier this year to form a consulting firm, "said he never had anything to do with the Gun Lake casino issues," a spokeswoman at his company said. He did not comment on any job discussions with Abramoff. A spokesman for Abramoff also declined to comment. Greenberg Traurig, citing the ongoing investigation, had no comment on possible job talks with department officials.

In a separate case, Abramoff and a business partner were indicted this month on federal wire fraud and conspiracy charges in Florida. They are accused of providing lenders with a counterfeit financial document to consummate their purchase of a casino cruise line in 2000. Allegations of fraud emerged after the seller was later killed in a gangland-style hit.

The Washington probe, being conducted by the Justice Department's fraud and public corruption unit, focuses on Abramoff's lobbying work on Capitol Hill for Indian tribes for which he and public relations executive Michael Scanlon

were paid $82 million. Scanlon, one of about a dozen congressional staffers who went to work with Abramoff, had served as press spokesman for House Majority Leader Tom DeLay (R-Tex.).

The Justice Department task force, which includes the FBI and the IRS, is looking into Abramoff's dealings with lawmakers and their staffs. Investigators from the Interior Department's inspector general's office, part of the task force, have been asking witnesses about the Gun Lake casino project, according to people who have had contact with the investigators.

The task force also is examining Abramoff's relationships and influence with officials of the Bush administration, as highlighted by the previously undisclosed Gun Lake e-mails. The e-mails show how Abramoff relied on the president of a conservative group, Italia Federici, to intercede with Griles, who was her friend.

Copies of Abramoff's e-mails referencing Griles and Federici were obtained from a variety of sources, including the Interior Department. Some e-mails involving Gun Lake were read to The Post by a person who declined to release them because of the federal probe.

Department officials said the Gun Lake process was proper, adding that they could not comment further because of the ongoing investigation into Abramoff's contacts with Interior.

'The Way to Stop It'

The Gun Lake tribe, formally known as the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, in 2001 began seeking approval for a casino on 147 acres near Grand Rapids.

As part of its application, the tribe prepared an environmental assessment and was close to approval by the end of 2002. The tribe was not asked to produce an environmental impact statement, or EIS, a much more detailed study.

On Dec. 4, 2002, Abramoff received an e-mail from Saginaw Chippewas tribal representative Chris Petras, who said that Gun Lake's proposal was moving forward rapidly. A public comment period on the tribe's environmental assessment was expected to be the last step before the Bureau of Indian Affairs -- a part of the Interior Department -- cleared the way.

That same day, Abramoff sent an urgent e-mail to Federici, president of the Council of Republicans for Environmental Advocacy.

"This is a disaster in the making," Abramoff wrote. "This is the casino we discussed with Steve and he said that it would not happen. It seems to be happening! The way to stop it is for Interior to say they are not satisfied with the environmental impact report. Can you get him to stop this one asap? They are moving fast. Thanks Italia. This is a direct assault on our guys, Saginaw Chippewa."

Federici posted a quick reply: "I will call him asap." She met with Griles in his office two days later, according to a copy of Griles's schedule released under the Freedom of Information Act. Federici did not respond to interview requests for this article.

Federici's group, CREA, was founded in the 1990s by conservative anti-tax activist Grover Norquist and Gale Norton, now secretary of the interior. It has received financial backing from chemical and mining interests, leading some environmentalists to brand it a front for industrial polluters. Abramoff directed tribes he represented to donate $225,000 to CREA from 2001 to 2003.

Days after he appealed to Federici for help with Griles, Abramoff reassured the Saginaw Chippewas tribal representative. "The meeting with Griles went well. We have a lot to do but we'll get there," he told Petras in a Dec. 12, 2002, e-mail.

Scanlon weighed in the following week, suggesting technical roadblocks to stop the casino. "Hey, I think a real quick way to blow this Gun Lake thing out of the water is to have BIA reject the land into trust, or lay some stipulation on their application that would buy us some time," Scanlon wrote Abramoff on Dec. 16. "Any word from Griles on this?"

Abramoff wrote back: "I thought the way to do this is to have them reject the EIS, which I believe Griles has committed to do."

In the first half of 2003, the Gun Lake tribe remained under the impression that its application was about to be approved. But in July of that year, the Department of Justice's Indian law section raised concerns about the project and sought to have the tribe prepare an environment impact statement.

Federal investigators are examining the circumstances that led the section to raise its objections, according to people who have been interviewed in the probe.

Thomas L. Sansonetti, then the associate attorney general overseeing the Indian law section, told Interior Department officials that his office did not want to take on the burden of defending the department if it was sued by Michigan opponents of Gun Lake on environmental grounds.

In an interview this month, Sansonetti said that he wanted to have a strong defense in the event of a lawsuit. He said he was not moved by the Gun Lake tribe's offer to provide legal assistance for any court case.

Sansonetti said he first heard about Gun Lake from the Interior Department's solicitor's office. "I think there was a concern with the [environmental assessment] being sufficient all along," he said.

Sansonetti said he has attended events sponsored by Federici's group. He said he had no communication with Griles or Abramoff about Gun Lake and said he is unaware of any investigation of the matter. He left the Justice Department this year to join a Wyoming law firm.

Asked to comment on how his tribe's application was handled, Gun Lake leader D.K. Sprague issued a statement complaining of the cost of the delay in the casino application and urging "a thorough investigation" by the Justice Department task force. "We have been denied our federal rights, economic self-sufficiency, and jobs that will benefit our community," he said.

Opponents Sue Interior

In addition to Gun Lake, in 2003 Abramoff and Griles were active in an effort to stop a casino proposed by the Jena Band of Choctaws in Louisiana, rivals of another Abramoff client.

Late in that year, Griles, who was generally not involved in Indian issues, presented Interior officials with a binder containing legal arguments and congressional letters opposing the Jena plan. Griles acknowledged to colleagues that the binder had probably been put together by Abramoff, according to one former senior department official, who spoke on the condition of anonymity.

In March, The Post reported that Griles's involvement in the Jena case led to a clash with other Interior Department officials, including former legal counsel Michael G. Rossetti. A spokeswoman for Griles commented for that article, saying that he "didn't participate in any decision-making process regarding the Jena Band and gaming."

In April, the Interior Department solicitor's office dropped opposition to the Gun Lake tribe's casino application. The tribe subsequently received approval for its casino.

A group of Grand Rapids business leaders, who had long argued that the casino would harm the city's renewal plans and should undergo a more extensive environmental review, immediately sued the Interior Department.

One of those involved in the legal action was Peter F. Secchia, a major GOP fundraiser who served as an ambassador for President George H.W. Bush. In December 2002, he told the Kalamazoo Gazette that he was going all-out to block the casino, so much so that he spoke to presidential political adviser Karl Rove about it at a White House Christmas party for donors.

"I talked to Rove, and he put me in touch with his guy in charge of this kind of operation. I'm going to do my damnedest on this one. This is really important to us," Secchia told the Gazette that December.

In a recent interview, Secchia said he has spoken not only to Rove but also to President George W. Bush and Vice President Cheney about what he sees as the negative impact of the proliferation of tribal casinos. Both men, he said, told him it was a legislative issue. "Karl told me to talk to [congressional] committee people," he said, and put him in touch with the White House office of intergovernmental relations.

Secchia said he has not talked to officials at Interior or Justice about Gun Lake. He said he has never had contact with Abramoff, who is out on $2.25 million bond and is to be arraigned next week in Miami in the casino fleet case.

Copyright 2005, Citizens for Responsibility and Ethics in Washington, All Rights Reserved.
11 DuPont Circle, N.W., 2nd Floor, Washington, D.C. 20036



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



March 21, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296**, seeking:

> "This request related to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.
>
> This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.
>
> Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all

1

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

Today we are sending a partial initial response, consisting of 218 documents containing 5038 pages on 1 CD ROM in TIFF Format (except for an Index to Calendars which is in Microsoft Word).

As noted during our telephone conversation on Friday, the documents include travel records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until March 29, 2004. We are also sending some correspondence from Conrad Burns to DOI, and another folder, the Jena Band of Choctaw documents, both sets of which were released under previous FOIA requests, and are therefore readily available. To recap our conversation, we are now searching the Secretary's Automated Correspondence Indexing System for correspondence between all of the relevant parties you named, and will notify you when those searches are completed. In addition we will provide you with calendar information for Secretary Norton and former Deputy Secretary Griles through November 2004 as soon as it completes the review process. We have also made a referral to BIA for their direct response to you.

**Deleted from some of the documents enclosed, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)), is the following information:**

> **Fixed conference call codes**
> **Agency credit card numbers**
> **Government cellular phone numbers**
> **Homeland security-related information**

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

### Conference Call Codes

Conference call codes are codes that allow access to telephone conference calls.[1] Release of non-variable access codes linked to telephone conference calls scheduled at standard, fixed intervals could allow individuals not authorized to participate in these calls to eavesdrop on them, and so circumvent security precautions established to protect the privacy of agency deliberations. Therefore, we have determined that fixed conference call codes belong to the category of information likely to result in harmful circumvention under "high 2."

### Credit Cards

The Department of Justice has determined that agency credit card numbers belong to the category of information likely to result in harmful circumvention under "high 2". Specifically, the Department of Justice lists agency credit card numbers as an example of "high 2" information. (Freedom of Information Act Guide and Privacy Act Overview, 128 (May 2000 ed.)) Additionally, the United States District Court for the District of Columbia has held agency credit card numbers to fall within the "high 2" exemption. The court based its determination on the possibility of misuse and fraud of agency credit cards. Judicial Watch, Inc. v. United States Dep't. of Commerce, 83 F.Supp. 2d 105, 110 (D.D.C. 1999).

### Cellular Phone Numbers

Two courts have held that telephone numbers constitute trivial administrative matters with no genuine public interest. Hale v. Department of Justice, 973 F.2d 894, at 902 (10th Cir., 1992); Voinche v. Federal Bureau of Investigations, 46 F.Supp.2d 26, at 30 (D.D.C. 1999). The redacted information pertains to the numbers assigned to the cellular phone numbers provided to federal employees by the government. The release of this information would not shed significant light on an agency personnel

---

[1] Generally, access codes are variable, that is, they are viable only for a given conference call at a specified time on a specified date. The release of variable access codes, after their expiration, would not risk circumvention of a legal requirement because none of these numbers could be used to obtain access to a telephone conference call.

rule or practice; nor does the public have a substantial interest in the redacted information. Finally, the information redacted bears no relation to the substantive contents of the records released. Therefore, we have determined that government cellular phone numbers fall under the category of information withholdable under Exemption 2.

*Homeland Security Information*
Information concerning the need to protect facilities and national assets from security breaches and harm that reasonably could be expected to enable someone to succeed in causing the feared harm is necessarily protected under "high 2." The redacted information could be used by those intending to plan an act of terrorism on U.S. soil to obtain an advantage over the government by gaining insight into what the government perceives as areas of vulnerability. This type of information is directly related to homeland security and is properly withheld under exemption 2.

**Also, information has been deleted from one of these documents, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege "exempt[s] those documents . . . normally privileged in the civil discovery context." National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege "protect[s] the decisionmaking process of government agencies" and "encourage[s] the frank discussion of legal and policy issues" by ensuring that agencies are not "forced to operate in a fish bowl." Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional

and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept. of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one "prepared in order to assist an agency decisionmaker in arriving at his decision," and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents that reflect the personal opinions of the writer rather than the policy of the agency." Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the "deliberative process" if "the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Id.

The portions of the documents that have been withheld pursuant to Exemption 5 do not contain or represent formal or informal agency policies or decisions. The contents have been held confidential by all parties. Public dissemination of this information would most certainly have a chilling effect on the agency's deliberative processes. It would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

**Also deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), are the following categories of information pertaining to the individuals named in the records:**

>     **dates of birth**
>     **birthdays**
>     **home addresses**
>     **home and cell telephone numbers**
>     **pager numbers**
>     **time and attendance data**
>     **hotel/rental car confirmation numbers**
>     **names of individuals not selected for employment**
>     **personal, family and medical appointments**
>     **names of security personnel providing protection to Secretary**
>     **information pertaining to individuals not selected for employment by**
>         **the Department     (names, telephone numbers, etc.)**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")

(3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

**Also deleted from one of the documents enclosed pursuant to Exemption 7E of the FOIA (5 U.S.C. § 552 (b)(7)(E)), is the following information:**

**phone number of FBI employee**

Exemption 7(E) affords protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigation or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

The Office of the Secretary has determined that the phone numbers of individuals employed by the Federal Bureau of Investigation are not routinely disclosed to the

6

public because public access to this number could reasonably be expected to expose the individual to harassment and/or hinder the individual's ability to carry out his/her law enforcement investigations.

We have concluded, therefore, that there are sound grounds for withholding it, pursuant to exemption 7E of the FOIA (5 U.S.C. § 552 (7)(E)).

**Deleted, additionally, from one of the documents enclosed pursuant to Exemption 7F and 7C of the FOIA (5 U.S.C. § 552 (b)(7)(C) & (F)), is the following information:**

**names of security personnel providing protection to Secretary**

Exemption 7(C) provides protection for personal information in law enforcement records. It allows an agency to withhold law enforcement information the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

Exemption 7(F) permits the withholding of information necessary to protect the physical safety of a wide range of individuals. This exemption provides protection to "any individual" when disclosure of information about him "could reasonably be expected to endanger [his] life or physical safety."

The Office of the Secretary has determined that disclosure of the names of the individuals assigned to protect the Secretary on specific occasions in the past could reasonably be expected to endanger not only the individuals to whom this information pertains but also the Secretary of the Interior, should these same individuals be assigned to protect the Secretary on future occasions.

We have concluded, therefore, that there are sound grounds for withholding it, pursuant to exemption 7C and 7F of the FOIA (5 U.S.C. § 552 (7)(C) & (F)).

Lisa Lance, Tim Murphy, Cindy Cafaro, Robin Friedman, Donald S. Harris, and Stephanie Yu, Attorney-Advisors in the Office of the Solicitor, were consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter.) Your appeal letter must be marked, both on its envelope

and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $2.00, calculated as follows:

1      CD ROM disk                          @ $    2.00 per disk

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

**PRIVACY ACT notice**: *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of*

*the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



April 12, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296,** seeking:

"This request related to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all

1

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

As you will recall, by telephone we agreed that, aside from the referral to BIA, which will answer you directly, within the Office of the Secretary you would accept appointment records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until at least well into 2004, and for all of the parties and topics mentioned, and the index results of a search of the Secretary's Automated Correspondence Indexing System.

On March 21, 2005 we sent a partial response which included calendars for some Department of Interior officials, including Secretary Norton and former Deputy Secretary Griles, (from the beginning of their tenure through March 29, 2004, the records readily available because of previous FOIA requests), and which included material previously released under other FOIA requests addressing related subjects.

Today we are sending a second partial response which includes the indexes generated as a result of the searches of the Secretary's Automated Correspondence Indexing System.

**Deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), are the following categories of information pertaining to the individuals named in the records:**

> **Names of constituents**
> **Names of private citizens expressing views**
> **Names of persons recommended for positions**

**Name of person applying for position**
**Personal information about individuals**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")

(3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Robin Friedman, Attorney-Advisor in the Office of the Solicitor, was consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you

3

may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter.) Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $28.14, calculated as follows:

| ½ hour of Managerial Search Time | @ $ | 12.25 per ¼ hour |
| 28 Pages | @ $ | .13 per page |

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

This concludes the response within the Office of the Secretary, except for the calendars for Secretary Norton and former Deputy Secretary Griles for the time period March 30, 2004 through approximately December 31, 2004. These documents are currently under review, and you may expect to receive them shortly.

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

*PRIVACY ACT notice*: *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*



### United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240



April 27, 2005

Melanie Sloan,
Executive Director
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Sloan:

On March 18, 2005, you filed a Freedom of Information Act (FOIA) request, **OS-2005-00296**, seeking:

> "This request related to any contact, dating from January 1, 2001, to the
> present, that any office of the Department of the Interior may have had,
> including any and all field offices, with Jack Abramoff, any employee of the
> firm Greenberg Traurig, any employee of the firm Preston Gates, Michael
> Scanlon, any officer or employee of Capitol Campaign Strategies, James
> Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of
> the National Center of Public Policy Research, Grover Norquist, any officer
> or employee of Americans for Tax Reform, General Services Administration
> Chief of Staff David Safavian, Congressman Robert Ney, any employee in
> the office of Congressman Ney, Congressman Tom DeLay, any employee in
> the office of Congressman DeLay or in the office of the Majority Leader,
> Speaker of the House Dennis Hastert, any employee in the office of
> Congressman Hastert or in the office of the Speaker of the House, Senator
> Conrad Burns, and any employee in the office of Senator Burns, concerning
> any matter within the jurisdiction of the Bureau of Indian Affairs.
> This request further includes any records, dating from January 1, 2001, to
> the present, from any office of the Department of the Interior including but
> not limited to the Office of the Secretary, the Office of the Deputy Secretary
> and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm
> Springs, California, the Tiqua Tribe of El Paso, Texas, the Saginaw
> Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the
> Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.
> Specifically, we request the release of any records that reflect any contact
> between any and all offices of the Department of the Interior and any and all

individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts. We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs."

As you will recall, by telephone we agreed that, aside from the referral to BIA, which will answer you directly, within the Office of the Secretary you would accept appointment records for Secretary Norton and for former Deputy Secretary Griles from the beginning of such records until at least well into 2004, and for all of the parties and topics mentioned, and the index results of a search of the Secretary's Automated Correspondence Indexing System.

On March 21, 2005 we sent a partial response which included calendars for some Department of Interior officials, including Secretary Norton and former Deputy Secretary Griles, (from the beginning of their tenure through March 29, 2004, the records readily available because of previous FOIA requests), and which included material previously released under other FOIA requests addressing related subjects.

On April 12, 2005 we sent a second partial response which included the indexes generated as a result of the searches of the Secretary's Automated Correspondence Indexing System.

Today we are sending the final response, which includes calendar information for Secretary Norton and former Deputy Secretary Griles until near the end of 2004, comprising 18 documents with 630 total pages.

**2.    Portions of some of these documents have been deleted, pursuant to Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)).  The following category of information has been deleted:**

> direct phone number of agency employees
> access codes and conference call numbers

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

We have determined that direct phone numbers of agency employees belong to the first category of exemption 2 data: internal matters of a relatively trivial nature. The courts have held that such telephone numbers constitute trivial administrative matters with no genuine public interest. *Hale v. Department of Justice*, 973 F.2d 894, at 902 (10th Cir., 1992; *Voinche v. Federal Bureau of Investigation*, 46 F.Supp.2d, at 30 (D.D.C. 1999); *see*, FREEDOM OF INFORMATION ACT OVERVIEW (May 2002 ed.), at p. 135.

**A Portion has been deleted, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency. (5 U.S.C. § 552 (b)(5)). As such, the privilege exempts those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept of Health & Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d

1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Maricopa Audubon Society v. United States Forest Service, 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

That portion of the document that has been withheld pursuant to Exemption 5 is both predecisional and deliberative. It contains recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of its author. It does not contain or represent formal or informal agency policies or decisions. Furthermore, it is the result of frank and open discussions among employees of the Department of the Interior. Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

**Portions of some of these documents have also been deleted, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)). The following categories of information pertaining to the individuals named in the records have been deleted:**

> **home addresses**
> **home and cell telephone numbers**
> **personal information pertaining to families of individuals**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's

right to disclosure.

(1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")

(3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Attorney-Advisor, in the Office of the Solicitor, was consulted in reaching this decision. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making this decision.

## 3.    Appeal Rights

If you believe that the decision to withhold this information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience), and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $10.45, calculated as follows:

| | | |
|---|---|---|
| ¼ hour of Managerial Search Time | @ $ | 12.25 per ¼ hour |
| 1 CD Rom Disk | @ $ | 2.00 per disk |

However, it is the policy of the Secretary of the Interior to not collect fees for the processing of FOIA requests when under $30.00 since the cost of collection would be greater than the fee collected. There is thus no fee at this time. In addition, as noted above, your request for fee waiver is being considered.

This concludes the response within the Office of the Secretary. (We are still conducting the search for your other pending FOIA request, OS-2005-00331, and you should expect to hear from us shortly with respect to that FOIA request.)

If you have any questions regarding any of the issues discussed in this letter, you may contact me by phone at 202-208-6045, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

*PRIVACY ACT notice: Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of*

*the information you submit.  Also, e-mail is not necessarily secure against interception.  If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

March 18, 2005

Ms. Sue Ellen Sloca
Office of the Secretary
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

  **BY FAX:** 202-219-2374

  Re: <u>Freedom of Information Act Request</u>

Dear Ms. Sloca:

  Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, audiotapes, videotapes and photographs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, et seq.

  This request relates to any contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

  This request further includes any records, dating from January 1, 2001, to the present, from any office of the Department of the Interior including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of Indian Affairs regarding the Agua Caliente Tribe of Palm Springs, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

  Specifically, we request the release of any records that reflect any contact between any and all offices of the Department of the Interior and any and all individuals within those offices, including but not limited to Secretary Gale Norton and former Deputy Secretary J. Steven Griles, and the above-delineated individuals and entities, regardless of who initiated the contact, as well as the substance of all such contacts.

Ms. Sue Ellen Sloca
March 18, 2005
Page Two

We also request any documents, regardless of format, medium or physical characteristics, that were provided to any office of the Department of the Interior by Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, former General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, and any employee in the office of Senator Burns concerning any matter within the jurisdiction of the Bureau of Indian Affairs. As used in this request "and" also means "or," and "or" also means "and." As used in this request, "any matter within the jurisdiction of the Bureau of Indian Affairs" includes, but is not limited to, any matter also within the jurisdiction of the Office of the Secretary.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts and notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe **each** document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (*emphasis added*). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular

Ms. Sue Ellen Sloca
March 18, 2005
Page Three

part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central
v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from
disclosure, please disclose any reasonably segregable non-exempt portions of the
requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a record
shall be provided to any person requesting such record after deletion of the portions
which are exempt . . . "); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205,
1209 (D.C. Cir. 1992). f it is your position that a document contains non-exempt
segments, but that those non-exempt segments are so dispersed throughout the document
as to make segregation impossible, please state what portion of the document is non-
exempt and how the material is dispersed throughout the document. Mead Data Central,
566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail
as required for claims of exemptions in a Vaughn index. If a request is denied in whole,
please state specifically that it is not reasonable to segregate portions of the record for
release.

**Fee Waiver Request**

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees
associated with processing this request for records. The subject of this request concerns
the operations of the federal government and the disclosures will likely contribute to a
better understanding of relevant government procedures by CREW and the general public
in a significant way. Moreover, the request is primarily and fundamentally for non-
commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v.
Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to
contribute to the public's understanding of the process used by the Department of the
Interior to approve tribal bids for casinos on Indian lands.

CREW is a non-profit corporation, organized under section 501(c)(3) of the
Internal Revenue code. CREW is committed to the protection of the citizen's right to be
aware of the activities of government officials and to ensuring the integrity of those
officials. CREW is dedicated to empowering citizens to have an influential voice in
government decisions and in the governmental decision-making process. CREW uses a
combination of research, litigation, and advocacy to advance its mission. The release of
information garnered through this request is not in CREW's financial interest. CREW
will analyze the information responsive to this request, and will likely share its analysis
with the public, either through memorandums, reports or press releases.

Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

Ms. Sue Ellen Sloca
March 18, 2005
Page Four

## Conclusion

Please respond to this request in writing within twenty (20) days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the twenty-day period, please call me within that time period. I can be reached at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Sincerely,


Melanie Sloan
Executive Director


cc: Bureau of Indian Affairs

# CREW | citizens for responsibility and ethics in washington

April 5, 2005

By Email

Ms. Linda Thomas
Office of the Secretary
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
email: osfoia@nbc.gov

Re: FOIA Request OS-2005-00296

Dear Ms. Thomas:

On March 18, 2005, Citizens for Responsibility and Ethics in Washington ("CREW") filed a Freedom of Information Act ("FOIA") request with the Department of the Interior (Request OS-2005-00296) seeking records, regardless of format and including electronic records and information, relating to the following:

> [A]ny contact, dating from January 1, 2001, to the present, that any office of the Department of the Interior may have had, including any and all field offices, with Jack Abramoff, any employee of the firm Greenberg Traurig, any employee of the firm Preston Gates, Michael Scanlon, any officer or employee of Capitol Campaign Strategies, James Dobson, Ralph Reed, Scott Reed, Italia Federici, any officer or employee of the Council of Republicans for Environmental Advocacy, any officer or employee of the National Center of Public Policy Research, Grover Norquist, any officer or employee of Americans for Tax Reform, General Services Administration Chief of Staff David Safavian, Congressman Robert Ney, any employee in the office of Congressman Ney, Congressman Tom DeLay, any employee in the office of Congressman Tom DeLay or in the office of the Majority Leader, Speaker of the House Dennis Hastert, any employee in the office of Congressman Hastert or in the office of the Speaker of the House, Senator Conrad Burns, any employee in the office of Senator Burns, concerning any matter within the jurisdiction of the Bureau of Indian Affairs.

CREW's March 18, 2005 FOIA request also sought:

> [A]ny records, dating from January 1, 2001, to the present, from any office of the Department of the Interior, including but not limited to the Office of the Secretary, the Office of the Deputy Secretary and the Bureau of

Indian Affairs regarding the Agua Caliente Tribe of Palm Spring, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians.

By letter dated March 21, 2005, your office acknowledged receipt of CREW's FOIA request, and stated that you were sending CREW a partial response consisting of 218 documents. In a follow-up telephone conversation between Melanie Sloan and Sue Ellen Sloca, we were advised that the Department of the Interior ("DOI") had also produced certain travel records, and was sending some additional documents, which CREW has now received. In addition, your office stated it was searching the Secretary's Automated Correspondence Indexing system for correspondence between all the relevant parties named in CREW's FOIA request and would also provide CREW with certain additional calendar information.

In a subsequent telephone conversation, CREW also requested that DOI search electronic records for responsive information within the parameters of CREW's FOIA request. You indicated that, notwithstanding the language of our March 18, 2005 FOIA request specifying that the records we sought included electronic records, a request for such records should be considered as a new FOIA request in light of the prior discussions between our offices. While we do not agree that a new FOIA request is necessary, we are nevertheless submitting this letter outlining the additional documents we seek and ask that, if necessary, you consider this letter to constitute a FOIA request and process it accordingly. It is our understanding that even if deemed a new FOIA request, it will be combined with our March 18, 2005 FOIA request and processed simultaneously.

Specifically, CREW seeks all electronic records relating to any contact, dating from January 1, 2001, to the present, that any of the following individuals may have had with the individuals and entities outlined in our March 18, 2005 FOIA request relating to any matter within the jurisdiction of the Bureau of Indian Affairs, and all contacts the following individuals had with the six Indian Tribes listed in our request:

Secretary Gale Norton
William D. Betterberg, Director, Office of Policy Analysis
James E. Carson, Associate Deputy Secretary
Tom Fulton, Deputy Assistant Secretary, Land and Minerals Management
J. Steven Griles, former Deputy Secretary
Kit Kimball, Director, Office of External and Intergovernmental Affairs
Ann Klee, Counselor to the Secretary
Michael Rossetti, Counselor to the Secretary
Lynn Scarlett, Assistant Secretary for Policy, Management and Budget

Brian Waidmann, Chief of Staff
Sue Ellen Woolridge, Deputy Chief of Staff
William G. Myers, III, Solicitor
Lawrence Jensen, Counsel, Office of the Solicitor
Mathew E. McKeown, Special Assistant, Office of the Solicitor
David W. Anderson, Assistant Secretary, Indian Affairs
Ross Swimmer, Special Trustee for Indian Affairs
George T. Skibine, Director, Office of Indian Gaming Management
Aurene Martin, Principal Deputy Assistant Secretary, Indian Affairs

In addition, to the extent not listed above, we seek all electronic records relating to the above-delineated contacts for the individuals who occupied the following positions in DOI's Bureau of Indian Affairs from January 1, 2001, to the present:

Director, IIT Office of American Indian Trust
Director, IAE Office of Audit and Evaluation
Deputy Director, IAE Office of Audit and Evaluation
Director, ISC Office of Self Governance
Compact Negotiation Manager, ISC Office of Self Governance
Compact Negotiation Specialist, ISC Office of Self Governance
Director, OIE Office of Indian Education Programs
Deputy Director, OIE Office of Indian Education Programs
Chief, 13 Branch of Management Information Services
Chief, 30 Division of Planning/Oversight and Evaluation
Chief, 30 Branch of Planning
Deputy Commissioner of Indian Affairs
Director, 120 Congressional and Legislative Affairs
Legislative Coordinator, 120 Congressional and Legislative Affairs
Director, 130 Indian Gaming Management Staff
Secretary, 130 Indian Gaming Management Staff
Management Analyst, 130 Indian Gaming Management Staff
Director, Office of Trust Responsibilities
Director, Office of Information Resources Management
Director, Office of Tribal Services
Secretary, Division of Tribal Government Services
Chief, Branch of Tribal Enrollment
Chief, Branch of Tribal Relations
Director, Office of Management and Administration
Director, Office of Economic Development

In addition, we request all documents, regardless of format, medium or physical characteristics, that relate in any way to a meeting Secretary Norton had on November 8, 2002, with Clint Bolick, Grover Norquist, Chip Mellor and Sue Ellen Wooldridge. Our

request includes, but is not limited to, any telephone messages, voice mail messages, daily agenda and calendar information about this meeting, whether in-person or over the telephone, agendas for this meeting, minutes of this meeting, e-mail regarding this meeting, e-mail or facsimiles sent as a result of this meeting, and any transcripts or notes of this meeting.

If it is DOI's position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). Please refer to our FOIA request of March 18, 2004, for an explanation of what the Vaughn index must include.

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portions of a record shall be provided to any person requesting such records after deletion of the portions which are exempt . . ."). For a further explanation of the agency's responsibilities in this regard, please see CREW's March 18, 2005 FOIA request.

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process used by the Department of the Interior to approve tribal bids for casinos on Indian lands.

CREW is a non-profit corporation, organized under section 501(C)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request us not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases. Under these circumstances, CREW fully satisfies the criteria for a fee waiver.

Please respond to this request in writing within twenty (20) days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available

within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request, or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period, at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such a determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Finally, we really appreciate the timeliness and professional courtesy your office has shown to date, and look forward to working with you in a continued cooperative manner.

Sincerely,


Anne L. Weismann
Staff Attorney

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

**TAKE PRIDE**
**IN AMERICA**

FOIA #06207

JUL 2 9 2005

Ms. Anne L. Weismann
CREW
11 Dupont Circle, NW, 2nd Floor
Washington, DC 20036

Dear Ms. Weismann:

This letter is in response to your Freedom of Information Act (FOIA) request of April 5, 2005, regarding electronic records between the Agua Caliente Tribe, Tigua Tribe, Saginaw Tribe, Mississippi Band of Choctaw Indians, Coushatta Tribe, and Jena Band of Choctaw Indians and Mr. George T. Skibine, Director, Office of Indian Gaming Management. We have reviewed our files and were unable to locate any records responsive to your request.

Under 43 CFR 2.28, you may appeal this response by writing to the Freedom of Information Act Appeals Officer, Office of Information Resources Management, U.S. Department of the Interior, MS-5312 MIB, Washington, DC 20240. Your appeal must be received no later than 30 workdays after the date of this letter or 30 workdays after receipt of any records that are provided to you. The appeal should be marked, both on the envelope and the face of the appeal letter, with the legend "Freedom of Information Appeal." Your appeal should be accompanied by a copy of your original request and this letter, along with any information you have which leads you to believe the records do in fact exist, including where they might be found, if the location is known to you.

Sincerely,

Willie S. Chism

Freedom of Information Act Officer
Office of Information Policy

**EXHIBIT CC**

United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:
FOIA Appeal No. 2006-014

NOV 2 8 2005

Anne L. Weisman
Citizens for Responsibility
    and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, D.C. 20036

Dear Ms. Weisman:

This responds to your October 20, 2005, Freedom of Information Act ("FOIA") appeal ("appeal") to the Department of the Interior ("Department"), which was received on October 26, 2005, and filed on behalf of Citizens for Responsibility and Ethics in Washington ("CREW"). The Department has assigned your appeal as **Appeal Number 2006-014**. Please cite this number in any future correspondence you send to the Department regarding this appeal. Your appeal concerns the Office of the Secretary's ("OS") September 27, 2005, response to your September 26, 2005, FOIA request, which sought "additional documents that were provided to other FOIA requesters in response to the following FOIA requests:" OS-2005-00-228, OS-2005-00-249, OS-2005-00-272, and OS-2005-00-413 ("four FOIA requests").

Your appeal also intends to challenge whether the OS conducted an adequate search of its files for documents that are responsive to a March 18, 2005, FOIA request submitted by CREW for which the OS issued its final response on April 27, 2005. You are also intending to challenge in your appeal the Bureau of Indian Affairs's ("BIA") July 29, 2005, determination that it was "unable to locate any records [that are] responsive to your [April 5, 2005, FOIA] request." The Department's FOIA regulations state that an appeal questioning the adequacy of a bureau's search for responsive documents or challenging a bureau's determination that it does not possess responsive documents "must be received by the FOIA Appeals Officer no later than 30 workdays after the date of the final response or 30 workdays after receipt of any records that are provided to you." *See 43 C.F.R. § 2.29(a)*. With respect to the OS's April 27, 2005, final response to your March 18, 2005, FOIA request, the Department received your appeal of that matter on October 26, 2005, which is almost six months after the date of the OS's final response. As for your appeal of the BIA's July 29, 2005, determination that it does not possess responsive documents, the Department also received your appeal of that matter on October 26, 2005, which is almost three months after the date of BIA's final response. As such, your appeals of the OS's search for documents that are responsive your March 18, 2005, FOIA request and the BIA's determination that it does not possess documents that are responsive to your April 5, 2005, FOIA request are not timely and the Department has not accepted the matters for processing as an appeal. However, since the Department

timely received your appeal of the OS's September 27, 2005, final response to your September 26, 2005, FOIA request, the Department has reviewed the OS's processing of this FOIA request in connection with this appeal.

After reviewing the issues in your appeal and discussing with the OS the efforts it undertook to locate responsive documents, the Department concludes that it conducted an adequate search of its files and the OS does not have any further documents that are responsive to your September 26, 2005, FOIA request to disclose to you. Therefore, your appeal is denied.

To determine whether a bureau provided a requester with all of its disclosable documents that are responsive to a FOIA request, the Department looks at whether the bureau conducted a reasonable search of its files in an effort to locate the requested documents. *See 5 U.S.C. § 552(a)(3)*. A reasonable search is one that is "reasonably calculated to uncover the sought materials." *See Judicial Watch, Inc. v. United States DOE*, 310 F. Supp. 2d 271, 296 (D.D.C. 2004) (quoting *Weisberg v. Department of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Where a bureau has conducted a reasonable search of its files to locate the requested documents, the Department will deem its search as adequate. The fact that a requester believes that the subject of the requested records should generate more documents than what a bureau disclosed or addressed does not mean that the search was not adequate. The bureau simply cannot produce documents that it does not have or cannot locate through a reasonable search.

In connection with the appeal, the Department requested that the OS provide a description of the search it conducted to locate documents that are responsive to your FOIA request. Since your September 26, 2005, FOIA request sought "additional documents that were provided to other FOIA requesters in response to" four FOIA requests that you identified, the OS conducted an electronic and manual search of its FOIA files to locate the files of these four FOIA requests. The OS has advised the Department that it provided you with all of the documents in each of those files that were released in response to the four FOIA requests that you identified. As evidenced by the letters the OS issued responding to each of the four FOIA requests (copies of which are attached), the OS released to those FOIA requesters a total of 146 documents (659 pages) in full or in part. In response to your September 26, 2005, FOIA request, the OS also released to you a total of 146 documents (659 pages) in full or in part. The Department is satisfied that the OS provided you with all of the documents that "were provided to other FOIA requesters in response to" the four FOIA requests that you identified and the Department has no reason to question the OS's statements that it does not possess any further documents that are responsive to your FOIA request.

Accordingly, based on the foregoing, the Department concludes that the OS conducted a search that was reasonably calculated to uncover the materials sought. Because the OS conducted a reasonable search of its files, the Department concludes that its search was adequate. Therefore, your appeal is denied.

2

This completes the Department's response to your appeal. If you are dissatisfied with this decision, you have a right to seek judicial review under *5 U.S.C. § 552(a)(4)(B)*.

If you have any questions, you may call me at (202) 208-5339.

Sincerely,

Darrell R. Strayhorn
FOIA Appeals Officer
Department of the Interior

Attachments

cc: Pamala Quallich, Chief, Information Branch, OS
    Carol Smalley, FOIA Officer, BIA
    Alexandra Mallus, Departmental FOIA Officer

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240



April 14, 2005

Ms. Susan Schmidt
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071-7403

Dear Ms. Schmidt:

On February 11, 2005 you filed a Freedom of Information Act (FOIA) request, **OS-2005-00228**, seeking

> "All records produced to the Senate Committee on Indian Affairs during the past year requested in connection with the committee's investigation of the lobbying practices of Jack Abramoff and Michael Scanlon."

On February 16, 2005, we acknowledged your request, advised you of your fee status under the FOIA, and informed you that we were conducting a search for records within the Office of the Secretary.  We are writing today to provide the final response.

Enclosed are copies of all responsive records: 79 documents, totaling 420 pages, as TIFF images on 1 CD ROM disk.

**Pursuant to Exemption 4 of the FOIA (5 U.S.C. § 552 (b)(4)), some Commercial and financial information of a proprietary nature has been deleted.**

Exemption 4 protects trade secrets and commercial or financial information, obtained from a person, which is privileged or confidential.  This exemption is intended to protect both the interests of commercial entities that submit proprietary information to the Government and the interests of the Government in receiving continued access to it.  Information is considered "confidential" if disclosure of it "is likely to cause substantive harm to the competitive position of the person from whom the information was obtained." National Parks & Conservation Ass'n. v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).

1

The tribe that supplied this information, The Coushatta Tribe of Louisiana, is considered a "person," under the law, because the term "person" includes a wide range of entities including Indian Tribes and corporations. In addition, the auditing companies that used the information provided by the Tribe to prepare the audits, Dunn, Roberts and Company LLC, and REDW LLC, are also "persons" for purposes of Exemption 4 under the FOIA. The Tribe has a clear commercial interest in the information which has been denied (information detailing its financial resources, budget allocations and receivables, some of which is related to its casino operations). This information represents financial data which was provided to the Government through an auditing process as proprietary and which would not customarily be provided to the public. Public release of it in response to this FOIA request would cause potential harm to its competitive position in the marketplace. It would give an unfair advantage to other Tribes or persons competing against it in future business activities such as casino operations.

**Portions of some of these documents have been deleted, pursuant to Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege exempts those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Serv., 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept

of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one prepared to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

The portions of the documents that have been withheld pursuant to the deliberative process aspect of Exemption 5 are both predecisional and deliberative. They contain recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of their authors. They do not contain or represent formal or informal agency policies or decisions. Furthermore, they are the result of frank and open discussions among employees of the Department of the Interior. Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

In addition, some of the withheld material constitutes privileged communications between attorney and client. Exemption 5 permits the withholding of "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." See, e.g., Mead Data Central, Inc. v. Dep't of The Air Force, 556 F.2d at 252-63 (D.C. Cir. 1977).

**Portions of some of these documents have also been deleted, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)). The following categories of information pertaining to the individuals named in the records have been deleted:**

> **Cellular telephone numbers**
> **Home telephone numbers**
> **Personal FAX number**
> **Personal email addresses**
> **Home addresses**
> **Social security number**
> **Employment information including resignation information**
> **Name of constituent**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1) First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2) Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties").

(3) Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

If you believe that the decision to withhold this information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first

page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience), and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

Robin Friedman, Attorney-Advisor, in the Office of the Solicitor, was consulted in reaching this decision. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making this decision.

The FOIA fee for the processing of your request within the Office of the Secretary is $18.90, calculated as follows:

.5 Hour Professional Search Time      @ $8.45 per ¼ Hour
1 CD ROM Disc      @ $2.00 per Disc

However, as a matter of policy the Department of Interior does not bill when the cost is lower than $30.00 because the cost of collection would be greater than the fee collected. (See 43 CFR § 2.18(a)). The fee for processing this FOIA request is therefore waived.

If you have any questions regarding our response to your request, or any of the issues discussed in this letter, you may contact Linda Thomas by phone at 202-208-7294, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

Enclosures

***PRIVACY ACT notice****: Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We*

*may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



April 25, 2005

Ms. Susan Schmidt
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071-7403

Dear Ms. Schmidt:

On February 11, 2005 you filed a Freedom of Information Act (FOIA) request,
**OS-2005-00249**, seeking

> "Any documents produced in the past year by the Interior Department and
> the Bureau of Indian Affairs to the FBI, the Interior inspector general of the
> Senate Indian Affairs Committee reflecting any contacts, correspondence or
> comments concerning lobbyist Jack Abramoff from January 2001 to the
> present. For the same period, any documents, memos, phone records,
> emails reflecting department or BIA interaction with the Coalition of
> Republican Environmental Activists, the Council of Republicans for
> Environmental Advocacy, with CREA president Italia Federici, the
> National Center for Public Policy Research."

On February 22, 2005, we acknowledged your request, advised you of your fee
status under the FOIA, and informed you that we were conducting a search for
records within the Office of the Secretary for the new portion of your request..
That portion of your request relating to any contact with the Bureau of Indian
Affairs duplicates a search conducted pursuant to your prior request, OS-2005-
00229, and hence was not repeated here. In addition, the first part of your request
is addressed by your prior request OS-2005-00228, which has been completed and
final response sent to you.

For this request, we conducted a new search within the Office of the Secretary.
Enclosed are copies of all responsive records: 18 documents, totaling 99 pages, as
TIFF images on 1 CD ROM disk.

**Portions of some of these documents have been deleted, pursuant to
Exemption 2 of the FOIA (5 U.S.C. § 552 (b)(2)). The following category of
information has been deleted:**

1

Exemption 2 exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency." Courts have interpreted the exemption to encompass two categories of information, internal matters of a relatively trivial nature ("low 2" information) and more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement ("high 2" information).

The Department of Justice has determined that agency credit card numbers belong to the category of information likely to result in harmful circumvention under "high 2". Specifically, the Department of Justice lists agency credit card numbers as an example of "high 2" information. (Freedom of Information Act Guide and Privacy Act Overview, 206, (May 2004 Edition.)) Conference call codes are codes that allow access to telephone conference calls.[1] Release of non-variable access codes linked to telephone conference calls scheduled at standard, fixed intervals could allow individuals not authorized to participate in these calls to eavesdrop on them, and so circumvent security precautions established to protect the privacy of agency deliberations. Therefore, we have determined that fixed conference call codes also belong to the category of information likely to result in harmful circumvention under "high 2." Finally, the individual names of law enforcement officials including security officers also are protected from release by Exemption 2, because they are internal personnel practices of an agency, the release of which could provide an opportunity for circumvention of the law.

**A portion of one of these documents has been deleted pursuant to Exemption 4 of the FOIA (5 U.S.C. § 552 (b)(4)):**

**Bank account information on a bank draft check**

Exemption 4 protects trade secrets and commercial or financial information, obtained from a person, which is privileged or confidential. This exemption is intended to protect both the interests of commercial entities that submit proprietary information to the Government and the interests of the Government in receiving continued access to it. Information is considered "confidential" if disclosure of it "is likely to cause substantive harm to the competitive position of the person from whom the information was obtained." National Parks & Conservation Ass'n. v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).

The organization listed on the check, "Bush-Cheney'04, Inc.", is considered a "person," under the law, because the term "person" includes a wide range of

---

[1] Generally, access codes are variable, that is, they are viable only for a given conference call at a specified time on a specified date. The release of variable access codes, after their expiration, would not risk circumvention of a legal requirement because none of these numbers could be used to obtain access to a telephone conference call.

2

entities including corporations. This corporation has a clear commercial interest in the safeguarding of its bank account information. This information represents proprietary financial information which would not customarily be provided to the public. Public release of it in response to this FOIA request would cause potential harm to its security interests in safeguarding its financial information

**Portions of some of these documents have also been deleted, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)). The following categories of information pertaining to the individuals named in the records have been deleted:**

> **Cellular telephone numbers**
> **Home telephone numbers**
> **Personal email addresses**
> **Home addresses**
> **Social security number**
> **Personal information about government employees**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

(1)  First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

(2)  Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties").

(3)  Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

3

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Donald S. Harris, Attorney-Advisor, in the Office of the Solicitor, was consulted in reaching this decision. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making this decision.

If you believe that the decision to withhold this information is incorrect, you may file a FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $18.90, calculated as follows:

| .5 | Hour of Professional Search Time | @ $ | 8.45 per ¼ hour |
|----|----------------------------------|-----|------------------|
| 1  | CD ROM disk                      | @ $ | 2.00 per disk    |

However, the Department of Interior does not bill for the processing of FOIA requests when the amount is less than $30.00, because the cost of collection would have been greater than the fee collected. (This is discussed in Department FOIA regulations at 43 CFR § 2.20(a).) The fee for processing this FOIA request is therefore waived.

This concludes our response to your request.

4

If you have any questions regarding our response to your request, or any of the issues discussed in this letter, you may contact Linda Thomas by phone at 202-208-7294, by fax at 202-219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

Enclosures

***PRIVACY ACT notice****: Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



April 27, 2005

Ms. Susan Schmidt
Business News Department
The Washington Post
1150 15th Street
Washington, D.C. 20071-7403

Dear Ms. Schmidt:

On March 2, 2005, you filed a FOIA request, **OS-2005-00272**, seeking:

> "Any correspondence to and from Sen. Conrad Burns, members of his staff,
> his Interior Appropriations subcommittee staff, including Ryan Thomas and
> Will Brooke in that was directed to the office of Policy, Management and
> Budget, to Aurene Martin, or others in the Secretary's office. In particular,
> I request any correspondence concerning Indian tribes, including but not
> limited to the Jena Band of Choctaw Indians, the Choctaw Indians, and the
> Saganaw Chippewa Indians."[1]

On March 3, 2005 we acknowledged your request, advised you of your fee status,
and informed you that we were initiating searches within the Office of the
Secretary and the Office of Policy, Management, and Budget. We have received
the responsive records as a result of these searches and are writing today to
provide the final response. (In addition, we referred your FOIA request to the
Bureau of Indian Affairs, which will be responding to you directly.)

Enclosed are copies of all responsive records: 39 documents, totaling 120 pages,
as TIFF images on 1 CD ROM disk.

**Portions of some of these documents have been deleted, pursuant to
Exemption 5 of the FOIA (5 U.S.C. § 552 (b)(5)).**

Exemption 5 allows an agency to withhold "inter-agency or intra-agency
memorandums or letters which would not be available by law to a party . . . in
litigation with the agency." 5 U.S.C. § 552 (b)(5). As such, the privilege exempts

---

[1] This request is similar to OS-2005-00227, which we have completed, but expanded the time frame from the last 4
months of 2003 to the period 2001 through 2004.

1

those documents . . . normally privileged in the civil discovery context. National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132 (1975) (NLRB). The exemption incorporates several of these privileges from discovery in litigation, including the deliberative process privilege. Id. at 149.

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank discussion of legal and policy issues by ensuring that agencies are not forced to operate in a fish bowl. Mapother v. United States Dept. of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citing Wolfe v. United States Dept. of Health & Human Serv., 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)) (Mapother). Three policy purposes have been advanced by the courts as the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. United States Dept. of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (Russell); Coastal States Gas Corp. v. United States Dept. of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The deliberative process privilege protects materials that are both predecisional and deliberative. Mapother, 3 F.3d at 1537; Access Reports v. United States Dept of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). A predecisional document is one prepared to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Maricopa Audubon Society v. United States Forest Serv., 108 F.3d 1089, 1093 (9th Cir. 1997). A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Id.

The portions of the documents that have been withheld pursuant to Exemption 5 are both predecisional and deliberative. They contain recommendations, proposals, suggestions, and/or other subjective documents that reflect the personal opinions of their authors. They do not contain or represent formal or informal agency policies or decisions. Furthermore, they are the result of frank and open discussions among employees of the Department of the Interior. Public dissemination of this information would have a chilling effect on the agency's deliberative processes; it would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

2

**Deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), are the following categories of information pertaining to the individuals named in the records:**

> **Names of constituents**
> **Names of private citizens expressing views**
> **Names of persons recommended for positions**
> **Name of person applying for position**
> **Personal information about individuals**
> **Personal FAX Number**
> **Home Addresses**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

> (1)   First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.
> (2)   Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties.")
> (3)   Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the above categories of information pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, therefore, the public interest to

be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Attorney-Advisor in the Office of the Solicitor, was consulted in reaching these decisions. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making these decisions.

If you believe that any of these decisions to withhold information is incorrect, you may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter.) Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience,) and a copy of this letter, along with a brief explanation of why you believe that the particular decision in question is in error.

The FOIA fee for the processing of your request within the Office of the Secretary is $69.60, calculated as follows:

| | | |
|---|---|---|
| 2 Hours of Professional Search Time | @ $ | 8.45 per ¼ hour |
| 1 CD Rom Disk | @ | 2.00 per disk |

However, by regulation the Department of the Interior does not collect fees for search time for the processing of FOIA requests by media category requesters. (See 43 C.F.R. § 2.17.) That would have left only the $2.00 fee for the CD Rom disk. However, it is the policy of the Office of the Secretary not to collect FOIA processing fees when the amount is less than $30.00, since the cost of collection would be greater than the fee collected. Therefore your fee is waived.

This concludes the response within the Office of the Secretary. Because I have not received correspondence that the Bureau of Indian Affairs has responded to this request, I am providing FOIA contact information for that Bureau:

> Department of Interior
> Willie Chism, BIA Office of Information Policy
> 625 Herndon Parkway

Herndon, Virginia  20170

Her telephone number is 703-735-4415; her FAX Number is 703-735-4416.  She does not have email.

If you have any questions regarding any of the issues discussed in this letter, you may contact Linda Thomas by phone at 202-208-7294, by fax at 202- 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C.  20240.   Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

**PRIVACY ACT notice**:  *Before you choose to contact us, electronically, there are a few things you should know.  The information you submit, including your electronic address, may be seen by various people.  We will scan a copy of your request into our electronic OS FOIA administrative/image file.  We will key the information that you provide to us into our electronic OS FOIA tracking file.  We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration.  You may be contacted by any of these individuals.   In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit.  Also, e-mail is not necessarily secure against interception.  If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



July 11, 2005

Via Certified Mail/Return Receipt (7003 2260 0001 8027 5458)
Ms. Susan Schmidt
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071

Dear Ms. Schmidt:

On June 8, 2005, you filed Freedom of Information Act (FOIA) request OS-2005-00413, in which you requested:

> "Any documents, opinions, position papers, correspondence, emails, phone logs, messages, or calendar entries, from the office of former deputy secretary Stephen Griles, the Solicitor's office, both under William G. Myers and Sue Ellen Woolridge [sic], concerning an environmental assessment for the proposed Gun Lake tribal casino in Michigan, including any discussion of whether an environmental impact statement should be sought. In addition, I am requesting any documents, opinions, position papers, correspondence, emails, phone logs, messages, or calendar entries since 1/20/2001 between the Interior Department's solicitor's office and the Justice Department concerning whether casino-seeking tribes should be required to prepare environmental impact statements instead of environmental assessments."

On June 8, 2005, we acknowledged your request, advised you of your fee classification, and informed you that the portion of your request seeking records maintained within the Office of the Solicitor was referred to that office for direct response to you. I am writing today to respond to your request.

1. Enclosed are twenty (20) pages responsive to your request. Eight of these pages consist of indexes that were generated from the Secretary's Automated Correspondence Control System by searching on the terms "Gun Lake" and "Match-E-Be-Nash-She-Wish." Should you be interested in our pursuing any particular letters, you could contact us again. Please reference individual letters by their ACCN numbers.

1

2. Deleted from some of the documents enclosed, pursuant to Exemption 6 of the FOIA (5 U.S.C. § 552 (b)(6)), is the following information pertaining to the individuals named in the records:

**Personal e-mail addresses.**

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(6). The courts have held that the phrase "similar files" involves all information that applies to a particular person.

When disclosure of information about particular individuals is requested, the courts have decided that it is necessary for us to determine whether release of the information would constitute a clearly unwarranted invasion of the individual's privacy.

To make this determination, we are required to perform a "balancing test." This means that we must weigh the individual's right to privacy against the public's right to disclosure.

    (1)    First, we must determine whether the individual has a discernable privacy interest in the information that has been requested.

    (2)    Next, we must determine whether release of this information would serve "the public interest generally" (i.e., whether it would "shed light on the performance of the agency's statutory duties").

    (3)    Finally, we must determine whether the public interest in disclosure is greater than the privacy interest of the individual in withholding.

The information that we are withholding consists solely of the information listed above pertaining to the individuals named in the records. The Office of the Secretary has determined that the individuals to whom this information pertains have a substantial privacy interest in it. Additionally, we have determined that the disclosure of this information would shed little or no light on the performance of the agency's statutory duties and that, on balance, the public interest to be served by its disclosure does not outweigh the privacy interest of the individuals in question, in withholding it.

In short, we have determined that release of the information that we have withheld would constitute a clearly unwarranted invasion of the privacy of these individuals, and that, therefore, it may be withheld pursuant to Exemption 6.

Timothy Murphy, Attorney-Advisor, was consulted in reaching this decision. Sue Ellen Sloca, Office of the Secretary FOIA Officer, is responsible for making this decision.

3. If you believe that the decision to withhold this information is incorrect, you may file an FOIA appeal by writing to the FOIA Appeals Officer, U.S. Department of the Interior, 1849 C Street, NW, Mail Stop 7456, MIB, Washington, D.C. 20240. Your appeal letter must be received no later than 30 calendar days (excluding Saturdays, Sundays and legal holidays) after the date of our response (this letter). Your appeal letter must be marked, both on its envelope and at the top of its first page, with the legend "FREEDOM OF INFORMATION APPEAL." Your appeal letter must be accompanied by a copy of your original FOIA request (a copy of which is enclosed with our response, for your convenience) and a copy of this letter, along with a brief explanation of why you believe that this decision is in error.

4. The FOIA fee for the processing of your request is $ 36.40, calculated as follows:

| | | |
|---|---|---|
| 1 | hour of Professional search time | @ $ 8.45 per ¼ hour |
| 20 | pages of photocopying | @ $ 0.13 per page |

However, insofar as we have classed your request as a "media-use" request, which entitles you to receive 100 reproduced pages without charge before being asked to pay for the copying of any additional records, your fee for the processing of your request, after the subtraction of your entitlements, is $0.00.

This concludes the Office of the Secretary's response to your request.

If you have any questions regarding our response to your request, you may contact Lizzette Katilius by phone at (202) 565-1109, by fax at (202) 219-2374, by e-mail at osfoia@nbc.gov, or by mail at U.S. Department of the Interior, MS 1413 MIB, Washington, D.C. 20240. Within the Office of the Secretary, we are committed to providing you, our customer, with the highest quality of service possible.

Sincerely,

Sue Ellen Sloca
Office of the Secretary
FOIA Officer

3

Enclosure

**PRIVACY ACT notice:** *Before you choose to contact us, electronically, there are a few things you should know. The information you submit, including your electronic address, may be seen by various people. We will scan a copy of your request into our electronic OS FOIA administrative/image file. We will key the information that you provide to us into our electronic OS FOIA tracking file. We may share it with other individuals, both within and without the Department, involved in Freedom of Information Act administration. You may be contacted by any of these individuals. In other limited circumstances, including requests from Congress or private individuals, we may be required by law to disclose some of the information you submit. Also, e-mail is not necessarily secure against interception. If your communication is very sensitive, or includes personal information like your bank account, charge card, or social security number, you might want to send it by postal mail, instead.*

4

**EXHIBIT DD**

**CREW** | citizens for responsibility
and ethics in washington

April 21, 2005

Willie Chism
U.S. Department of Interior
BIA Office of Information and Policy
625 Herndon Parkway
Herndon, Virginia 20170

**BY FAX: 703-735-4416**

Dear Ms. Chism:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, et seq. This request is a follow-up to a FOIA request CREW directed to the Unites States Department of the Interior on April 5, 2005, and is made at the suggestion of Sue Ellen Sloca, Office of the Secretary, FOIA Officer.

This request relates to any contact, dating from January 1, 2001, to the present, that any of the individuals who occupied the following positions in DOI's Bureau of Indian Affairs from January 1, 2001, to the present may have had regarding the Agua Caliente Tribe of Palm Springs, California, the Tigua Tribe of El Paso, Texas, the Saginaw Chippewa Tribe of Michigan, the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, and the Jena Band of Choctaw Indians. More specifically, we are seeking information pertaining to efforts of any and all of the above-delineated tribes to receive DOI approval for gaming, including, but not limited to, any lobbying efforts by private individuals or members of Congress.

Director, IIT Office of American Indian Trust
Director, IAE Office of Audit and Evaluation
Deputy Director, IAE Office of Audit and Evaluation
Director, ISC Office of Self Governance
Compact Negotiation Manager, ISC Office of Self Governance
Compact Negotiation Specialist, ISC Office of Self Governance
Director, OIE Office of Indian Education Programs
Deputy Director, OIE Office of Indian Education Programs

Director, OIE Office of Indian Education Programs
Deputy Director, OIE Office of Indian Education Programs
Chief, 13 Branch of Management Information Services
Chief, 30 Division of Planning/Oversight and Evaluation
Chief, 30 Branch of Planning
Deputy Commissioner of Indian Affairs
Director, 120 Congressional and Legislative Affairs
Legislative Coordinator, 120 Congressional and Legislative Affairs
Director, 130 Indian Gaming Management Staff
Secretary, 130 Indian Gaming Management Staff
Management Analyst, 130 Indian Gaming Management Staff
Director, Office of Trust Responsibilities
Director, Office of Information Resources Management
Director, Office of Tribal Services
Secretary, Division of Tribal Government Services
Chief, Branch of Tribal Enrollment
Chief, Branch of Tribal Relations
Director, Office of Management and Administration
Director, Office of Economic Development

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process used by the Department of the Interior to approve tribal bids for casinos on Indian lands.

CREW is a non-profit corporation, organized under section 501©(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within twenty (20) working days as required under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents which are available within that time period.

If you have any questions about this request or foresee any problems in releasing fully the requested records within the twenty-day period, please call either Anne Weismann or Melanie

Sloan at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Sincerely,

ANNE L. WEISMANN

4

TRANSMISSION VERIFICATION REPORT

```
TIME   : 04/21/2005 09:59
NAME   : CREW
FAX    : 2025885563
TEL    : 2025885565
SER.#  : BROM2J870748
```

```
DATE,TIME          04/21  09:58
FAX NO./NAME       7037354416
DURATION           00:01:28
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```